**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

DIANE HARRELL, Individually and as Administratrix
of the Estate of Samuel D. Harrell, III, Deceased,

Plaintiff,

-against-

NEW YORK STATE DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION ("DOCCS"); DOCCS
Acting Commissioner ANTHONY J. ANNUCCI, in his
individual capacity; DOCCS Deputy Commissioner JOSEPH
BELLNIER, in his individual capacity; NEW YORK STATE
OFFICE OF MENTAL HEALTH ("OMH"); OMH
Commissioner ANN MARIE T. SULLIVAN, M.D., in her
individual capacity; OMH Employees MAURA ENDRIZZI,
JASON LAUFMAN, and MARIA D. ZAPROWSKI, in their
individual capacities; NEW YORK STATE
CORRECTIONAL OFFICERS & POLICE BENEVOLENT
ASSOCIATION, INC. ("NYSCOPBA"); Agents and
Officials of NYSCOPBA ## 1, 2, 3, ETC., in their individual
capacities; Former Fishkill Correctional Facility
Superintendent WILLIAM CONNOLLY, in his individual
capacity; DOCCS Corrections Lieutenant ALAN WASHER,
in his individual capacity; DOCCS Corrections Sergeants
JOHN U. CARRERAS, JOSEPH GUARINO, and TERRY
W. SHULTIS, in their individual capacities; DOCCS
Corrections Officers ANDERSON, BERONI, JUSTIN T.
CHARPENTIER, DeFREESE, THOMAS A. DICKINSON,
BRYAN W. EULL, PAUL F. HARRINGTON, BENJAMIN
V. MATHEW, MARIO MOREL, ROBERT D. MICHELS,
O'CONNOR, RUTGER RIVERA, JOHN L. ROLLE, TIM J.
SALERNO, CHRIS SHERMAN, JUSTIN M. SORENSEN,
and JOHN L. YAEGER, in their individual capacities;
DOCCS Medical Professionals FREDERICK BELANGER,
SHAWNA L. HEALY, MARGARET BERRY, SELESTE
LEIGH WALLACE, MARIANNE SARVIS, SHIRLEY R.
ROBERTS, in their individual capacities; and JOHN and
JANE DOE ## 1, 2, 3, ETC., in their individual and official
capacities.

Defendants.

------------------------------------------------------------------------ X

**FIRST AMENDED**
**COMPLAINT**


**JURY TRIAL**
**DEMANDED**

No. 15-cv-7065 (RA)

Plaintiff DIANE HARRELL, individually and as Administratrix of the Estate of Samuel D. Harrell, III, Deceased, by her attorneys, Beldock Levine & Hoffman LLP, as and for her Complaint, alleges as follows:

## PRELIMINARY STATEMENT

1.     This is a civil rights action brought by DIANE HARRELL, individually and as Administratrix of the Estate of Samuel D. Harrell, III, for the wrongful death of her husband, Mr. Harrell.

2.     On April 21, 2015, Mr. Harrell, a person diagnosed with bipolar disorder with psychotic features, and known to exhibit delusional behavior, was suffering under the false belief that his sister and wife were picking him up that evening to take him home from the Fishkill Correctional Facility, where he was incarcerated. Two individuals incarcerated with Mr. Harrell sought help, requesting that two corrections officers obtain immediate medical assistance. Instead, the sergeant on duty called in additional corrections officers. Moments after the additional corrections officers arrived, Mr. Harrell, who had been calmly sitting on a chair, panicked, stood up, and moved toward the exit. Mr. Harrell took only a few steps before corrections officers tackled him to the ground and handcuffed him. Numerous corrections officers, including members of the notorious "Beat Up Squad,"[1] proceeded to punch, kick, stomp, and jump on Mr. Harrell's face, head, neck, back, sides, and legs as he lay handcuffed on the ground to the point where Mr. Harrell became motionless and unresponsive. Two officers then threw Mr. Harrell's limp, lifeless body down the stairs. The Orange County Medical Examiner's Office ruled Mr. Harrell's death a homicide.

---

[1] Inmates at Fishkill Correctional Facility refer to this group of corrections officers as the "Beat Up Squad," the "Beat Down Squad," and "Team Beat Down." Members of this group include, among others, Defendants EULL, also known as "Captain America," and Defendants MICHELS, YAGER, ANDERSON, and O'CONNOR.

3.      The gravity of these actions, as discussed in greater detail below, embody the very antithesis of civil rights, including rights to be free from cruel and unusual punishment, the right to equal protection under the law, and the rights of those with disabilities to receive appropriate accommodations for their disabilities.

4.      Plaintiff now seeks redress for the acts and omissions of the Defendants, which were contrary to law and the norms of a civilized society, and caused the wrongful death of Mr. Harrell.

## JURISDICTION

5.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of plaintiff's constitutional and civil rights.

6.      Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

## VENUE

7.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to plaintiff's claims took place.

## JURY DEMAND

8.      Plaintiff demands a trial by jury in this action on each and every one of his claims for which jury trial is legally available.

## THE PARTIES

9.      Samuel D. Harrell, III was a 30-year-old African American man who resided at Fishkill Correctional Facility ("Fishkill"), a medium security prison located in Beacon, New York.

Mr. Harrell was housed in Building 21, a mental health unit, at the time of his death on April 21, 2015.

10.     Diane Harrell is the surviving spouse of Mr. Harrell. On June 22, 2015, New York Surrogate's Court, Dutchess County, issued Limited Letters of Administration appointing her the Administratrix of the Estate of Samuel D. Harrell, III.

11.     The New York State Department of Corrections and Community Supervision ("DOCCS") is a department of the State of New York with its central office in Albany, New York. DOCCS is responsible for the confinement and habitation of incarcerated individuals held in correctional facilities throughout the State. DOCCS receives federal funding.

12.     At all relevant times herein, Fishkill Correctional Facility was operated and maintained by DOCCS, which is a department and/or agency of the State of New York with its central office in Albany, New York. DOCCS is responsible for the confinement and habitation of incarcerated individuals held in correctional facilities throughout the State.

13.     At all times relevant herein, Defendant ANTHONY J. ANNUCCI was the Acting Commissioner of DOCCS. ANNUCCI was responsible for the policy, practice, supervision, implementation, and conduct of all DOCCS matters and was responsible for the training, supervision, and conduct of all DOCCS personnel, including DOCCS Defendants referenced herein. As the Acting Commissioner of DOCCS, ANNUCCI was also responsible for the care, custody, and control of all incarcerated individuals in DOCCS's facilities. In addition, at all relevant times herein, ANNUCCI was responsible for enforcing the rules of DOCCS, and for ensuring that DOCCS personnel obeyed the laws of the United States and the State of New York. At all relevant times herein, Defendant ANNUCCI was acting under color of state law and in the

scope of his capacity as an agent, servant, and/or employee of DOCCS. Defendant ANNUCCI is sued in his individual capacity.

14.     At all times relevant herein, Defendant JOSEPH BELLNIER was the Deputy Commissioner of DOCCS. BELLNIER, as Deputy Commissioner of DOCCS, was responsible for the policy, practice, supervision, implementation, and conduct of all DOCCS matters and was responsible for the training, supervision, and conduct of all DOCCS personnel, including Defendants referenced herein. As Deputy Commissioner, BELLNIER was also responsible for the care, custody, and control of all incarcerated individuals in DOCCS's facilities. In addition, at all relevant times herein, BELLNIER was responsible for enforcing the rules of DOCCS, and for ensuring that DOCCS personnel obeyed the laws of the United States and the State of New York. At all relevant times herein, Defendant BELLNIER was acting under color of state law and in the scope of his capacity as an agent, servant, and/or employee of DOCCS. Defendant BELLNIER is sued in his individual capacity.

15.     The New York State Office of Mental Health ("OMH") is a department of the State of New York with its central office in Albany, New York. OMH is responsible for operating and managing psychiatric services across the State, including at Fishkill Correctional Facility. As an OMH Level 1 facility, Fishkill is required to provide access to residential mental health care and have full-time mental health staff available at the facility. The mental health service providers at Fishkill are OMH staff members. OMH receives federal funding.

16.     At all relevant times herein, Defendant ANN MARIE T. SULLIVAN, M.D., was Commissioner of OMH. She was responsible for the operation and administration of all OMH facilities within the department, including at Fishkill. At all relevant times herein, Defendant

SULLIVAN was acting under color of state law and in the scope of her capacity as an agent, servant, and/or employee of OMH. Defendant SULLIVAN is sued in her individual capacity.

17.    At all relevant times herein, Defendants OMH Medical Professionals MAURA ENDRIZZI, JASON LAUFMAN, and MARIA D. ZAPROWSKI (collectively, the "OMH MEDICAL PROFESSIONALS") were medical and mental health care providers, employed by OMH, who were responsible for the medical care of people incarcerated at DOCCS facilities. OMH MEDICAL PROFESSIONALS participated in, had knowledge of, and/or failed to intervene in the denial of adequate medical care to Mr. Harrell. Their duties included, but were not limited to, caring for all patients in their assigned areas of Fishkill, including, but not limited to, cell visits, physical and psychological examinations, identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric and/or psychological counseling, coordination of treatment with other providers at Fishkill, direct oversight and supervision of medical staff, and/or provision of emergency medical care. At all relevant times herein, the OMH MEDICAL PROFESSIONALS acted under color of state law and within the scope of their capacities as agents, servants, and/or employees of OMH. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of New York State correctional facilities, including DOCCS and OMH policies, procedures, directives, and protocols, in additional to all relevant local, state, and federal statutes and regulations. The OMH MEDICAL PROFESSIONALS are sued in their individual capacities.

18.    The New York State Correctional Officers & Police Benevolent Association, Inc. ("NYSCOPBA"), is a domestic not-for-profit corporation registered with the New York State Department of State with its principle offices located at 102 Hackett Boulevard, Albany, New

York 12209. NYSCOPBA is a labor union that represents corrections officers and sergeants assigned to DOCCS facilities, including Fishkill.

19.     NYSCOPBA agents and/or employees whose names are presently unknown (collectively, the "NYSCOPBA Defendants") were agents and officials of NYSCOPBA who conspired to cover-up the murder of Samuel Harrell.

20.     At all relevant times herein, Defendant WILLIAM CONNOLLY was the Superintendent of Fishkill. As Superintendent, CONNOLLY was the highest-ranking member of Fishkill, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in Fishkill. He was also responsible for the care, custody, and control of all individuals incarcerated in Fishkill. While carrying out the acts and omissions alleged herein, CONNOLLY was acting in the scope of his capacity as an agent, servant, and/or employee of DOCCS, and acted under color of state law. Defendant CONNOLLY is sued in his individual capacity.

21.     Upon information and belief, at all times relevant herein, DOCCS Medical Professional Defendants FREDERICK BELANGER, SHAWNA L. HEALY, MARGARET BERRY, SELESTE LEIGH WALLACE, MARIANNE SARVIS,  and SHIRLEY R. ROBERTS (collectively, the "DOCCS MEDICAL PROFESSIONAL Defendants") were medical and mental health care providers, employed by DOCCS, and who were responsible for the medical care of incarcerated people and participated in, had knowledge of, and/or failed to intervene in the denial of adequate medical care to Mr. Harrell. Their duties included, but were not limited to, caring for all patients in their assigned areas of Fishkill, including, but not limited to, cell visits, physical and psychological examinations, identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of

psychiatric and/or psychological counseling, coordination of treatment with other providers at Fishkill, direct oversight and supervision of medical staff, and/or provision of emergency medical care. At all relevant times herein, the DOCCS MEDICAL PROFESSIONAL Defendants were acting under color of state law and within the scope of their capacities as agents, servants, employees, and/or contracted personnel of Defendant DOCCS. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of New York State correctional facilities, including DOCCS policies, procedures, directives, and protocols, in additional to all relevant local, state, and federal statutes and regulations. The DOCCS MEDICAL PROFESSIONAL Defendants are sued in their individual capacities.

22.     At all times relevant herein, Lieutenant ALAN WASHER, Sergeant JOHN U. CARRERAS, Sergeant JOSEPH GUARINO, and Sergeant TERRY W. SHULTIS, and a number of unnamed senior officers (collectively, the "SENIOR FISHKILL OFFICERS") were high-ranking corrections officers at Fishkill including, but not limited to, Captains, Lieutenants, and Sergeants who participated in, had knowledge of, and/or failed to intervene in the murder of Mr. Harrell. At all times relevant herein, the SENIOR FISHKILL OFFICERS were acting under color of state law and within the scope of their capacities as agents, servants, and employees of Defendant DOCCS.  Defendants CARRERAS, GUARINO, and SHULTIS, and the other SENIOR FISHKILL OFFICERS, are sued in their individual capacities.

23.     At all times relevant herein, Defendant Corrections Officers ANDERSON, BERONI, JUSTIN T. CHARPENTIER, DeFREESE, THOMAS A. DICKINSON, BRYAN W. EULL, PAUL F. HARRINGTON, BENJAMIN V. MATHEW, MARIO MOREL, ROBERT D. MICHELS,  O'CONNOR, RUTGER RIVERA, JOHN L. ROLLE, TIM J. SALERNO, CHRIS SHERMAN, JUSTIN M. SORENSEN, and JOHN L. YAEGER, and JOHN and JANE DOES

(collectively, the "FISHKILL OFFICERS") were, at all relevant times, Fishkill corrections officers who physically assaulted without lawful justification Mr. Harrell and/or failed to appropriately respond to Mr. Harrell's emergency medical needs and, upon information and belief, participated in, had knowledge of, and/or failed to intervene in the murder of Mr. Harrell. At all times relevant herein, the FISHKILL OFFICERS were acting under color of state law and within the scope of their capacities as agents, servants, and employees of DOCCS. The FISHKILL OFFICERS are sued in their individual capacities.

## STATEMENT OF FACTS

### Mr. Harrell's Background

24.     Samuel D. Harrell, III was born in Houston, Texas on December 18, 1984.

25.     In 2010, Mr. Harrell was involuntarily committed to Benedictine Hospital in Kingston, New York where he was diagnosed with bipolar disorder with psychotic features, held for seven days, and put on anti-psychotic medication. He was discharged and remained on his medication.

26.     Mr. Harrell married Diane Marie Lichwick on October 14, 2011.

27.     On April 16, 2014, Mr. Harrell was sentenced by the State of New York to eight years in prison for criminal sale of a controlled substance in the third degree, a non-violent crime.

28.     He was transferred to Fishkill Correctional Facility on or about January 25, 2015. At Fishkill, he was housed in Building 21, a building that contained a high population of incarcerated individuals suffering from mental illnesses.

29.     The FISHKILL OFFICERS, OMH MEDICAL PROFESSIONALS, and DOCCS MEDICAL PROFESSIONALS knew of Mr. Harrell's condition and his tendency to exhibit delusional behavior.

30.     Upon information and belief, the DOCCS and/or OMH MEDICAL PROFESSIONALS had a policy or practice that resulted in the failure to prescribe Mr. Harrell medication, the failure to provide medicine prescribed and the failure to provide the necessary treatment to address his bipolar disorder.

**Events Leading to Mr. Harrell's Murder**

31.     On November 19, 2014, after Mr. Harrell had been incarcerated for approximately seven months, his mother passed away.

32.     Mr. Harrell was very close to his mother and took her death particularly hard.

33.     He began showing signs of depression and antisocial behavior immediately after learning of her passing.

34.     On or about January 25, 2015, Mr. Harrell was transferred to Fishkill where he was housed in Building 21.

35.     From the moment Mr. Harrell arrived at Fishkill, he was repeatedly punished without cause, beaten, and abused by a number of the FISHKILL OFFICERS, including Defendant CHARPENTIER. This included being sent to solitary confinement, known as the Special Housing Unit, or the "SHU."

36.     Upon information and belief, the FISHKILL OFFICERS made false allegations that caused incarcerated individuals, including Mr. Harrell, to be forced into solitary confinement without cause.

37.     On April 2, 2015, Mr. Harrell was placed in solitary confinement for alleged possession of synthetic marijuana, also known as K-2. Upon information and belief, he was not in possession of K-2.

38.     Pursuant to the Settlement Agreement reached on or about April 27, 2007, in *Disability Advocates, Inc. v. New York State Office of Mental Health*, New York State and its agencies agreed to commit to "a heightened level of care for all inmates with serious mental illnesses." The Agreement "provides for additional treatment modalities and benefits for persons with mental illness in the State's correctional system." *See* Private Settlement Agreement, *Disability Advocates, Inc. v. New York State Office of Mental Health*, 02-cv-4002 (GEL) (Dkt. No. 94) (S.D.N.Y. April 27, 2007), at 2.

39.     Defendants were on notice that a mental illness can be aggravated in solitary confinement, turning an inmate's mental disability into a mental disability crisis.[2]

40.     Upon information and belief, Incarcerated individuals with serious mental illness ("SMI") housed in SHU are required to receive two hours per day of out-of-cell therapeutic programming and mental health treatment five days per week.

41.     Upon information and belief, OMH staff are required to make two daily rounds to inmates in solitary confinement at Fishkill.[3]

42.     Prior to April 21, 2015, OMH Medical Professionals had diagnosed Mr. Harrell had with mood disorder, antisocial personality disorder, and bipolar disorder.

43.     Under the care of DOCCS MEDICAL PROFESSIONALS and/or OMH MEDICAL PROFESSIONALS, Mr. Harrell had been taking medication to treat his bipolar disorder for years.

44.     Though the OMH Medical Professionals were required to ensure that Mr. Harrell

---

[2] *See* Private Settlement Agreement, *Disability Advocates, Inc. v. New York State Office of Mental Health*, 02-cv-4002 (GEL) (Dkt. No. 94) (S.D.N.Y. April 27, 2007).

[3] Report: *Fishkill Correctional Facility: 2012*, CORRECTIONAL ASS'N OF N.Y., (Apr. 2012) at 30 ("DOCCS staff informed us that OMH staff makes two daily rounds in the S-block").

was compliant with taking his medication, Mr. Harrell had not taken his required medication prior to the incident.

45.    Harrell was released from solitary confinement on April 17, 2015, only four days before his death.

46.    Upon leaving solitary confinement, Mr. Harrell returned to Section B-West of Building 21. He immediately began exhibiting signs of depression and paranoia.

**The Day of Mr. Harrell's Murder**

47.    On April 21, 2015, Mr. Harrell was noticeably depressed and upset.

48.    Late in the afternoon, Mr. Harrell began telling a number of FISHKILL OFFICERS and other incarcerated individuals that he was going home that evening.

49.    He told incarcerated individuals that we was meeting his wife and sister, and that he needed to pack his things.

50.    In the early evening of April 21, 2015, Mr. Harrell was inside his cell in section B-West of Building 21.

51.    At approximately 8:00 p.m., Mr. Harrell began packing his personal belongings from his cell into several bags.

52.    Two incarcerated individuals took Mr. Harrell to the Corrections Officer's desk in section B-West of Building 21 and told Defendant Corrections Officers BENJAMIN V. MATHEW and ROBERT D. MICHELS, that Mr. Harrell needed immediate medical attention as a result of his delusional thoughts.

53.    Upon information and belief, Corrections Officers MATHEW and/or MICHELS reported Mr. Harrell's condition to SGT. GUARINO.

54. Defendant Corrections Officer MICHELS, aware that Mr. Harrell was having a mental health episode, also called Defendant OMH Nurse JASON LAUFMAN and informed him that Mr. Harrell was exhibiting unusual behavior. Defendant LAUFMAN told the officer to bring Mr. Harrell to the Regional Medical Unit (RMU) to be seen by OMH Medical Professionals.

55. While this was being reported to the SGT. GUARINO, Mr. Harrell sat silently next to the Corrections Officers' desk.

56. Upon information and belief, rather than secure the necessary medical attention or ensuring Mr. Harrell, was transported to the RMU, SGT. GUARINO simply called for backup, including eventually sending out a so-called "Red Dot" alarm, which alerts all officers to respond to an incident where an inmate is engaging in inappropriate physical resistance to guards.

57. At approximately, 8:50 p.m., Mr. Harrell was surrounded by several FISHKILL OFFICERS, including officers who had previously physically and mentally abused him.

58. The initial response to Mr. Harrell served only to exacerbate whatever mental health crisis he was then experiencing and, as a result, Mr. Harrell stood up from his chair and began heading down the hallway of B-West towards B-East.

59. Approximately four to six FISHKILL OFFICERS, including Corrections Officers DICKINSON, SALERNO, MICHELS, and MATHEW followed him. One FISHKILL OFFICER jumped on Mr. Harrell's back and tackled him facedown onto the B-Center ground. The other FISHKILL OFFICERS including MATHEW, MICHELS, SALERNO, and/or DICKINSON, then jumped on top of Mr. Harrell and tackled him to the ground.

60. Almost immediately after being tackled, Mr. Harrell was handcuffed. Despite being handcuffed, a number of FISHKILL OFFICERS, including DICKINSON, SALERNO,

MICHELS, MATHEW, and YAGER, began to kick and punch Mr. Harrell about the head and body.

61.     Even after Mr. Harrell was handcuffed, and while he was still restrained on the ground by several FISHKILL OFFICERS, other FISHKILL OFFICERS who were on duty on the floor came over and punched, kicked, stomped, and/or jumped on Mr. Harrell's head, neck, arms, back, sides, and/or legs.

62.     The Corrections Officers who participated in beating Mr. Harrell included, but are not limited to, Defendants ANDERSON, BERONI, DICKINSON, HARRINGTON, MATHEW, MICHELS, MOREL, O'CONNOR, RIVERA, SALERNO, SHERMAN, SORENSEN, ROLLE, and/or YAGER , all of whom are white. Some of these officers are members of the notorious "Beat up Squad."

63.     At one point, Defendant DICKINSON stood on Mr. Harrell with one foot on his head and the other on his neck.

64.     At no time during this encounter did Mr. Harrell attempt to resist or strike back at the officers.

65.     Mr. Harrell was beaten so viciously that he defecated and urinated on himself.  He eventually became motionless and lost consciousness. Yet, FISHKILL OFFICERS continued to physically assault him.

66.     SENIOR FISHKILL OFFICERS, including Sergeants SHULTIS and GUARINO, witnessed both the initial beating and the continued assault on Mr. Harrell by the many FISHKILL OFFICERS. At no point did they intervene or attempt to intervene to stop the brutal assault and ultimate murder of Mr. Harrell.

67.     None of the corrections officers responding to this incident attempted to intervene to stop the brutal beating of Mr. Harrell.

68.     During the unprovoked and unnecessary physical assault on Mr. Harrell, one or more of the FISHKILL OFFICERS yelled, "You fucking nigger."

69.     The FISHKILL OFFICERS shouted at incarcerated individuals observing the abuse of Mr. Harrell words to the effect of, "Get the fuck back in the dayroom before you're next."

70.     The level of physical abuse against Mr. Harrell was so severe that, upon information and belief, Defendant MICHELS had an asthma attack from overexerting himself during the beating.

71.     Upon information and belief, Defendant HARRINGTON claimed to need medical assistance as a result of his involvement in the assault on Mr. Harrell to make it seem as though there had been a struggle.

72.     DOCCS and/or OMH MEDICAL PROFESSIONALS were called to respond to provide medical assistance to Defendants MICHELS and HARRINGTON, but not to provide medical assistance to Mr. Harrell.

73.     The DOCCS MEDICAL PROFESSIONALS responded to both Defendant MICHELS's asthma attack and to Defendant HARRINGTON's alleged injury, but did not attend to Mr. Harrell, who lay motionless on the ground.

74.     After the DOCCS and/or OMH MEDICAL PROFESSIONALS, and some FISHKILL OFFICERS, took Defendants MICHELS and HARRINGTON away on stretchers, SGT. GUARINO yelled at an unresponsive Mr. Harrell words to the effect of, "You want to put your hands on my staff? Drag this motherfucker to the stairs."

75. A JANE DOE Defendant went into the dayroom in B-Center and obtained bedsheets to cover Mr. Harrell's body.

76. As Mr. Harrell was being wrapped in bedsheets, one JOHN DOE FISHKILL OFFICER said words to the effect of, "I don't think he is going to make it."

77. Defendant SGT. GUARINO then ordered two FISHKILL OFFICERS including, upon information and belief, Defendant EULL, to throw Mr. Harrell down the stairwell.

78. Defendants EULL and DICKINSON dragged Mr. Harrell's restrained, limp body, wrapped in bedsheets toward the stairwell and threw him down the steps.

79. Upon information and belief, Senior Fishkill Officers witnessed the Fishkill Corrections Officers drag Mr. Harrell on the ground and throw him down the steps, but failed to intervene and stop the continued assault.

80. Mr. Harrell's body landed in an unnaturally distorted position against the ground floor wall of the stairwell.

81. As Mr. Harrell lay at the bottom of the stairwell, a number of FISHKILL OFFICERS brought a wheelchair and attempted to seat Mr. Harrell's motionless body into the wheelchair.

82. Upon information and belief, the FISHKILL OFFICERS did so to make it appear as though Mr. Harrell was still alive.

83. After placing Mr. Harrell in the wheelchair, Defendant COs covered him in bedsheets and strapped his right hand to his left leg and his left hand to his right leg with ripped bedsheets.

84. After Mr. Harrell was taken off the unit, one FISHKILL OFFICER ordered an inmate to clean up Mr. Harrell's blood off the floor.

85.     The FISHKILL OFFICERS brought the wheelchair carrying Mr. Harrell towards the building's main walkway where they created a human wall to obstruct the view of witnesses as the wheelchair approached a general population area.

86.     Upon information and belief, as the FISHKILL OFFICERS pulled the wheelchair through Building 21, Mr. Harrell's feet dragged along the ground.

87.     The FISHKILL OFFICERS, SENIOR FISHKILL OFFICERS, and/or DOCCS MEDICAL PROFESSIONALS, took Mr. Harrell to the RMU.

88.     After Mr. Harrell was wheeled into the RMU, he was placed in a corner and ignored for several minutes.

89.     Though the OMH MEDICAL PROFESSIONALS were present and knew of Mr. Harrell's presence, they failed to treat him.

90.     The FISHKILL MEDICAL PROFESSIONALS and/or OMH Medical Professionals including, but not limited to, Defendant Nurses HEALY, BERRY, and ROBERTS, treated the two allegedly injured officers, ignoring Mr. Harrell.

91.     Defendant MARIANNE SARVIS called an ambulance for the Defendants MICHELS and HARRINGTON, ignoring Mr. Harrell as he sat strapped into his wheelchair.

92.     After Defendant SARVIS called an ambulance for the two officers, the Fishkill Medical Professions and/or OMH Medical Professionals turned their attention to Mr. Harrell.

93.     The Fishkill Medical Professionals then attempted to resuscitate Mr. Harrell.

94.     Defendant BELANGER instructed Defendant Nurse MARGARET BERRY to call for an ambulance, and they falsely reported that Mr. Harrell had overdosed.

95.     Twenty minutes after the two corrections officers had been taken to the hospital, another ambulance arrived. The FISHKILL OFFICERS placed Mr. Harrell's limp body into the ambulance.

96.     Mr. Harrell was taken to St. Luke's Cornwall Hospital where, at approximately 10:19 p.m., emergency room doctors pronounced him dead.

97.     An autopsy performed by the Orange County Medical Examiner determined that Mr. Harrell's death was a homicide caused by a physical altercation with corrections officers. The autopsy further determined that there were no illegal drugs in Mr. Harrell's system.

**Notice of issues with the evening shift of Corrections Officers in Fishkill's Building 21/21A**

98.     In 2005, the Correctional Association of New York ("CANY") issued a report about Fishkill Correctional Facility, which identified "troubling problems" with the corrections officers on the 3:00 to 11:00pm shift.[4] The report describes that these officers were "prone to abusive behavior and intimidation." These came in the form of both physical and verbal abuses, including racial slurs.

99.     The 2005 CANY report also described the inmate grievance process in Fishkill as "ineffective, especially in addressing complaints about officer treatment," and incarcerated individuals were often in fear of retaliation for issuing complaints.

100.    In 2005, CANY met with the Fishkill Superintendent "and his Executive Team" to "review" CANY's findings, specifically with respect to the "tense relations among inmates and younger officers, particularly on the 3:00 to 11:00pm shift."[5]

---

[4] Prison Monitoring Report: *Fishkill Correctional Facility,* CORRECTIONAL ASS'N OF N.Y., at 4, 10–11 (Feb. 15, 2005).

[5] *Id*. at 10.

101.    In 2012, CANY released another report about Fishkill Correctional Facility. CANY officials discussed the findings with high level DOCCS and Fishkill officials. The 2012 CANY report again noted with particular concern frequent reports of "staff harassment, threats, retaliation, frequent issuance of tickets and SHU time, and sexual and other abuse, including on medical health units and particularly in the evening shift and in housing areas 21 and 21A" of Fishkill. The 2012 report went on to state "both the evening shift (3pm-11pm) and dorms 21 and 21A were repeatedly mentioned in interviews, general survey comments, and when asked specially about specific locations/times of abuse." One incarcerated person housed in this area referred to the staff during this shift as the "Beat Up Squad."[6]

102.    Upon information and belief, prior to the death of Mr. Harrell, Defendants ANNUCCI, BELLNIER, SULLIVAN, and CONNOLLY were fully aware of the contents of CANY's 2005 and 2012 reports.

103.    Defendants ANNUCCI, BELLNIER, SULLIVAN, CONNOLLY, the SENIOR OFFICER Defendants, and the FISHKILL OFFICERS are, and have been, aware that the evening shift in Buildings 21 and 21A were, and continue to be, staffed with corrections officers who routinely abuse and deliberately disregard the safety of incarcerated people.

104.    Mr. Harrell was murdered in Building 21 during the 3:00-11:00pm evening shift.


**The Conspiracy to Cover up Mr. Harrell's Murder**

105.    Upon information and belief, the SENIOR OFFICER Defendants, the FISHKILL OFFICERS, including members of the "Beat Up Squad," and the NYSCOPBA Defendants conspired to cover up Mr. Harrell's murder.

---

[6] Prison Monitoring Report: *Fishkill Correctional Facility*, CORRECTIONAL ASS'N OF N.Y., at 30 (Apr. 2012).

106.   This included repeatedly screaming "he's resisting arrest" when it was clear to witnesses that Mr. Harrell was unresponsive.

107.   On the day of Mr. Harrell's murder, the FISHKILL OFFICERS' attempted to cover-up Mr. Harrell's cause of his death by alleging that Mr. Harrell had overdosed, and falsely reporting the same to St. Luke's Hospital Cornwall.

108.   Upon information and belief, NYSCOPBA, the representatives of New York State Employees of DOCCS including the FISHKILL OFFICERS, became involved in the conspiracy to cover-up the cause of Mr. Harrell's death, and, through its agents, played a significant role in advancing the cover-up. In fact, days after the incident, James Miller, spokesman for NYSCOPBA, falsely informed the *Poughkeepsie Journal*, that Mr. Harrell had assaulted officers and that "several officers were needed to restrain Harrell after the assault."[7]

109.   In addition, the NYSCOPBA Defendants distributed a flier related to the murder of Mr. Harrell, falsely claiming that Mr. Harrell died from an overdose. A copy of the flier is attached hereto as Exhibit 1.

110.   Upon information and belief, NYSCOPBA's agents, including the NYSCOPBA Defendants, conferred with the FISHKILL OFFICERS and received incriminating admissions of criminal behavior. Instead of coming forward and promptly reporting this information, NYSCOPBA and its agents suppressed it and adopted and orchestrated an affirmative strategy of obstruction and falsification.

111.   Upon information and belief, inmate witnesses to Mr. Harrell's murder have been physically and verbally threatened by the defendant corrections officers, including supervisors.

---

[7] John W. Barry, *State identifies inmate who died at Fishkill prison*, POUGHKEEPSIE J., http://www.poughkeepsiejournal.com/story/news/local/2015/04/24/inmate-state-fishkill-harrell/26306813/ (Apr. 24, 2015).

112.    For example, after Mr. Harrell's restrained body, wrapped in bedsheets, was thrown down the stairs, one FISHKILL OFFICER grabbed an inmate witness's neck, forcefully pushed him into a corner, and yelled words to the effect of: "You better forget what you saw here if you ever want to make it home alive."

113.    Witnesses of Mr. Harrell's murder who have spoken with state police investigators, the DOCCS Investigator General ("I.G."), or attorneys investigating the case have been physically retaliated against by the Defendant FISHKILL OFFICERS, including being placed in solitary confinement without cause. Some of these witnesses qualify as SMIs.

114.    The Defendant FISHKILL OFFICERS threatened witnesses that, if they spoke out, the "same thing" that happened to Mr. Harrell would happen to them.

115.    The Defendant FISHKILL OFFICERS have called witnesses who have spoken out about Mr. Harrell's murder "Nigger lovers" and "Rats."

116.    The Defendant FISHKILL OFFICERS told several incarcerated individuals before they were to meet with a group of attorneys investigating Mr. Harrell's murder that nothing would be done to protect them and that they would be next.

117.    Days after Mr. Harrell's murder, a Defendant FISHKILL OFFICER gathered the incarcerated individuals in the dayroom on the B floor of Building 21 and informed them that the treatment on the floor would not change.

118.    Nearly all witnesses to Mr. Harrell's murder have been placed in solitary confinement for alleged conduct that did not occur.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 Against ANNUCCI, BELLNIER, SULLIVAN, CONNOLLY, DOCCS and OMH MEDICAL PROFESSIONALS, the SENIOR OFFICERS, and the FISHKILL OFFICERS)**

119.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

120.     The acts of ANNUCCI, BELLNIER, SULLIVAN, CONNOLLY, the SENIOR OFFICER Defendants, and the FISHKILL OFFICERS, constituted conduct under color of state law which deprived Mr. Harrell of rights, privileges, and immunities secured by the Constitution and laws of the United States.

121.     These Defendants, acting under the pretense and color of law, permitted, tolerated, and were deliberately indifferent to a pattern and practice of abuse and neglect at Fishkill, specifically in Building 21/21A, which included false accusations to force mentally ill individuals into the SHU, and brutal physical attacks constituting torture on individuals after they had already been handcuffed, including being thrown down a stairwell.

122.     Defendants ANNUCCI, BELLNIER, SULLIVAN, CONNOLLY, also knew that a pattern of serious physical abuse and neglect against inmates in Buildings 21/21A during the 3:00p.m. to 11:00p.m. shift, specifically targeting mentally ill inmates, existed at Fishkill prior to and including the time of Mr. Harrell's murder. Despite this knowledge, they consciously permitted the continuance of the custom or practice of severe physical and emotional abuse and deprived the incarcerated individuals of adequate medical care. Their failure to take measures to curb this pattern of abuse and neglect constituted acquiescence in the known unlawful behavior of their subordinates and deliberate indifference to the rights and safety of the incarcerated individuals in their care and custody, including Mr. Harrell. Their conduct was affirmatively linked to the deprivation of Mr. Harrell's rights, and was a substantial factor in the continuation of such abuse and a proximate cause of the constitutional violations alleged in this Complaint and ultimately of Mr. Harrell's death.

123.    By reason of the foregoing, and by failing to diagnose and/or treat Mr. Harrell's Serious Mental Illness, and thereafter, brutalizing him in a way that can only be described as torture, these Defendants deprived Mr. Harrell of rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution.

124.    Defendants ANNUCCI, BELLNIER, SULLIVAN, CONNOLLY, acting under the pretense and color of law, also permitted, tolerated, and were deliberately indifferent to a pattern and practice of racially discriminatory treatment of incarcerated individuals, including Mr. Harrell. Specifically, these Defendants have been aware of the existence of the "Beat Up Squad," consisting of an all-white group of FISHKILL OFFICERS, which operates in a discriminatory manner against incarcerated individuals of minority backgrounds.

125.    The SENIOR FISHKILL OFFICERS each had the opportunity to intercede on behalf of Mr. Harrell to prevent the excessive use of force that resulted in Mr. Harrell's death, but, due to their intentional conduct or deliberate indifference, declined to do so.

126.    The DOCCS and/or OMH MEDICAL PROFESSIONALS, the SENIOR FISHKILL OFFICERS, and the FISHKILL OFFICERS were deliberately indifferent to Mr. Harrell's serious medical needs prior to his murder by failing to respond to a request and apparent need for medical assistance, as well as the moments during his brutal beating at the hands of the FISHKILL OFFICERS while they attended to two FISHKILL OFFICERS while Mr. Harrell lie motionless on the ground.

127.    The SENIOR FISHKILL OFFICERS and the FISHKILL OFFICERS have been operating with impunity, brutalizing and torturing incarcerated individuals of minority

backgrounds, including Mr. Harrell. During the murder of Mr. Harrell, this all-white group of officers and Defendant Sergeants SHULTIS and GUARINO used racial slurs when enforcing the attack and ultimate murder of Mr. Harrell.

128.    Defendant CONNOLLY was deliberately indifferent to his subordinate's unconstitutional conduct, and his inaction is affirmatively linked to the deprivation of Mr. Harrell's rights. He is thus liable under the theory of Supervisory Liability.

129.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983 – Conspiracy to Violate the Fourth, Eighth,**
**and Fourteenth Amendments Against CONNOLLY, DOCCS and OMH MEDICAL**
**DEFENDANTS, the SENIOR OFFICERS, the NYSCOPBA Defendants, and the**
**FISHKILL OFFICERS)**

130.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

131.    The acts of the Defendants constituted conduct under color of state law which deprived Mr. Harrell of rights, privileges, and immunities secured by the Constitution and laws of the United States.

132.    The Defendants knew of the fatal beating of Mr. Harrell and conspired together to cover it up by falsely claiming that Mr. Harrell was "resisting" while he was being beaten when he was handcuffed and unresponsive, and by placing his unresponsive body in a wheelchair, and, thereafter, claiming that Mr. Harrell had overdosed on synthetic marijuana.

133.    As a direct and proximate result of the conduct alleged herein, the Defendants conspired to and, thereafter, deprived Mr. Harrell of the following clearly established rights under the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, more specifically:

a.    the right to be free from the use of excessive and unreasonable force and seizure;

b.    the right to be free from cruel and unusual punishment; and

c.    the right to equal protection under the law.

134.    In committing the acts and omissions complained of herein, the Defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens, Mr. Harrell in this case, from infringement by other law enforcement officers in their presence.

135.    These Defendants did, under color of law, conspire with one another and with NYSCOPBA to deprive Mr. Harrell of his constitutional rights.

136.    In furtherance of this conspiracy to cover up the acts of brutality that occurred in Building 21/21A at approximately 8:45 p.m. and thereafter, defendants engaged in the following:

a.    Jointly devising a false, exculpatory version of the events of April 21, 2015, which would be told to investigating authorities;

b.    Submitting false reports, statements, and testimony to support and corroborate the fabricated charges lodged against Mr. Harrell to insulate the FISHKILL OFFICERS from administrative and criminal sanctions;

c.    Lying to authorities concerning events of April 21, 2015;

d.    Meeting and discussing information concerning the state of the investigation and present a united front in the face of any questioning;

e.      Circulating false and defamatory information concerning Mr. Harrell, in an effort to depict Mr. Harrell as a man with the propensity for violence; and

f.      Retaliating against incarcerated individual witnesses by charging them with false violations to diminish the credibility of any information and testimony they provided, sending these individuals to the SHU for excessive amounts of time, and verbally abusing them.

137.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

## THIRD CAUSE OF ACTION
### (42 U.S.C. § 1985(2) – Conspiracy to Impede Due Course of Justice Against the NYSCOPBA Defendants, SGT. GUARINO, and the FISHKILL OFFICERS)

138.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

139.    Each of the individual FISHKILL OFFICER Defendants including, but not limited to, Officers ANDERSON, BERONI, JUSTIN T. CHARPENTIER, DeFREESE, THOMAS A. DICKINSON, BRYAN W. EULL, PAUL F. HARRINGTON, BENJAMIN V. MATHEW, MARIO MOREL, ROBERT D. MICHELS,  O'CONNOR, RUTGER RIVERA, JOHN L. ROLLE, TIM J. SALERNO, CHRIS SHERMAN, JUSTIN M. SORENSEN, and JOHN L. YAEGER,, conspired together, along with the NYSCOPBA Defendants, to impede the due course of justice, with the intent of denying Mr. Harrell and his Estate the equal protection of the laws.

140.    As a direct and proximate result of the Defendants' conduct, Plaintiff Diane Harrell, individually and as Administratrix of the Estate of Samuel D. Harrell III, claims as damages

pecuniary loss including medical expenses, funeral expenses and lost earnings, as well as non-economic damages including conscious pain and mental anguish and physical injury suffered by the Mr. Harrell prior to his death and the consequential loss of enjoyment of life.

141.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

**FOURTH CAUSE OF ACTION**
**(42 U.S.C. § 1985(3) – Conspiracy to Interfere with Civil Rights**
**Against NYSCOPBA Defendants, SENIOR FISHKILL OFFICERS, and the**
**FISHKILL OFFICERS)**

142.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

143.    42 U.S.C. § 1985(3) prohibits two or more persons from conspiring to deprive an individual of equal protection of the law on the basis of race.

144.    Each of the individual SENIOR FISHKILL OFFICER Defendants, including, but not limited to, Lieutenant ALAN WASHER, Sergeant JOHN U. CARRERAS, Sergeant JOSEPH GUARINO, and Sergeant TERRY W. SHULTIS, and a number of unnamed senior officers as well as the NYSCOPBA Defendants knew of the conspiracy to deprive Mr. Harrell of the equal protection of the law on the basis of his race in violation of 42 U.S.C. § 1985(3).

145.    Each of the individual FISHKILL OFFICER Defendants, including but not limited to Officers ANDERSON, BERONI, JUSTIN T. CHARPENTIER, DeFREESE, THOMAS A. DICKINSON, BRYAN W. EULL, PAUL F. HARRINGTON, BENJAMIN V. MATHEW, MARIO MOREL, ROBERT D. MICHELS,  O'CONNOR, RUTGER RIVERA, JOHN L.

ROLLE, TIM J. SALERNO, CHRIS SHERMAN, JUSTIN M. SORENSEN, and JOHN L. YAEGER,  as well as the NYSCOPBA Defendants knew of the conspiracy to deprive Mr. Harrell of the equal protection of the law on the basis of his race in violation of 42 U.S.C. § 1985(3).

146.    This is evidenced by the conduct of the "Beat Up Squad" which was comprised of only white Corrections Officers.

147.    Defendants have known about the "Beat Up Squad," including their racially motivated abusive actions, which has acted with impunity since at least 2012.

148.    The NYSCOPBA Defendants have conspired to cover up these racially motivated abuses, including against Mr. Harrell.

149.    The Defendants had the power and ability to prevent the conspiracy but refused and/or neglected to do so.

150.    In furtherance of their conspiracy, Defendants subjected Mr. Harrell to unlawful acts thereby depriving him of his rights to the equal protection of the laws and equal privileges and immunities under the laws in contravention of the Fourteenth Amendment to the United States Constitution.

151.    As a direct and proximate result of the Defendants' conduct, Plaintiff Diane Harrell, individually and as Administratrix of the Estate of Samuel D. Harrell III, claims as damages pecuniary loss including medical expenses, funeral expenses and lost earnings, as well as non-economic damages including conscious pain and mental anguish and physical injury suffered by the Mr. Harrell prior to his death and the consequential loss of enjoyment of life.

152.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious

28

indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

### FIFTH CAUSE OF ACTION
**(42 U.S.C. § 1986 – Neglect to Prevent Interference with Civil Rights Against NYSCOPBA Defendants, SENIOR FISHKILL OFFICERS, and the FISHKILL OFFICERS)**

153.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

154.    42 U.S.C. § 1986 makes liable any person who knows that any of the wrongs conspired to be done, and mentioned in 42 U.S.C. § 1985, are about to be committed and has the power to prevent or aid in preventing the commission of those wrongs but refuses or neglects to do so.

155.    These Defendants knew of the conspiracy to deprive Mr. Harrell of the equal protection of the law on the basis of his race in violation of 42 U.S.C. § 1985(3).

156.    These Defendants also knew of the conspiracy to impede the due course of justice with the intent to deprive Mr. Harrell and his heirs the equal protection of the laws.

157.    These Defendants had the power and ability to prevent or aid in preventing the commission of the wrongs conspired to be done but refused and/or neglected to do so.

158.    These Defendants therefore violated 42 U.S.C. § 1986.

159.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

## SIXTH CAUSE OF ACTION
### (Title VI of the Civil Rights Act of 1964
### Against DOCCS)

160.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

161.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance.

162.    DOCCS is a recipient of federal funds, and is subject to the mandate of Section 504.

163.    The acts and conduct of DOCCS complained of herein were motivated by racial animus, and were intended to discriminate on the basis of race.

164.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

## SEVENTH CAUSE OF ACTION
### (Title II of the ADA and the Rehabilitation Act
### Against DOCCS and OMH)

165.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

166.    Title II of the ADA, 42 U.S.C. §§ 12131-12134, extends to state and local governments the non-discrimination provisions of the Rehabilitation Act. It requires that the services, programs, and activities of state and local governments be administered in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

167.    Under Section 504 of the Rehabilitation Act, recipients of federal funds, including state agencies, must reasonably accommodate persons with disabilities in their facilities, program activities, and services. It further requires such recipients to modify such facilities, services, and programs as necessary to accomplish this purpose.

168.    DOCCS and OMH are recipients of federal funds, and are subject to the mandate of Section 504.

169.    The ADA prohibits public entities from excluding qualified individuals with disabilities from participating in some service, program, or activity by reason of their disability.

170.    Pursuant to the Settlement Agreement achieved in *Disability Advocates, Inc. v. New York State Office of Mental Health*, New York State and its agencies agreed to commit to "a heightened level of care for all inmates with serious mental illnesses" and also "provides for additional treatment modalities and benefits for persons with mental illness in the State's correctional system." *See* Private Settlement Agreement, *Disability Advocates, Inc. v. New York State Office of Mental Health*, 02-cv-4002 (GEL) (Dkt. No. 94), at 2.

171.    DOCCS and OMH knew that Mr. Harrell had a severe mental disability. Rather than accommodating Mr. Harrell's disability, the Defendants violated Mr. Harrell's rights under Title II of the ADA and Section 504 by depriving and excluding Mr. Harrell of OMH level one services required by reason of his disability.

172.    Additionally, the DOCCS and/or OMH MEDICAL PROFESSIONALS failed to accommodate Mr. Harrell's disability after two incarcerated persons specifically made an earlier request for emergency mental health care for Mr. Harrell.

173.    The DOCCS and/or OMH MEDICAL PROFESSIONALS tended to Corrections Officers' injuries and failed to attend to Mr. Harrell as he lay dying or dead on the floor.

174. The SENIOR FISHKILL OFFICERS including, but not limited to Lieutenant ALAN WASHER, Sergeant JOHN U. CARRERAS, Sergeant JOSEPH GUARINO, and Sergeant TERRY W. SHULTIS, failed to respond to Mr. Harrell.

175. But for the SENIOR FISHKILL OFFICERS and the FISHKILL OFFICERS' wanton disregard of Mr. Harrell's apparent medical emergency, and the DOCCS and/or MEDICAL PROFESSIONAL Defendant's egregious failures in responding to Mr. Harrell, Mr. Harrell would not have walked away in a panic and would not have been tackled to the floor and ultimately murdered.

176. Additionally, but for DOCCS and OMH's failure to designate Mr. Harrell as OMH Level 1 due to his Serious Mental Illness, Mr. Harrell's bipolar disorder, psychotic tendencies, and delusions would have been controlled.

177. Defendants' failure to accommodate Mr. Harrell's disability was the proximate cause of his death.

### EIGHTH CAUSE OF ACTION
### (Wrongful Death Against SULLIVAN and the
### OMH MEDICAL PROFESSIONALS)

178. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

179. The acts of the Defendants, alleged herein, wrongfully caused the death of Mr. Harrell.

180. As a direct and proximate result of these Defendants' violations of the Constitutional rights of Mr. Harrell, which resulted in his death, Plaintiff Diane Harrell, individually and as Administratrix of the Estate of Samuel D. Harrell, III, claims as damages pecuniary loss including medical expenses, funeral expenses and lost earnings, as well as non-

economic damages including conscious pain and mental anguish and physical injuries suffered by the Mr. Harrell prior to his death and the consequential loss of enjoyment of life.

## NINTH CAUSE OF ACTION
### (State Constitutional Claim under Article I § 12
### Against SULLIVAN and
### the OMH MEDICAL PROFESSIONAL Defendants)

181.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

182.    By reason of the foregoing, by denying Mr. Harrell adequate medical care and killing him, defendants deprived him of rights, remedies, privileges, and immunities guaranteed to every New Yorker by Article I § 12 of the New York Constitution.

183.    Defendants acted under pretense and color of state law and in their individual capacities and within the scope of their respective employment. Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants willfully, knowingly, and with the specific intent to deprive Mr. Harrell of his constitutional rights secured by Article I § 12 of the New York Constitution.

184.    Defendants, their officers, agents, servants, and employees, were responsible for the deprivation of Mr. Harrell's state constitutional rights.

185.    Defendant SULLIVAN, as employer of some or all of the Medical Defendants, was deliberately indifferent to her subordinates' unconstitutional conduct, and her inaction is affirmatively linked to the deprivation of rights. She is thus liable under the doctrine of Supervisory Liability.

186.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious

indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

## TENTH CAUSE OF ACTION
### (Negligence Against SULLIVAN and the OMH MEDICAL PROFESSIONAL Defendants)

187.   Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

188.   Defendants owed the Mr. Harrell a duty to exercise reasonable care not to act in a manner that unreasonably threatened the health and safety of Mr. Harrell, including, but not limited to, properly diagnosing and treating Mr. Harrell's Serious Mental Illness, properly responding to his need for emergency medical care, and treating him during the incident that resulted in his death.

189.   Defendants breached their duty of care and were grossly negligent by, *inter alia*, recklessly and negligently:

a.     Failing to properly diagnose and/or treat Mr. Harrell's bipolar disorder;

b.     Failing to provide Mr. Harrell with medical attention when it was urgently needed;

c.     Failing to treat him during the incident that resulted in his death; and

d.     Otherwise recklessly and/or intentionally causing Mr. Harrell to sustain injury that resulted in his death.

190.   These Defendants' actions, and failure to act, were intentional, willful, with reckless and exhibited wanton disregard for human life and were malicious.

191.   These Defendants' acts and failure to act caused Mr. Harrell to sustain grievous bodily injury including physical and mental pain and, ultimately, his death.

192.   Defendant SULLIVAN, as the ultimate supervisor of some or all of the Medical Defendants, was deliberately indifferent to her subordinate's unconstitutional conduct, and her

inaction is affirmatively linked to the deprivation of rights. She is thus liable under the doctrine of Supervisory Liability.

193.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Negligent Hiring, Training, and Supervision Under State Law Against SULLIVAN)

194.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

195.    Defendant SULLIVAN, as OMH Commissioner, was negligent in hiring, screening, training, supervision and retention of OMH MEDICAL PROFESSIONAL Defendants

196.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Mr. Harrell that shocks the conscience. They are therefore also liable for punitive damages.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands the following relief against the Defendants, jointly and severally:

(a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

(b)    punitive damages to the extent allowable by law;

(c)    attorneys' fees;

(d)     the costs and disbursements of this action;

(e)     interest;

(f)     such other and further relief as the Court deems just and proper.


Dated:        New York, NY
              May 9, 2018

                                          BELDOCK LEVINE & HOFFMAN LLP
                                          99 Park Avenue, PH/ 26th Fl.
                                          New York, New York 10016
                                          (212) 490-0400


                                     By: _____
                                          Jonathan C. Moore
                                          Luna Droubi

                                          *Attorneys for Plaintiff Diane Harrell,
                                          Individually and as Administratrix of the
                                          Estate of Samuel D. Harrell, III*

# EXHIBIT 1



# FISHKILL UNITED

On April 15, 2015 at approximately 11:11am, CONvict Harrell was locked up for CONtraband an Smuggling (K2). Under Mr. CONnolly's lax policies and second chance mentality, CONvict Harrell received onl *14 days*. Mr. CONnolly then had CONvict Harrell released into the same building and same floor. Just 6 shor days after getting out of the SHU, CONvict Harrell was able to get resupplied and start drugging again.

On April 21, 2015 at approximately 8:30pm, this CONvict was so stoned that he assaulted numerous officers, sending two of them to the outside hospital and a half dozen or so to the RMU. The CONvict ended up deceased. 6 BCI investigators, The Office of Special Investigations and numerous union reps responded to this facility. So where was our not-so-Superintendent you ask??? *HE WAS TOO INEBRIATED TO EVEN SHOW UP!!!* He lives a whole 400 yards from the front door of this facility and didn't respond. He never even checked on his staff or their well being.

Mr. CONnolly has cut staff from the visiting room by 25% a month ago. Since then, both visitors and inmates have established a monopoly on the drug trade at Fishkill CF.

On a more positive note Mr. CONnolly, you have rid this facility of plastic tubular hangers, forks that your 1300 tax-paying employees eat their lunches with and umbrellas that keep us dry and in good health to be able to come to work. Your lists of accomplishments are overwhelming...
One more thing, as if this facility couldn't have gotten any more unprofessional, we see that you snuck your son back in the door. Let's take a look at what he brings to the table:

- 2 DUI charges, one with narcotics in his possession.
- On 12/23/2013 he beat a female half to death on state property. I mean right in your own house. This resulted in an assault charge and 2 orders of protection for poor Nicole M.
- A totaled Gator worth over $10,000. (Pictures available)
- A Perimeter fence replaced. (Pictures available)

How about the civilian plumber he started a fight with (over his parole crush)???
How about the C.O. he pulled over on the bridge, where the State Police had to be called???

All of the trouble you were able to get him out of in Beacon by threatening them with the firing range, *LIKE IT'S ACUALLY YOURS*. The best part of all this isn't even the blatant violation of the Nepotism Directive. I think my favorite thing is when the $80,000 worth of Oxycontin went missing from the storehouse. We all know who the number one suspect was, especially since he was offering everyone some. Of course he got caught with some and he went to rehab, but then three months later, by some miracle, Dep Chuck found that box of dope and put it back into circulation before anyone could actually count it.

*What's wrong???   There were no better candidates for a civil service job???   Who was his investigator???  What cheese dick did you beg to OK this???*

