**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

DIANE HARRELL, Individually and as
Administratrix of the Estate of Samuel D. Harrell, III,
Deceased,

                             Plaintiff,

      -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION
("DOCCS") et al.,

                           Defendants.

-------------------------------------------------------------------- X

No. 15-cv-7065 (RA)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
THE STATE DEFENDANTS' PARTIAL MOTION TO DISMISS
THE AMENDED COMPLAINT**

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. STATEMENT OF FACTS.................................................................................................... 3
   1. Mr. Harrell's Background.................................................................................................. 3

   2. Events Leading to Mr. Harrell's Murder ........................................................................ 4

   3. The Day of Mr. Harrell's Murder .................................................................................... 4

   4. Notice of Issues with the Evening Shift of Corrections Officers in Fishkill's
   Building 21/21A ..................................................................................................................... 6

   5. The Cover Up...................................................................................................................... 8

III. LEGAL STANDARD......................................................................................................... 8

IV. ARGUMENT....................................................................................................................... 9
   POINT I:    PLAINIFF'S  §  1983  CLAIMS  AGAINST  DEFENDANTS
   ANNUCCI, BELLNIER, SULLIVAN, AND CONNOLLY MUST SURVIVE................. 9

      1. Plaintiff Sufficiently Alleged Personal Involvement of the Supervisory
      Defendants ............................................................................................................................ 10

         A. Defendants Annucci, Bellnier, and Sullivan......................................................... 10

         B. Defendant Connolly ................................................................................................. 11

      2. Failure to Provide Adequate Medical Care................................................................. 12

      3. Failure to Protect............................................................................................................. 15

      4. Equal Protection.............................................................................................................. 19

   POINT II:    PLAINTIFF    STATES    A    §    1983    CLAIM    AGAINST
   CHARPENTIER ....................................................................................................................... 20

   POINT III: PLAINTIFF STATES A § 1983 CLAIM REGARDING HIS MENTAL
   HEALTH TREATMENT ......................................................................................................... 22

   POINT IV:    PLAINTIFF PROPERLY PLED A § 1983 CONSPIRACY TO
   VIOLATE MR. HARRELL'S CONSTITUTIONAL RIGHTS.......................................... 23

      1. Conspiracy to Cover-Up a Constitutional Violation Can Be Actionable Under §
      1983...................................................................................................................................... 24

      2. Plaintiff Properly Pled a § 1983 Conspiracy............................................................... 25

i

POINT V:   PLAINTIFF PROPERLY PLED A CLAIM UNDER 42 U.S.C. § 1985(2) THAT THE STATE DEFENDANTS OBSTRUCTED A STATE INVESTIGATION WITH THE INTENT TO DENY MR. HARRELL EQUAL PROTECTION OF THE LAWS AND A CORRESPONDENT § 1986 CLAIM.............. 30

POINT VII:   PLAINTIFF'S COMPLAINT ADEQUATELY PLEADS A § 1985(3) CONSPIRACY TO DEPRIVE MR. HARRELL OF EQUAL PROTECTION OF THE LAWS BASED ON HIS RACE ................................................. 32

POINT VII: PLAINTIFF SUCCESSFULLY PLED A TITLE VI CLAIM....................... 34

POINT VIII: MR. HARRELL WAS DENIED A SERVICE IN VIOLATION OF THE ADA AND REHABILITATION ACT ...................................................................... 35

POINT IX: THE WRONGFUL DEATH CLAIMS MUST SURVIVE............................. 39

   1. Plaintiff's Wrongful Death Claims Against Nurse Endrizzi, Nurse Laughman, and Nurse Zaprowski Relate Back to the Original Complaint and Are Not Time Barred............................................................................................................... 39

   2. Plaintiff's Wrongful Death Claim Against OMH Commissioner Sullivan Should Survive ........................................................................................................... 40

POINT X: STATE CONSTITUTIONAL CLAIMS SHOULD NOT BE DISMISSED ................................................................................................................. 42

POINT XI: THE NEGLIGENCE CLAIM WAS PROPERLY PLED ............................... 43

POINT XII:   PLAINTIFF PROPERLY PLED LIABILITY FOR NEGLIGENT HIRING, TRAINING, AND SUPERVISION .................................................... 44

V. CONCLUSION ..................................................................................................... 46

# TABLE OF AUTHORITIES

**Cases**

*Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166 (2d Cir. 2013) ................................... 9

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ................................................................ 35

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ............................................ 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 9, 11

*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) .................................... 37

*Barrett v. United States*, 689 F.2d 324 (2d Cir. 1982) ................................................ 28

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................ 9, 11

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) ............................... 26, 31, 32

*Bellere v. Gerics*, 759 N.Y.S.2d 105 (2d Dept. 2003) ................................................ 45

*Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) ...................................................... 45

*Bolton v. Goord*, 992 F. Supp. 604 (S.D.N.Y. 1998) ................................................ 21

*Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991) ................................................ 13

*Boykin v. KeyCorp*, 521 F.3d 202 (2d Cir. 2008) ...................................................... 9

*Brock v. Wright*, 315 F.3d 158 (2d Cir. 2002) ........................................................ 15

*Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000) ........................................ 28

*Brown v. State*, 89 N.Y.2d 172 (1996) .................................................................... 43

*Buran v. Coupal*, 87 N.Y.2d 173 (1995) ................................................................ 40

*Burns v. City of Concord*, 99 F. Supp. 3d 1007 (N.D. Cal. 2015) .............................. 25

*Cash v. Cty. of Erie*, 654 F.3d 324 (2d Cir. 2011) .................................................... 18

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) .............................................. 14, 21

*Chavez v. City of New York*, 99 A.D.3d 614 (1st Dep't 2013) .................................... 45

*Chong v. N.Y. City Tr. Auth.*, 441 N.Y.S.2d 24 (2d Dep't. 1981) .............................. 41

*Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002) ................................ 23

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) ........................................... 19

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) ................................................................. 10

*Conte v. County of Nassau*, 2008 U.S. Dist. LEXIS 25694  (E.D.N.Y. Mar. 31, 2008) ............. 20

*Dacosta v. City of N.Y.*, 296 F. Supp. 3d 569 (E.D.N.Y. 2017) ........................................... 40

*Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302 (S.D.N.Y. 2014) ............................... 9

*DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir. 2003) ..................................................... 20

*Eberts v. Makarczuk*, 861 N.Y.S.2d 731 (2d Dep't 2008) ................................................. 41

*Erickson v. Pardus*, 551 U.S. 89 (2007) .......................................................................... 9

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976) .................................................................... 13

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................... 14, 18, 21

*Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005) (report and recommendation), *rej'd in part on other grounds*, *Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005) .................. 24

*Giano v. Senkowski*, 54 F.3d 1050 (2d Cir. 1995) ............................................................ 19

Gloster v. Wong, 1997 U.S. Dist. LEXIS 3991, 1997 WL 151766 (N.D.N.Y. March 28, 1997) 27

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) .............................................................. 32, 33

*Guardians Assoc. v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582 (1983) ............................... 35

*Guglielmoni v. Alexander*, 583 F. Supp. 821 (D. Conn. 1984) .......................................... 21

*Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008) ...................................................... 25

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980) ................................................................................................................. 26

*Harrison v. Barkley*, 219 F.3d 132 (2d Cir. 2000) .......................................................... 21

*Haus v. City of New York*, 2011 U.S. Dist. LEXIS 155735 (S.D.N.Y. Aug. 31, 2011) .............. 43

*Helling v. McKinney*, 509 U.S. 25 (1993) ....................................................................... 21

*Johnson v. California*, 543 U.S. 499 (2005) ................................................................... 20

*Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998) .................................................. 37

*Koch v. Christie's Int'l PLC*, 699 F.3d 141 (2d Cir. 2012) ................................................. 9

iv

*Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538 (2010) ............................................................ 39

*Kush v. Rutledge*, 460 U.S. 719 (1983)..................................................................................... 31

*Langley v. Coughlin*, 888 F.2d 252 (2d Cir. 1989) ...................................................................... 13

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)..................................................... 36, 37

*Lowrance v. Coughlin*, 862 F. Supp. 1090 (S.D.N.Y. 1994)........................................................ 17

*Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001) .............................................................. 43

*McGarty v. Town of Carmel*, 997 F. Supp. 435 (S.D.N.Y. 1998) ................................................ 27

*Meriwether v. Coughlin*, 879 F.2d 1037 (2d Cir. 1989) .............................................................. 16

*Morell v. Balasubramanian*, 70 N.Y.2d 297 (1987)............................................................... 41, 42

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182 (2d Cir. 1996) ................................ 8

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999) .................................................................. 24

*Pattiasina v. Sewalt*, No. 12 Civ. 6170, 2015 U.S. Dist. LEXIS 131319 (S.D.N.Y. Sept. 28, 2015) ..................................................................................................................................... 17

*Penn. Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998)........................................................ 35

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979)................................................................. 34

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002)....................................................................... 21

*Phillip v. Schriro*, 2014 U.S. Dist. LEXIS 117720, 2014 WL 4184816 (S.D.N.Y. Aug. 22, 2014) (Abrams, J.)............................................................................................................................ 16

*Phillips v. Girdich*, 408 F.3d 124 (2d Cir. 2005)........................................................................ 20

*Randle v. Alexander*, 960 F.Supp.2d 457 (S.D.N.Y. 2013)......................................................... 27

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) ........................................ 34

*Rhynders v. Greene*, 255 A.D. 401 (3d Dep't 1938) ................................................................... 42

*Ronzani v. Sanofi S.A.*, 899 F.2d 195 (2d Cir. 1990)................................................................... 46

*Rounseville v. Zahl*, 13 F.3d 625 (2d Cir. 1994)......................................................................... 24

*Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983)........................................................................ 25

*Sanchez v. State of N.Y.*, 99 N.Y.2d 247 (2002) ......................................................................... 42

*Small v. City of New York*, 274 F. Supp. 2d 271 (E.D.N.Y. 2003), *rev'd in part on other grounds*, *Pena v. Deprisco*, 432 F.3d 98 (2d Cir. 2005). ......................................................................... 25

*Smith v. Carpenter*, 316 F.3d 178 (2d Cir. 2003) ........................................................................ 14

*Stamile v. County of Nassau*, 2014 U.S. Dist. LEXIS 39320  (E.D.N.Y. Mar. 25, 2014)........... 17

*Stevens v. Goord*, 535 F. Supp. 2d 373 (S.D.N.Y. 2008) ............................................................. 13

*Trammell v. Keane*, 338 F.3d 155 (2d Cir. 2003) ........................................................................ 21

*Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), *cert. granted*, 137 S. Ct. 293 (2016)................ 10

*Ugarriza v Schmieder*, 46 N.Y.2d 471 (1993) ............................................................................. 44

*United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 840 n.1 (1983) ........... 31

*United States v. Rivera*, 971 F.2d 876, 890 (2d Cir. 1992)........................................................... 29

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (*per curiam*)........................................... 20

*Walker v. Schult*, 717 F.3d 119 (2d Cir. 2013) ............................................................................ 10

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) ................................................................... 25

*Weiland v. Palm Beach County Sheriff's Office*,792 F.3d 1313 (11th Cir. 2015) ........................ 25

*Williams v. Smith*, 781 F.2d 319 (2d Cir. 1986) ..................................................................... 17, 18

*Yeskey v. Commonwealth of Pa. Dep't of Corr.*, 118 F.3d 168 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998).......................................................................................................................................... 37

*Zappulla v. Fischer*, 2013 U.S. Dist. LEXIS 49728 (S.D.N.Y. Apr. 5, 2013) ............................ 16

**Federal Statutes**

28 U.S.C. § 1331 ................................................................................................................. 8

29 U.S.C. § 794 ................................................................................................................. 34

42 U.S.C. § 1983 ............................................................................................................... 23

42 U.S.C. § 1985(2) ................................................................................................... 29, 30

42 U.S.C. § 1985(3) ................................................................................................... 31, 32

42 U.S.C. § 1986 ............................................................................................................... 29

**State Statutes**

EPTL § 5-4.1(1) ............................................................................................................... 38

## PRELIMINARY STATEMENT

Plaintiff Diane Harrell, individually and as Administratrix of the Estate of Samuel D. Harrell, III, submits this Memorandum in Opposition to the Partial Motion to Dismiss filed by the New York State Department of Corrections and Community Supervision ("DOCCS"), DOCCS Acting Commissioner Anthony Annucci, DOCCS Deputy Commissioner Joseph Bellnier, the New York State Office of Mental Health ("OMH"), OMH Commissioner Ann Marie Sullivan, OMH Nurse Maura Endrizzi, OMH Nurse Jason Laughman, OMH Nurse Maria Zaprowski, Former Fishkill Correctional Facility ("Fishkill") Superintendent William Connolly, Sergeant ("Sgt.") John Carreras, Sgt. Joseph Guarino, Sgt. Terry Shultis, Corrections Officer ("CO") Justin Charpentier, CO Thomas Dickinson, CO Bryan Eull, CO Paul Harrington, CO Benjamin Mathew, CO Mario Morel, CO Robert Michels,[1] CO Rutger Rivera, CO John Rolle, CO Tim Salerno, CO Chris Sherman, CO Justin Sorensen, CO John Yager, DOCCS Nurse Administrator Frederick Belanger, DOCCS Nurse Shawna Healy, DOCCS Nurse Margaret Berry, DOCCS Nurse Seleste Wallace, DOCCS Nurse Marianne Sarvis, and DOCCS Nurse Shriley Roberts (collectively the "State Defendants"). For the reasons stated herein, State Defendants' Partial Motion should be denied in its entirety.[2]

This case arises from the death of Samuel Harrell, a 30-year-old African American man who was beaten to death on April 21, 2015 by New York State corrections officers while he was

---

[1] Defendants are correct that Plaintiff has withdrawn her claims against CO Martin Michels.

[2] As the State Defendants have not moved to dismiss § 1983 claims for excessive force and deliberate medical indifference against Defendants Lt. Washer, Sgt. Crareras, Sgt. Guarino, Sgt. Shultis, CO Dickinson, CO Eull, CO Harrington, CO Mathew, CO Morel, CO Michels, CO Rivera, CO Rolle, CO Salerno, CO Sherman, CO Sorenson, CO Yager, Nurse Administrator Belanger, Nurse Healy, Nurse Berry, Nurse Wallace, Nurse Sarvis, Nurse Roberts, OMH Nurse Laughman, and OMH Nurse Zaprowski arising out of the April 21, 2015 incident, the case will proceed with respect to those Defendants regardless of the outcome of the pending motion. (Defs' Mot. at 2 n.4.)

incarcerated at Fishkill.[3] Shortly after his release from two weeks in solitary confinement, Mr. Harrell, who had a history of mental health issues well known to the Defendants, mistakenly believed that he was going to be picked up by his wife and sister and taken home. He started to pack his belongings. Concerned with his behavior, two inmates escorted Mr. Harrell to two corrections officers and requested emergency mental health assistance for Mr. Harrell. Instead of providing assistance, numerous corrections officers—including some who were members of a notorious group of corrections officers called the "Beat Up Squad"—brutally beat, kicked, and punched Mr. Harrell to death. The perpetrators then conspired with these very Defendants, high level DOCCS and OMH employees and union representatives, to cover up Mr. Harrell's murder both on the night of Mr. Harrell's murder and thereafter through impeding the investigation.

Defendants do not dispute Plaintiff's allegations and details regarding the horrific murder of Mr. Harrell. Instead, they seek immunity for high level DOCCS and OMH officials who had knowledge of the troubling issues in Building 21/21A of Fishkill, where Harrell was housed, yet failed to take the necessary remedial steps. These officials, including Defendants DOCCS Acting Commissioner Annucci, DOCCS Deputy Commissioner Bellnier, the OMH Commissioner Sullivan, and Former Fishkill Correctional Facility ("Fishkill") Superintendent Connolly (hereinafter, the "Supervisory Defendants"), despite their knowledge of serious deficiencies, failed to remedy the repeated and persistent abuses of inmates by lower level corrections officers and medical and mental health professionals, particularly in Building 21/21A. The Defendants also move to dismiss the conspiracy claims of all State Defendants, the ADA and/or Rehabilitation Claim, a number of state law claims against OMH Commissioner Sullivan, as well as a number of

---

[3] Plaintiff incorporates all facts set forth in Plaintiff's Opposition to the Motion to Dismiss submitted by the New York State Correctional Officers & Police Benevolent Association, Inc. (NYSCOPBA), and its agents and employees.

state law claims against others.

Defendants also seem to be moving to dismiss claims against Defendant CO Charpentier, who was directly involved in the incident by placed Mr. Harrell in solitary confinement on false grounds when he knew that Mr. Harrell had a serious mental health illness, exacerbating Mr. Harrell's illness which ultimately led to his death. With respect to Mr. Harrell's mental health care treatment, the Complaint contains detailed allegations regarding the failure of actors, including OMH nurses and officials present on the night of his murder.

After a painstakingly detailed pre-litigation investigation, to the extent possible prior to the benefit of discovery, the Plaintiff has more than sufficiently alleged facts to support all of her claims. To the extent that the Court perceives any deficiencies, Plaintiff specifically requests the opportunity to amend her Complaint to amplify the allegations and add facts recently discovered by Plaintiff.

Following his death, Mr. Harrell's wife, Diane Harrell, brought this lawsuit as the Administratrix of his Estate and on her own behalf. She brought claims against DOCCS and OMH as well as DOCCS and OMH officers and officials. She also sued NYSCOPBA and its agents and officials for, *inter alia*, interfering with the administration of justice by attempting to cover up the facts of Mr. Harrell's death.[4]

The State Defendants' motion overlooks well-pleaded facts and misinterprets the governing legal standards. As such, the partial motion should be denied in its entirety.

## STATEMENT OF FACTS

### 1.  Mr. Harrell's Background

---

[4] The NYSCOPBA Defendants moved to dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(6) on October 26, 2018 (Dkt. No. 197).

On April 21, 2015, Samuel Harrell, a 30-year-old African American inmate, was incarcerated in Building 21 at Fishkill Correctional Facility. (Am. Compl. ¶¶ 9, 34.)[5] He had served less than one year of an eight-year sentence for criminal sale of a controlled substance in the third degree, a non-violent crime. (*Id.* ¶ 27.)

Prior to his incarceration, Mr. Harrell had suffered for years from diagnosed bipolar disorder with psychotic features. (*Id.* ¶ 25.) Defendants were well aware of this history. Immediately after arriving at Fishkill, Mr. Harrell was subject to abuse by corrections officers, including sending him to solitary confinement ("SHU"). (*Id.* ¶¶ 36–37.)

### 2. Events Leading to Mr. Harrell's Murder

In or around November 2014, while he was incarcerated, Mr. Harrell learned that his mother had passed away. (*Id.* ¶ 31.) He took her death particularly hard and immediately began showing signs of depression, which exacerbated his bipolar disorder. (*Id.* ¶ 33.) On April 2, 2015, Defendant Charpentier fabricated charges of Mr. Harrell and, knowing that Mr. Harrell had severe mental health issues, placed him in solitary confinement. He was released on April 17, 2015, only four days before his death. (*Id.* ¶¶ 37, 45.) The effects of solitary confinement on inmates with mental disorders is well known and documented. (*Id.* ¶ 39.) Though the OMH Medical Professionals were required to ensure that Mr. Harrell was compliant with taking his medication, Mr. Harrell had not taken his required medication prior to the incident. (*Id.* ¶ 44.)

### 3. The Day of Mr. Harrell's Murder

On April 21, 2015, Mr. Harrell was noticeably depressed and upset. (*Id.* ¶ 47.) Convinced that his wife and sister were picking him up, he began packing his belongings into several bags and insisted to other inmates and corrections officers that he was going home. (*Id.* ¶¶ 49–51.)

---

[5] Plaintiff's First Amended Complaint, filed on May 11, 2018 as Dkt. No. 120, is hereinafter referred to as "Am. Compl."

Recognizing that Mr. Harrell was having a mental health crisis, two inmates informed the corrections officers on duty that Mr. Harrell was in need of immediate assistance. (*Id.* ¶ 52.) Rather than properly respond to Mr. Harrell's mental health crisis, as was their duty, the officers called Defendant Sergeant Guardino, who called for backup. (*Id.* ¶ 56.) When the officers arrived, Mr. Harrell recognized some of the officers who had previously physically and mentally abused him. (*Id.* ¶ 57.) As a result, he began to walk away. (*Id.* ¶ 58.) Approximately four to six corrections officers, including CO Dickinson, CO Salerno, CO Michels, and CO Mathew jumped on top of Mr. Harrell, tackling him to the ground. (*Id.* ¶ 59.) They then immediately handcuffed him. (*Id.* ¶¶ 59–60.)

Despite being handcuffed and restrained on the ground, the officers, including but not limited to COs Mathew, Michels, Salerno, and/or Dickinson, proceeded to brutalize Mr. Harrell. (*Id.* ¶¶ 60–61.)  He was beaten so viciously that he defecated and urinated on himself. (*Id.* ¶ 65.) Throughout the assault, corrections officers screamed racial epithets, threatened inmate witnesses, and falsely stated that Mr. Harrell was resisting arrest. (*Id.* ¶¶ 68, 106.) Mr. Harrell lay handcuffed and motionless on the floor throughout the entire assault. (*Id.* ¶¶ 61, 65.) The officers involved in the beating including, but are not limited to, COs Anderson, Beroni Dickinson, Harrington, Mathew, Michels, Morel, O'Connor, Rivera, Salerno, Sherman, Sorensen, Rolle and/or Yager. (*Id.* ¶ 62.) Sergeants Shultis and Guarino witnessed both the initial beating and the continued assault on Mr. Harrell. At no point did they intervene or attempt to intervene to stop the brutal assault and ultimate murder of Mr. Harrell. (*Id.* ¶ 66.)

After the attack, an officer covered Mr. Harrell's body with a bedsheet. Sergeant Guarino then ordered two officers to throw Mr. Harrell's body down the stairs. (*Id.* ¶¶ 75, 78.) When they did so, Mr. Harrell's body fell in an unnaturally distorted position against the ground floor wall of

the stairwell. (*Id.* ¶ 80.) Rather than calling for medical assistance, officers placed Mr. Harrell's limp body in a wheelchair to make it seem as though he was still alive. (*Id.* ¶ ¶¶ 81–82.) To perpetuate the false narrative that Mr. Harrell had assaulted officers, an ambulance was called for CO Michels and CO Harrington who were, upon information and belief, not injured. (*Id.* ¶¶ 72–73.) Mr. Harrell was then taken to the Regional Medical Unit (RMU), where DOCCS Medical Professional Defendants Frederick Belanger, Shawna L. Healy, Margaret Berry, Seleste Leigh Wallace, Marianne Sarvis, and Shirley R. Roberts (hereinafter, the "DOCCS Medical Professionals) placed Mr. Harrell in a corner, and ignored him as they treated CO Michels and CO Harrington. (*Id.* ¶¶ 21, 87–88.) Though OMH Medical Professionals were present including, but not limited to, Maura Endrizzi, Jason Laufman, and Maria D. Zaprowski (collectively, the "OMH Medical Professionals) (*Id.* ¶ 17.)  The OMH Medical Professionals knew of Mr. Harrell's presence, they failed to treat him. (*Id.* ¶ 89.)  Twenty minutes later, the Defendants finally called for an ambulance for Mr. Harrell, falsely reporting that he had overdosed. (*Id.* ¶ 82.) At approximately 10:00 p.m., Mr. Harrell was pronounced dead at St. Luke's Cornwall Hospital. (*Id.* ¶ 95.) The Orange County Medical Examiner deemed Mr. Harrell's death a homicide following a physical altercation with corrections officers. (*Id.* ¶ 96.)

### 4. Notice of Issues with the Evening Shift of Corrections Officers in Fishkill's Building 21/21A

The occurrence of this level of brutality was not unique at Fishkill. Beginning in at least 2005, the Correctional Association of New York ("CANY") published reports on Fishkill identifying officers in the 3pm–11pm shift within a specific building, Building 21/21A—the exact time frame and location of the fatal assault on Mr. Harrell. (*Id.* ¶ 98.) The Report also noted that Building 21/21A, which primarily housed individuals with mental health issues, had a problem

with the excessive use of violence on inmates.[6]  (*Id.* ¶¶ 98.) The Reports noted that officers in that shift were notorious for their violent and aggressive behavior towards incarcerated individuals. (*Id.* ¶¶ 98, 101.) CANY is an independent non-profit organization which was granted unique authority by the New York State Legislature to inspect prisons and to report its findings and recommendations to the public.

In the introductory paragraph of the 2005 Report, CANY states:"[t]here is a widespread view that the officers on the 3:00 to 11:00pm shift, who tend to be inexperienced, are prone to abusive behavior and intimidation of inmates." (Yan Decl., Ex. A, at 1.)  The Report goes on to describe serious problems with the medical services, finding that "[t]he inmates and staff agree that individuals with mental illness are misunderstood and poorly cared for." (*Id.*) The report adds that some correctional staff members believed "that there is insufficient mental health staff to assist inmates with mental illness, and they feel unprepared and poorly trained to provide appropriate services or ensure safety." (*Id.* at 3.) Most significantly, the 2005 Report explains that CANY met with the Superintendent and "his Executive Team," informing them of the issues with the 3:00 to 11:00pm shift and that, in turn, the Superintendent's executive staff had "acknowledged that more experienced officers bid for the earlier shift, creating a tenser environment on the evening shift." (*Id.* at 10.)

In 2012, CANY issued a second report on Fishkill, identifying the violence in Building 21/21A.  The 2012 Report, which again was provided to both high level "DOCCS and Fishkill officials" and involved a "conference call with the Superintendent and members of the Executive Team," provides even more detail. (Yan Decl. Ex. B at 1.) The CANY Report summarized its

---

[6] Plaintiff joins Defendants' request that the Court take judicial notice of the contents of the reports, because they are incorporated by reference into the Complaint. (Defs' Mot. at 15 n.8.) *See, e.g.*, *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

findings, including that there was concern about "staff harassment, threats, retaliation, frequent issuance of tickets and SHU time, and sexual and other abuse, including on mental health units and particularly in the evening shift and in housing areas 21 and 21A." (*Id.* at 2.)

### 5. The Cover-Up

DOCCS agents and officials immediately responded to Fishkill and conspired with their fellow corrections officers and NYSCOPBA to cover up Mr. Harrell's murder. Attached to Plaintiff's Amended Complaint, as evidence of the conspiracy to cover-up the murder, was a flyer distributed by corrections officers on April 22, 2015. The flyer states that "numerous union reps responded to [Fishkill]" on April 21, 2015. (Am. Compl. at Ex. 1.) The NYSCOPBA Defendants then engaged in overt acts, with other officers and officials from the New York State Department of Corrections and Community Supervision ("DOCCS") and the New York State Office of Mental Health ("OMH"), to cover up the circumstances of Mr. Harrell's murder. (*Id.* ¶ 94.)

## LEGAL STANDARD

Defendants have alleged that this Court does not have jurisdiction over certain state law claims, and therefore those claims must be dismissed pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction. Though it is unclear which claims the State Defendants are referring to, dismissals pursuant to 12(b)(1) are difficult where cases involve federal question jurisdiction, which provides district courts with "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331 "In federal question cases, the very statute that creates the cause of action often confers jurisdiction as well—that is, the claim 'arises under' the same federal law that gives the plaintiff a cause of action." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182 (2d Cir. 1996).

With respect to Rule 12(b)(6), "when ruling on a defendant's motion to dismiss, a judge

must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true. . . .") (alteration and internal quotation marks omitted). Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

The Court must also accept facts alleged "upon information and belief" "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)); *see also Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008).

Based on this view of the allegations, if there are "enough facts to state a claim to relief that is plausible on its face," the Court must deny the motion to dismiss. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Arista Records*, 604 F.3d at 120. A claim is plausible if it contains enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570. The motion to dismiss standard is not a "heightened pleading standard." *Id.* at 569 n.14.

### ARGUMENT

### POINT I: PLAINIFF'S § 1983 CLAIMS AGAINST DEFENDANTS ANNUCCI, BELLNIER, SULLIVAN, AND CONNOLLY MUST SURVIVE

Plaintiff's Complaint alleges constitutional violations of the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution. Defendants argue that Plaintiff has failed to plead

enough facts to show the personal involvement of DOCCS Commissioner Annucci, DOCCS Deputy Commissioner Bellnier, Superintendent Connolly and/or OMH Commissioner Sullivan (collectively, the "Supervisory Defendants"). However, Defendants misconstrue existing precedent on what actions or inactions constitute "personal involvement."

Personal involvement can be found where "(1) the defendant supervisor participated directly in the alleged constitutional violation; (2) the supervisor, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the supervisor created a policy or custom under which constitutional violations occurred or allowed the continued exercise of such a policy or custom; (4) the supervisor was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the supervisor exhibited deliberate indifference to the rights of plaintiff by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

The Second Circuit has recently reiterated this standard in *Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015), *cert. granted*, 137 S. Ct. 293 (2016). The Court held that a plaintiff's complaint was sufficient where the factual allegations "permit[ted] the inference that [a Supervisory Official] knew that [prison] staff subjected the . . . Plaintiffs to the 'unofficial abuses' and permitted—if not facilitated—the continuation of these abuses." *Id.* (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). Plaintiff has more than sufficiently pled the personal involvement of the Supervisory Defendants in the Complaint.

1. **Plaintiff Sufficiently Alleged Personal Involvement of the Supervisory Defendants**

   A. **Defendants Annucci, Bellnier, and Sullivan**

Plaintiff pled that the Defendants Annucci, Bellnier, and Sullivan had "information indicating that unconstitutional acts were occurring" yet failed to take steps to remedy the situation,

sufficient to establish personal involvement with respect to the Fourth, Eighth, and Fourteenth Amendment claims. *Colon*, 58 F.3d at 873.

Under the standards developed in *Iqbal* and *Twombly*, in order to plead supervisory liability, a Plaintiff must plead more than legal conclusions, alleging facts that "nudge their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680. For example, in *Iqbal* the Supreme Court found allegations that "[Defendant] Ashcroft was the 'principal architect' of [an] invidious policy, and that [Defendant] Mueller was 'instrumental' in adopting and executing it" were insufficient. *Iqbal*, 556 U.S. at 680–81.

In contrast, Plaintiff's complaint provides specific details, identification of specific meetings and relevant reports, that plausibly establish that these Supervisory Defendants had the requisite knowledge to render them liable. Specifically, Plaintiff has alleged that Commissioner Annucci, Deputy Commissioner Bellnier, and OMH Commissioner Sullivan had been provided with CANY's 2005 and 2012 Reports and had discussions with CANY officials related to those reports(Am. Compl. ¶ 100), including discussion about the violent and aggressive group of officers in Building 21/21A of Fishkill during the 3p.m.-11p.m shift. (Am. Compl. ¶¶ 101, Yan Decl. Ex. A.) In fact, CANY's 2012 Report specifically stated that it was provided to both "DOCCS and Fishkill officials." (Yan Decl. Ex. B at 1.) Through these Reports, as well as conversations with CANY, Defendants were "aware that the evening shift in Buildings 21 and 21A were, and continue to be, staffed with corrections officers who routinely abuse and deliberately disregard the safety of incarcerated people." (Am. Compl. ¶ 103.)

### B. Defendant Connolly

The State Defendants' argument that "there is no allegation that Superintendent Connolly was even on duty on the night of April 21, 2015," and therefore cannot be held liable misconstrues

11

the legal standard.    (Defs' Mot. at 19.) Defendant Connolly, who was alleged to be the Superintendent of Fishkill "at all relevant times herein," Am. Compl. ¶ 20, is being sued because of his flagrant and deliberate inaction with respect to the repeated abuses of inmates housed in Building 21/21A by officers on the 3–11pm shift. Plaintiff alleged that Defendant Connolly "was aware of the contents of CANY's 2005 and 2012 Reports (Am. Compl. ¶ 102), in which CANY indicated they discussed the contents of the 2012 Report through "correspondence with Fishkill officials in August 2013 and a conference call on September 30, 2013 with the Superintendent and members of the Executive Team to discuss our findings and recommendations." (Yan Decl. Ex. B at 2.) Plaintiff included with the Complaint a flyer distributed by corrections officers throughout Fishkill which indicated that Superintendent Connolly had failed to respond to the facility on April 21, 2015 because he was "too inebriated to even show up!!!" (Am. Compl. at Ex. 1.)

Most significantly, the 2005 Report explains that CANY met with the Superintendent and "his Executive Team," informing them of the issues with the 3:00 to 11:00pm shift and that, in turn, the Superintendent's executive staff had "acknowledged that more experienced officers bid for the earlier shift, creating a tenser environment on the evening shift." (Yan Decl. Ex. A, at 10.) CANY's 2012 Report was provided to both "DOCCS and Fishkill officials" and included a "conference call with the Superintendent and members of the Executive Team." (Yan Decl. Ex. B at 1.) The 2012 Report summarized its findings, including that there was concern about "staff harassment, threats, retaliation, frequent issuance of tickets and SHU time, and sexual and other abuse, including on mental health units and particularly in the evening shift and in housing areas 21 and 21A." (*Id.* at 2.)

### 2.  Failure to Provide Adequate Medical Care

Defendants argue that Plaintiff has failed to plead that the "supervisory defendants knew

of, and disregarded, an excessive risk to Decedent's health and safety." (Defs' Mot. at 14.) However, the Complaint does exactly that: pleading that the Supervisory Defendants "knew that a pattern of serious physical abuse and neglect against inmates in Buildings 21/21A during the 3:00p.m. to 11:00p.m. shift, specifically targeting mentally ill inmates, existed at Fishkill prior to and including the time of Mr. Harrell's murder. Despite this knowledge, they consciously permitted the continuance of the custom or practice of severe physical and emotional abuse and deprived the incarcerated individuals of adequate medical care." (Am. Compl. ¶ 122.)

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). In doing so, the Court explained that the failure to provide medical care "may actually produce physical 'torture or a lingering death,' the evils of most immediate concern to the drafters of the [Eighth] Amendment." *Estelle*, 429 U.S. at 103. Such evils are precisely what Mr. Harrell suffered at the hands of corrections officers overseen by the Supervisory Defendants.

The Second Circuit has interpreted the deliberate indifference standard pursuant to the Eighth Amendment to be "based on a plaintiff's pain and suffering, even when the severity of a plaintiff's condition is not necessarily worsened by the act." *Stevens v. Goord*, 535 F. Supp. 2d 373, 384 (S.D.N.Y. 2008) (holding that a protracted delay in starting hepatitis C treatment stated a claim). Other Circuits have followed similar reasoning. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154–55 (6th Cir. 1991) ("a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.").

In *Langley v. Coughlin*, the Second Circuit extended this right to providing adequate mental health care. 888 F.2d 252, 254 (2d Cir. 1989). "An official acts with deliberate indifference when

13

that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

The analysis of whether the Supervisory Defendants were deliberately indifferent to providing adequate medical care after the assault, and mental health care prior to the murder, have both objective and subjective components. "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003) (citation omitted).

Here, Mr. Harrell had previously been diagnosed with bipolar disorder with psychotic features (Am. Compl. ¶ 25). The Supervisory Officials had knowledge of the inadequate mental health treatment within Building 21/21A of Fishkill. Since at least 2005, CANY has provided details of the abuses and failures in medical assistance and mental health treatment in the exact unit where Mr. Harrell was murdered. In the introductory paragraph to the 2005 Report, attached to Defendants' papers, CANY provides that "[t]here is a widespread view that the officers on the 3:00 to 11:00pm shift, who tend to be inexperienced, are prone to abusive behavior and intimidation of inmates." The Report goes on to describe serious problems with the medical services, finding that "[t]he inmates and staff agree that individuals with mental illness are misunderstood and poorly cared for." (Yan Decl., Ex. A, at 1.)  The Report adds that some correctional staff members believed "that there is insufficient mental health staff to assist inmates with mental illness, and they feel unprepared and poorly trained to provide appropriate services or ensure safety." (*Id.* at 3.) The 2012 Report provides even more detail, noting "concerns that the

14

vast majority of people at Fishkill with mental health needs are in general population and thus receive limited metal health support other than medication." (*Id.* at 5.) The Report also noted that officers in the evening shift (3pm-11pm) and dorms 21 and 21A were known as "team beatdown," because of the abusive patdowns, and "a significant number of reports of physical abuse." (*Id.* at 23.) The Report added that there was a "lack of staff accountability" which "enabled abuse," and found that "the prison administration" failed to address and prevent the abuse. (*Id.* at 24.) All the Supervisory Defendants, in the course of the exercise of their duties, would have been aware of these glaring problems at Fishkill.

Such actions have been found to establish a "sufficiently culpable state of mind," as described in *Smith* for establishing failure to provide medical care. For example, in *Brock v. Wright*, the Second Circuit found summary judgment inappropriate where the Chief Medical Director of the New York Department of Corrections who had promulgated a policy that declared a skin issue "among the 'conditions and services which, absent the existence of collateral symptoms, are considered prima facie medically unnecessary." 315 F.3d 158, 165 (2d Cir. 2002).

### 3. Failure to Protect

Plaintiff's detailed Complaint more than sufficiently alleges that the Supervisory Defendants failed to protect Mr. Harrell because of their acquiescence to the constitutional violations that were rampant at Fishkill, which directly led to Mr. Harrell's murder. Specifically, these supervisory officials failed to protect inmates, including Mr. Harrell, from the known and persistent brutality of the Beat Up Squad.

Pursuant to the second *Colon* factor, Plaintiff alleged that the Supervisory Defendants had been informed of reports provided by CANY related to violence and abuse during the 3–11pm shift in Building 21/21A at Fishkill, including that the fact that meetings regarding these reports

15

and the findings took place between the Supervisory Defendants and CANY officials, and that the Supervisory Defendants failed to remedy the wrongs identified in the reports.[7] (Am. Compl. ¶¶ 98–104.) Plaintiff alleged that the Supervisory Defendants "are, and have been, aware that the evening shift in Buildings 21 and 21A were, and continue to be, staffed with corrections officers who routinely abuse and deliberately disregard the safety of incarcerated people," and that "Mr. Harrell was murdered in Building 21 during the 3:00-11:00pm evening shift." (Am. Compl. ¶¶ 102–104.)

Legal precedent in this Circuit provides that, at this early stage of litigation, Plaintiff's allegations must survive based on the second *Colon* factor alone. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1047-48 (2d Cir. 1989) (affirming finding of supervisory liability when evidence showed that supervisors knew or should have known that plaintiff inmates' reputations as alleged planners of a violent insurrection would expose them to extreme hostility from the guards, yet took no precautions for the inmates' safety).

In *Phillip v. Schriro*, this Court found that "'if a plaintiff alleges that a constitutional violation is ongoing, and that a defendant, after being informed of a violation through a report or appeal, failed to remedy the wrong, the plaintiff's claim against the defendant should not [be] dismissed under Rule 12(b)(6).'" 2014 U.S. Dist. LEXIS 117720 *13, 2014 WL 4184816 (S.D.N.Y. Aug. 22, 2014) (Abrams, J.) (quoting *Zappulla v. Fischer*, 2013 U.S. Dist. LEXIS 49728 (S.D.N.Y. Apr. 5, 2013)); *see also Wright v. Smith*, 21 F. 3d 496, 497–98, 502 (2d Cir. 1994); *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) (indicating that notice might be

---

[7] Defendants' argument that Superintendent Connolly was not at Fishkill in 2005 is irrelevant and not an allegation plead in the four corners of the Complaint. (Defs' Mot. at 17–18 n.9.) Further, Plaintiff alleged that the Supervisory Defendants, including Defendant Connolly, "were fully *aware* of the contents of [both] CANY's 2005 and 2012 reports." (Am. Compl. ¶ 102) (emphasis added). This is sufficient to maintain supervisory liability. *See, e.g.*, *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983) (finding a Superintendent had at least constructive notice of the practices employed at the correctional center he controlled.)

sufficient if "the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it."). That is precisely what Plaintiff has alleged in her Complaint.

Defendants claim *Pattiasina v. Sewalt*, No. 12 Civ. 6170, 2015 U.S. Dist. LEXIS 131319 (S.D.N.Y. Sept. 28, 2015) stands for the proposition that a CANY report "cannot be used to support a claim based on supervisory liability against the Supervisory Defendants" because it does not "single out any officers, single out a particular location in the prison where multiple attacks previously occurred, or anything along those lines." (Defs' Mot. at 15.) Aside from being factually inaccurate, this argument fails to acknowledge the low hurdle of Plaintiff's burden at this early stage of the litigation. Though the mere existence of such a report alone might not be sufficient, it is the Supervisory Defendants' knowledge of the substance of those reports that creates the supervisory liability here. *See, e.g., Lowrance v. Coughlin*, 862 F. Supp. 1090, 1104 (S.D.N.Y. 1994) (finding a prison commissioner liable under a supervisory liability theory because Plaintiff had established "adequate notice" of retaliatory transfers.) Moreover, in this case, Plaintiff alleges a history of abuse on the very same shift and in the very same location where Mr. Harrell was housed going back to 2005. One cannot imagine a report that would put the Defendant on better notice of unconstitutional conditions that needed to be addressed.

With respect to the third *Colon* factor, Plaintiff has alleged that the Supervisory Defendants had known about the policy or custom of abuse at Fishkill's Building 21/21A, but had failed to remedy the unconstitutional practices, and had allowed for the continuation of the unconstitutional policy/practice. "A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986); *see also Stamile v. County of Nassau*, 2014 U.S. Dist. LEXIS 39320  (E.D.N.Y. Mar. 25, 2014) (citing *Grullon v. City of New Haven*, 720

F.3d 133, 139 (2d Cir. 2013)). Here, the Supervisory Defendants ignored the deprivation of the rights of inmates who were repeatedly subjected to abuse, accepting a custom or policy at Fishkill of unconstitutional practices. *See, e.g.*, *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) ("we cannot say, on this record, that as Superintendent of Attica he was not directly responsible for the conduct of prison disciplinary hearings, . . . or that, . . . Smith did not accept a custom or policy at Attica allowing that unconstitutional practice to occur.").

Finally, pursuant to the fifth *Colon* factor, Plaintiff has also sufficiently alleged that the Supervisory Defendants exhibited deliberate indifference to the rights of Mr. Harrell by failing to act on information that unconstitutional acts had been occurring at Fishkill for years. *Cash v. Cty. of Erie*, 654 F.3d 324, 339 (2d Cir. 2011) (reversing dismissal of deliberate indifference claims because prison officials were on notice of the risk of sexual assaults by corrections officers).

In *Farmer v. Brennan*, the Supreme Court clarified that deliberate indifference could be attributed to supervisory officials who obtained knowledge "that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." 511 U.S. 825, 843 (1994). The Court added, "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). Here, where the Supervisory Officials were "exposed to information concerning the risk and thus 'must have known' about it, . . . such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.*

Defendants unwarranted assertions imply that this Court should interpret the State Defendants' Motion to Dismiss by drawing inferences in Defendants' favor. This is "contrary to

18

the Court's obligation to 'draw[] all inferences in the plaintiff's favor' in evaluating this motion to dismiss." *Stephens v. Venettozzi*, 2016 U.S. Dist. LEXIS 103681 (S.D.N.Y. Aug. 5, 2016) (Abrams, J.) (citing *Kozey v. Quarles*, 252 F. App'x 387, 387 (2d Cir. 2007)). In any event, Plaintiff should be allowed the opportunity for factual development to determine the extent to which the Supervisory Defendants were involved and failed to protect inmates in Building 21/21A at Fishkill.

### 4. Equal Protection

Defendants attempt to dismiss Plaintiff's Equal Protection claim against the Supervisory Defendants by claiming that Plaintiff failed to plead "how these defendants were supposedly aware" of the corrections officers' actions. (Defs' Mot. at 17.)   However, their argument misconstrues the standard at this stage of litigation.

The Complaint properly alleges a violation pursuant to the Equal Protection clause:

> Defendants Annucci, Bellnier, Sullivan, [and] Connolly, acting under the pretense and color of law, also permitted, tolerated, and were deliberately indifferent to a pattern and practice of racially discriminatory treatment of incarcerated individuals, including Mr. Harrell. Specifically, these defendants have been aware of the existence of the "Beat Up Squad," consisting of an all-white group of Fishkill Officers, which operates in a discriminatory manner against incarcerated individuals of minority backgrounds."

Am. Compl. ¶ 124.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). In order to state a violation of the Equal Protection Clause, a plaintiff must allege either "purposeful discrimination . . . directed at an identifiable or suspect class," or, in the case of claims brought by a "class of one," that the plaintiff "has been intentionally treated differently than others similarly situated and that there is no rational basis for the difference in treatment." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995); *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir.

2005); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*). The Supreme Court has long held that, even within the special context of prisons, racial classifications are immediately suspect due to the "fear that they are motivated by an invidious purpose." *Johnson v. California*, 543 U.S. 499, 505 (2005). As the Second Circuit has observed, "at the motion to dismiss stage, there is no 'requirement that a plaintiff identify in [her] complaint actual instances where others have been treated differently for the purposes of equal protection,' nor must that a plaintiff 'name names' in [her] complaint' with regard to those similarly situated.'" *Conte v. County of Nassau*, 2008 U.S. Dist. LEXIS 25694 * 52 (E.D.N.Y. Mar. 31, 2008) (quoting *DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir. 2003) (alteration in original)).

Therefore, the racial undertones of the Beat Up Squad's attack on Harrell pled in the Complaint (such as the racial makeup of the all-white attackers, their history of racially motivated abuse, and their flagrant use of racial epithets) sufficiently demonstrates racial animus directed at Mr. Harrell to plausibly establish a violation of the Equal Protection clause.

### POINT II: PLAINTIFF STATES A § 1983 CLAIM AGAINST CHARPENTIER

Defendant Corrections Officer Charpentier repeatedly "punished without cause, beat[], and abused" Ms. Harrell. (Am. Compl. ¶ 36.) With the knowledge of Mr. Harrell's mental health issues, Charpentier placed Mr. Harrell in solitary confinement on April 2, 2015 (just days before his death) based on false claims that he was in possession of synthetic marijuana. (*Id.* ¶¶ 36–39.). Thereafter, Charpentier was involved in the conspiracy to cover up claims related to Mr. Harrell's murder. (*Id.* ¶¶105–118.)

Regarding claims related to unconstitutional conditions of confinement, the Supreme Court has stated, "while the Constitution 'does not mandate comfortable prisons, prisoners may not be denied the minimal civilized measure of life's necessities.'" *Phelps v. Kapnolas*, 308 F.3d 180,

185 (2d Cir. 2002) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Specifically, the Eighth Amendment requires that inmates not be deprived of their "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal citation and quotation omitted).

To establish an Eighth Amendment claim arising out of inadequate medical care, a plaintiff must show that the defendant in question acted with "deliberate indifference to [his] serious medical needs." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). A serious medical condition exists when failure to treat the condition "could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000). Thus, it is well settled that Plaintiff's allegations of severe mental illness are sufficient to establish a severe medical condition. *See, e.g.*, *Guglielmoni v. Alexander*, 583 F. Supp. 821, 826 (D. Conn. 1984) (treatment of mental disorders in mentally disturbed inmates is a serious medical need).

The required culpable state of mind of the prison official is one of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. The prison official must know that the inmate faces "a substantial risk of serious harm and [must disregard] that risk by failing to take reasonable measures to abate it." *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998) (quoting *Farmer*, 511 U.S. at 847). For inadequate medical care, a plaintiff must plead "that the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance*, 143 F.3d 703 (internal citations omitted).

In placing Mr. Harrell, who had documented mental health issues, into solitary confinement on a false claim, Charpentier deliberately placed Mr. Harrell at direct risk of serious harm. (Am.

Compl. ¶¶ 9, 34.) As a result of Charpentier's actions, Mr. Harrell suffered a mental health breakdown. That mental health breakdown led to the April 21, 2015 confrontation with corrections officers that resulted in his death. As a result, Plaintiff's Eighth Amendment claim against Defendant Charpentier should survive.

### POINT III: PLAINTIFF STATES A § 1983 CLAIM REGARDING HIS MENTAL HEALTH TREATMENT

Although they state otherwise in their papers, Defendants also move to dismiss Plaintiff's § 1983 claims regarding OMH Nurse Endrizzi, OMH Nurse Laughman, and OMH Nurse Zaprowski related to Mr. Harrell's mental health treatment.[8] Given that all facts in the Complaint arise from or relate to Mr. Harrell's April 21, 2015 death, it's unclear what they are moving to dismiss. Plaintiff has clearly alleged that OMH Employees Endrizzi, Laughman, and Zaprowski violated Mr. Harrell's rights in failing to treat Mr. Harrell's serious mental health illness. Mr. Harrell was not medicated prior to being placed in solitary confinement.[9] Thereafter, these officials failed to treat Mr. Harrell upon learning that he was having a mental health crisis on April 21, 2015.

Regardless, "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met . . . deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment regardless how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 103–105 (1976).

---

[8] According to Defendants' Motion, "[t]he State Defendants are not moving to dismiss the § 1983 claims for excessive force and deliberate medical indifference against . . . OMH Nurse Endrizzi, OMH Nurse Laughman, and OMH Nurse Zaprowski . . . arising out of the April 21, 2015 incident." (Defs' Mot. at 2 n.4.)

[9] As discussed in Point I, § 2, the high level officials, including Commissioner Sullivan, had knowledge regarding the insufficiency of mental health staff. (Yan Decl., Ex. A, at 1–2.)

"When incarceration deprives a person of reasonably necessary medical care (including psychiatric or mental health care) which would be available to him or her if not incarcerated, the prison authorities must provide such surrogate care." *Langley v. Coughlin*, 888 F.2d 252, 254 (2d. Cir. 1989).

Mr. Harrell was diagnosed with mood disorder, antisocial personality disorder, and bipolar disorder. Whereas he had previously taken medication to treat his mental health issues, at the time he was placed in solitary confinement, he was not. (Am. Compl. ¶¶ 42–43.) As a result of being subjected to false claims and unwarranted solitary confinement, Mr. Harrell emerged from solitary confinement with heightened paranoia, trigging a mental health crisis that led to his death. OMH officials, though they knew he had bipolar disorder with psychotic features, did not ensure that he was adequately medicated. (Am. Compl. ¶¶ 42–44.) The OMH nurses knew of his prior mental health diagnosis. They were present on the night of his murder, and, while Mr. Harrell was still allegedly alive, left him in a corner in the infirmary without treatment. (*Id.* ¶¶ 87–92.) Mr. Harrell's claims against these OMH mental health officials must survive.

### POINT IV: PLAINTIFF PROPERLY PLED A § 1983 CONSPIRACY TO VIOLATE MR. HARRELL'S CONSTITUTIONAL RIGHTS

In a § 1983 conspiracy claim, the Plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002).

To establish a conspiracy, a plaintiff must provide evidence which one could reasonably infer that the accused parties had a "meeting of the minds." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970). "A plaintiff is not required to list the place and date of defendants' meetings and

23

the summary of their conversations when he pleads conspiracy, . . . but the pleadings must present facts tending to show agreement and concerted action." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (report and recommendation), *rej'd in part on other grounds*, *Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005) (citations and quotations omitted). The Second Circuit has recognized that "'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)).

1. **A Conspiracy to Cover-Up a Constitutional Violation Can Be Actionable Under § 1983**

Plaintiff has properly pled that the State Defendants, together with NYSCOPBA actors, conspired to deprive Mr. Harrell of his constitutional rights and, thereafter, conspired to cover up their actions. Plaintiff's allegations focus on three different stages of the conspiracy: (1) beating Mr. Harrell to death after he was handcuffed, taking him to the infirmary, and leaving him without medical treatment; (2) immediately covering up his death through a jointly devised, false narrative; and (3) falsifying records and impede the investigation into his death.

Therefore, the State Defendants' allegation that "the acts alleged consist solely of efforts to cover up the incident, as opposed to violating Decedent's rights in some other way" is inaccurate. (Defs' Mot. at 23.) Plaintiff properly pled that the deprivation of Mr. Harrell's constitutional rights, including his Fourth, Eighth, and Fourteenth Amendment rights, together with the conspiracy to cover up those deprivations, formed the basis of her § 1983 conspiracy claim. *See, e.g.*, *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999).

In *Small v. City of New York*, the Court found that the plaintiffs, estate administrators on behalf of individuals who had been killed by a police officer who had been driving while intoxicated with several fellow officers, sufficiently alleged a § 1983 conspiracy where there was

24

"a specific agreement between several individual officer defendants and individual [union] representatives" to prevent a Defendant officer "from facing the legal consequences of his drunk driving activities," together with "joint activity in furtherance of that agreement, namely, the destruction of evidence, the delayed administration of a sobriety test, and the intimidation of witnesses at the scene of the crime." 274 F. Supp. 2d 271 (E.D.N.Y. 2003), *rev'd in part on other grounds*, *Pena v. Deprisco*, 432 F.3d 98 (2d Cir. 2005). The court held that, at the motion to dismiss stage, "[t]hese allegations are sufficient to establish not only joint action, but, . . ., conspiracy, for the purpose of Section 1983 liability." *Id.*

Other Circuits provide guidance in this regard. In *Weiland v. Palm Beach County Sheriff's Office*, for example, the Eleventh Circuit held that, where a Plaintiff "specifies a causal connection between the alleged cover up and the specific deprivation of [Plaintiff's] constitutional rights, it sufficiently alleges 'an underlying actual denial of his constitutional rights,' which is required to state a claim for conspiracy under § 1983." 792 F.3d 1313, 1328 (11th Cir. 2015) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008)); *see also Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) ("Plaintiffs have identified several overt acts, including false testimony, false reporting, and alteration of recordings."); *Ryland v. Shapiro*, 708 F.2d 967, 974 (5th Cir. 1983) ("[42 U.S.C. § 1983 embraces deprivation or [sic] both due process of law and equal protection of the laws, and the action charged was under color of state law. It contemplates such deprivation through the unconstitutional application of a law by a conspiracy or otherwise."); *Burns v. City of Concord*, 99 F. Supp. 3d 1007, 1025 (N.D. Cal. 2015) ("the circumstantial evidence is sufficient to infer that the . . . Defendants and Mr. Bell agreed to use excessive force against [Plaintiff] and shared that common objective, even if all of them did not know the exact details of the plan.").

## 2. Plaintiff Properly Pled a § 1983 Conspiracy

Plaintiff clearly alleged that the State Defendants, together with NYSCOPBA and its agents and representatives, "conspired to and, thereafter, deprived Mr. Harrell of . . . clearly established rights under the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution," including  the right to be free from the use of excessive and unreasonable force and seizure, the right to be free from cruel and unusual punishment, the right to property, the right of access to the courts, and the right to equal protection under the law.  (Am. Compl. ¶ 133.) "In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; circumstantial evidence may provide adequate proof of conspiracy." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980). *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) ("Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire.").

Here, for the first stage of the conspiracy, these deprivations include beating Mr. Harrell to death after he was handcuffed, throwing him down the stairs and, while he was still allegedly alive, ignoring him in the infirmary while two corrections officers were being treated. Plaintiff more than sufficiently allege that these actions were a conspiracy in violation of Mr. Harrell's right to be free from the use of excessive and unreasonable force, the right to be free from cruel and unusual punishment. (Am. Compl. ¶¶ 47–90.) For the second stage of the conspiracy, Plaintiff alleged that the involved officers called supervisors and representatives from NYSCOPBA to come on the night of the murder, prior to calling an ambulance for Mr. Harrell where they jointly participated in creating a false narrative, including the claim that Mr. Harrell had overdosed on synthetic marijuana. (Am. Compl. ¶¶ 91–97, 105–110, Ex. 1.) Finally, for the third stage of the conspiracy, Plaintiff alleged that the State and NYSCOPBA Defendants thereafter committed a number of

overt acts, including "submitting false reports, statements, and testimony to support and corroborate the fabricated charges lodged against Mr. Harrell" to cover up their constitutional deprivations, impeding the Estate's right to property, right of access to the courts, and the right to equal protection under the law. (Am. Compl. ¶ 136.)

These constitutional violations have repeatedly been recognized by the Courts. For example, in *Randle v. Alexander*, a group of officers were alleged to have forced two inmates to fight one another causing the death of one inmate and serious injuries to another inmate who had documented mental health issues. The Court found that because the forced fight "objectively reflects a constitutional wrong," "[a]ccordingly, any agreement to effectuate such a fight or cover-up is an 'act in concert to inflict an unconstitutional injury' as required by the law." 960 F.Supp.2d 457, 475 (S.D.N.Y. 2013).

In *McGarty v. Town of Carmel*, a plaintiff moved to amend the complaint adding a claim of § 1983 conspiracy where the plaintiff alleged "the four individually named police officers conspired to cover up evidence that they used excessive force in shooting McGarty, and interfered with plaintiff's ability to develop the circumstances surrounding McGarty's shooting during pre-trial discovery." 997 F. Supp. 435, 437 (S.D.N.Y. 1998). The court found that the plaintiff "made an adequate showing of deprivation of access to courts." *Id.*; *see also Gloster v. Wong*, 1997 U.S. Dist. LEXIS 3991, 1997 WL 151766 (N.D.N.Y. March 28, 1997) (Pooler, J.) ("The official's conduct need not prevent the prisoner from pursuing a judicial remedy in order to give rise to actionable retaliation, because 'it is enough that the threat [or action] was intended to impose a limitation upon the prisoner's right of access to the court and was reasonably calculated to have that effect.'") (citing *Hudspeht v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978), *cert. denied*, 441 U.S. 913 (1979)).

27

Furthermore, the Defendants violated Mr. Harrell and his estate's right to bring a cause of action. "As the result of the conspiracy carried out under state law to cover up the true facts surrounding [Mr. Harrell's] death, the decedent's estate/beneficiaries were deprived of their constitutional right to property, consisting of their causes of action for reasonable compensation for [Mr. Harrell's] death, without due process of law. *Barrett v. United States*, 689 F.2d 324, 331 (2d Cir. 1982).

Defendants argue that Plaintiff failed to allege "with any particularity, overt acts which Superintendent Connolly, the Senior Officers, the DOCCS Medical Defendants, the OMH Medical Defendants, and the Fishkill Officers engaged in which were reasonably related to the promotion of the alleged conspiracy." (Defs' Mot. at 24.) However, the Defendants list in detail some of these overt acts alleged by Plaintiff, including, but not limited to: "(1) jointly devising a false version of the events to tell to authorities; (2) submitting false statements, reports and testimony; (3) lying to authorities; (4) meeting and discussing information concerning the state of the investigation and presenting a united front in the face of any questioning; and (5) circulating false and defamatory information concerning Decedent in order to depict him as a violent man." (Defs' Mot. at 25.) (citing Compl. ¶ 136.) Plaintiff also pled that Defendants Belanger and Berry, together with the Fishkill Officers called and falsely reported to officials at St. Luke's Hospital Cornwall on the day of Mr. Harrell's murder that Mr. Harrell had overdosed. (Am. Compl. ¶¶ 94, 107.) It is unclear how much more detail the State Defendants expect at the pleadings stage of the litigation. Regardless, Plaintiff "has alleged all of the necessary facts: the who, what, when, why, and how. No more is required at this stage." *Brokaw v. Mercer County*, 235 F.3d 1000, 1016 (7th Cir. 2000).

The State Defendants also claim that the flyer attached to Plaintiff's Complaint is "clearly disparaging of Superintendent Connolly" and therefore "does not plausibly suggest a conspiracy."

(Defs' Mot. at 24.) The disparagement of Superintendent Connolly in the flyer is irrelevant because it concerns matters peripheral to the conspiracy. It does not absolve him of the larger conspiracy. The flyer, distributed after Mr. Harrell's death, was the product of consultation with the officers involved in Mr. Harrell's murder and reflects an agreement with those corrections officers to set forth a false and misleading account of the circumstances of Mr. Harrell's death. The conspiracy went beyond the murder of Mr. Harrell at approximately 8:45p.m. in Building 21/21A of Fishkill. "Thereafter," the Defendants, including Connolly, "submitt[ed] false reports, statements, and testimony to support and corroborate the fabricated charges lodged against Mr. Harrell," and, among other thing, met to discuss "information concerning the state of the investigation and present a united front in the face of any questioning." (Am. Compl. ¶ 136(b).) Regardless of what other State and NYSCOBPA Defendants thought about Superintendent Connolly's banning plastic forks and his failure to show up after, they shared the common objective of covering up the true facts of Mr. Harrell's murder.

To the extent Defendants argue that Plaintiffs be required to name the Defendants individually or allege what specific actions they took, such requirements are into required at this stage of litigation. "[S]ince conspiracy by its very nature is a secretive operation, the elements of a conspiracy may be established through circumstantial evidence." *United States v. Rivera*, 971 F.2d 876, 890 (2d Cir. 1992) (internal quotation marks omitted); *Rooney Pace, Inc. v. Reid*, 605 F. Supp. 158, 162 (S.D.N.Y. 1985) (Evidence of conspiracy must await discovery; motion to dismiss conspiracy claim denied.).

Finally, though the Defendants cite the intracorporate conspiracy doctrine as a defense, Defs' Mot. at 25 n.11, the doctrine does not apply here because the conspiracy involved both state

actors and non-state actors. [10] However, even if the conspiracy involved corrections officers alone, it would still not apply. In a 2013 S.D.N.Y. case alleging a § 1983 conspiracy involving corrections officers alone, Judge J. Paul Oetken held that "no fair interpretation of [the Plaintiff's] allegations suggests that Defendants were acting within the scope of their responsibilities as prison guards when they forced [Plaintiff and another inmate] to fight each other in the mantrap area." *Randle v. Alexander*, 960 F. Supp. 2d 457, 475 (S.D.N.Y. 2013). Similarly, here, the Defendants' actions in, *inter alia*, excessively beating Mr. Harrell after he was handcuffed and on the ground and, thereafter, covering up their actions, cannot be said to have been within the scope of their employment.

Accepting all allegations in the Complaint as true, Plaintiff sufficiently pled a § 1983 conspiracy involving the State Defendants and NYSCOPBA which began on the night of Mr. Harrell's murder and continued through the investigation by various authorities.

> **POINT V:    PLAINTIFF PROPERLY PLED A CLAIM UNDER 42 U.S.C. § 1985(2) THAT THE STATE DEFENDANTS OBSTRUCTED A STATE INVESTIGATION WITH THE INTENT TO DENY MR. HARRELL EQUAL PROTECTION OF THE LAWS AND A CORRESPONDENT § 1986 CLAIM**

The State Defendants' only argument requesting dismissal of Plaintiff's § 1985(2) claim, or corresponding § 1986 claim, is that "Plaintiff fails to plead how such actions impeded, hindered, obstructed or defeated the due course of justice in any state judicial proceeding or even how she was otherwise prejudiced." (Defs' Mot. at 25.)

---

[10] Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring together. *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978). Furthermore, an exception to the doctrine exists where there are individuals who are "motivated by an independent personal stake in achieving the corporation's objective." *Girard v. 94th St. and Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976); *see, e.g., Yeadon v. New York City Transit Auth.*, 719 F. Supp. 204, 207, 212 (S.D.N.Y. 1989) (police officers engaged in race-based false arrests to "improve their arrest records in order to secure promotions and other benefits" had "independent, conspiratorial purpose").

Pursuant to 42 U.S.C. § 1985(2), such a conspiracy exists where:

> [1] two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, [2] the due course of justice [3] in any State or Territory, [4] with intent to deny to any citizen the equal protection of the laws.

42 U.S.C. § 1985(2); *Kush v. Rutledge*, 460 U.S. 719, 725 (1983).

Here, Plaintiff has clearly alleged that two or more persons conspired to obstruct justice by obstructing the duties of state officers investigating the murder of Samuel Harrell. These Defendants intimidated witnesses of Mr. Harrell's murder who spoke to both state police investigators and the DOCCS Investigator General, now known as the Office of Special Investigations; failed to come forward to report the incriminating admissions of criminal behavior, Am. Compl. ¶ 111; falsely reported that Mr. Harrell had overdosed to the hospital when they called for an ambulance, *Id*. ¶ 107; and distributed the same information to a newspaper, *Id*. ¶ 108. Together with NYSCOPBA and its agents, the named and identified State Defendants orchestrated an affirmative strategy of obstruction and falsification. (*Id*. ¶ 110.) This is sufficient to allege a § 1985(2) conspiracy. *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 840 n.1 (1983); *see also Bell v. Milwaukee*, 746 F.2d 1205, 1261 n.71 (7th Cir. 1984) (finding false testimony by a defendant at a coroner's inquest was sufficient to establish obstruction of justice pursuant to § 1985(2)).The Complaint also states that the officers involved in the murder were white, and discriminated against Mr. Harrell on the basis of his race. (Am. Compl. ¶¶ 145–146.) Plaintiff alleges that the State Defendants have known about the "Beat Up Squad," including their racially motivated and abusive actions since at least 2005. (*Id.* ¶¶ 147–148.)

In *Bell v. Milwakee*, the Seventh Circuit explained the rights protected in this regard: "conspiracy to cover up a killing, thereby obstructing legitimate efforts to vindicate the killing through judicial redress, interferes with the due process right of access to courts, which is protected

by Sections 1985(2) and 1985(3). Judicial access must be 'adequate, effective, and meaningful.'"

746 F.2d at 1261. The Court clarified what such a denial entails:

> To deny such access defendants need not literally bar the courthouse door or attack plaintiffs' witnesses. This constitutional right is lost *where, as here, police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress*. A contrary interpretation of the right to due process would encourage police officials to conceal the circumstances relating to unlawful killings committed under color of state law and other deprivations of federal rights which Section 1983 was designed to remedy.

*Id.* As a result, Plaintiff has sufficiently pled that the State Defendants conspired with others, with discriminatory and invidious intent, to impede the course of justice in the investigation into Mr. Harrell's murder.

### POINT VII:  PLAINTIFF'S COMPLAINT ADEQUATELY PLEADS A § 1985(3) CONSPIRACY TO DEPRIVE MR. HARRELL OF EQUAL PROTECTION OF THE LAWS BASED ON HIS RACE

In order to make out a claim under 42 U.S.C. § 1985(3), "the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828–29 (1983).

Much like a § 1985(2) claim discussed *supra*, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *accord Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012).  Thus, for such a claim, a plaintiff must show both that the normal elements of a civil conspiracy existed and that the *purpose* of the defendants' conspiracy was to deprive the plaintiff's equal protection rights.

32

Contrary to the assertion found in Defendants' Motion, the Amended Complaint is replete with detailed information regarding the racially motivated acts of the Beat Up Squad. The alleged conspiracy included prior knowledge by the State Defendants of the racially motivated, malicious actions of the Beat Up Squad, and that the Beat Up Squad was comprised of only white corrections officers (Am. Compl. ¶ 145) who worked the 3pm – 11pm shift in Building 21/21A at Fishkill. (*Id.* ¶¶ 98–104, 122.)

In *Griffin v. Breckenridge*, the seminal case on § 1985 claims, the Supreme Court found that three African-American plaintiffs had properly alleged a § 1985(3) conspiracy claim where they pled that they had been assaulted by multiple white defendants who had originally conspired to target them, even though the white officers were under the mistaken belief that the men were activists with a civil rights organization. 403 U.S. 88 (1971). There, the Complaint alleged that the purpose of the conspiracy was "to prevent [the] plaintiffs and other Negro-Americans, through . . . force, violence and intimidation, from seeking the equal protection of the law and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the State of Mississippi." 403 U.S. at 90. Similarly, Plaintiff has pled that the State Defendants had knowledge of the abusive actions of a group of white corrections officers known as the Beat Up Squad (Am. Compl. ¶ 134); that the abuses came in the form of both physical and verbal abuse, including racial slurs, (*see, e.g.*, *id.* ¶¶ 142–152); that the Defendant Corrections Officers murdered Mr. Harrell with an invidious purpose, established through their repeated use of racial slurs (*id.* ¶ 127); and that the purpose behind this was to intimidate other inmates from speaking out about what had happened (including continuous threats to their lives).  (*Id.* ¶¶ 111–118.)

Racial animus is central in this case. With allegations of racial slurs, a group of white officers named the Beat Up Squad with a history of racially motivated misconduct, and a union

33

agreeing to cover up the racially motivated assaults of its officers, Plaintiff has properly pled a §

1985(3) and, therefore, a § 1986 conspiracy involving the State Defendants.

### POINT VII: PLAINTIFF PROPERLY PLED A TITLE VI CLAIM

The State Defendants' argument that Plaintiff's complaint, "aside from the claim that

DOCCS received federal funding" is "bereft of any factual allegations that support a Title VI

claim" is without merit. Section 2000d provides, in full:

> No person in the United States shall, on the ground of race, color, or national origin,
> be excluded from participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. The Second Circuit has explained that Title VI was meant to cover "those

situations where federal funding is given to a non-federal entity which, in turn, provides financial

assistance to the ultimate beneficiary." *Soberal-Perez v. Heckler*, 717 F.2d 36, 38 (2d Cir. 1983),

*cert. denied* 466 U.S. 929 (1984). As the Supreme Court has explained, "[i]n view of the clear

legislative intent, Title VI must be held to proscribe only those racial classifications that would

violate the Equal Protection Clause." *Regents of the University of California v. Bakke*, 438 U.S.

265, 340 (1978) (Brennan, J.)("Congress intended the meaning of [Title VI's] prohibition to evolve

with the interpretation of the commands of the Constitution").

Defendants' argument that Plaintiff "fails to plead that DOCCS—as opposed to any

individual—intentionally discriminated against the Decedent in any way through its policies or

general practices" is misplaced. The concept of Title VI liability, in sum, focuses on the acts of the

decision-makers of an entity that accepts federal funding, including state entities. *See Pers. Adm'r*

*of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (holding that a successful showing of a Title VI

violation rests on the actions of a decision-maker). Private individuals who bring suits under Title

VI may not recover compensatory relief unless they show that the defendant engaged in intentional

34

discrimination. *Guardians Assoc. v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 597, 607 (1983); *see also Alexander v. Sandoval*, 532 U.S. 275, 282–83 (2001) (reaffirming that private individuals cannot recover compensatory damages under Title VI except in cases of *intentional discrimination*). The standard for intentional violations is "deliberate indifference to the strong likelihood [of] a violation:" *Bartlett v. New York State Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998) (internal citations omitted); *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009).

As the decision makers of DOCCS and OMH, the Supervisory Defendants were deliberately indifferent to the "strong likelihood" of a violation of individuals' constitutional rights. As alleged, these Defendants "permitted, tolerated, and were deliberately indifferent to a pattern and practice of racially discriminatory treatment of incarcerated individuals, including Mr. Harrell. Specifically, these [Supervisory] Defendants have been aware of the existence of the "Beat Up Squad," consisting of an all-white group of Fishkill Officers, which operates in a discriminatory manner against incarcerated individuals of minority backgrounds." (Am. Compl. ¶ 124.) Thus, Defendants' arguments must fail.

### POINT VIII: MR. HARRELL WAS DENIED A SERVICE IN VIOLATION OF THE ADA AND REHABILITATION ACT

Under Section 504 of the Rehabilitation Act, recipients of federal funds, including state agencies, must reasonably accommodate persons with disabilities in their facilities, program activities, and services. 29 U.S.C. § 794 (1973). Additionally, Section 504 requires such recipients to modify their facilities, program activities, and services as necessary to accomplish this purpose *Id*. Title II of the Americans with Disabilities Act extends to state and local governments, 42 U.S.C. § 12131 (1990), including prisons. *Penn. Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998). Mental health services provided by correctional facilities to those incarcerated are considered

"services, programs, or activities of a public entity" within the meaning of the ADA. *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001). "Rights against discrimination are among the few rights that prisoners do not park at the prison gates." *Crawford v. Indiana Dep't of Corr*, 115 F.3d 481, 486 (7th Cir. 1997) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)) "[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . [and] segregation . . . ." 42 U.S.C. §§ 12101(a)(2), (3), (5).

In order to bring a claim under Section 504 of the Rehabilitation Act and/or Title II of the ADA, a plaintiff must establish that:

(1)     the entity denying participation or enjoyment receives federal financial assistance;

(2)     he is a "handicapped person" as defined in the Act;

(3)     he is "otherwise qualified" to participate in the offered activity or program or to enjoy the services or benefits offered; and

(4)     he is being excluded from participation or enjoyment solely by reason of his handicap.

*See Rothschild v. Grottenthaler*, 907 F.2d 286, 289–90 (2d Cir. 1990). Though claims under Section 504 and Title II are not identical, "the main difference between [them] is that coverage under [the] Rehabilitation Act is limited to entities receiving federal financial assistance, while the ADA's reach extends to private entities. When brought together, claims under Title II and Section 504 may be treated identically." *Hilton v. Wright*, 928 F. Supp. 2d 530, 556-57 (N.D.N.Y. 2013) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d. Cir. 2003)).

The Second Circuit has held that "services, programs, or activities" "is a catch-all phrase that prohibits all discrimination by a public entity, regardless of context[.]" *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), *superceded on other grounds*, *Zervos*

36

*v. Verizon New York, Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001). Other Circuits agree with this interpretation. *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) ("Quite simply, the ADA's broad language brings within its scope anything a public entity does.") (quotations omitted); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002); *Yeskey v. Commonwealth of Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998); *see also Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (finding that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does").

On the night of Harrell's death, two inmates approached two Defendant corrections officers to inform them of Harrell's deteriorating mental state. Instead of ensuring that Harrell was provided the mental health services he required, the officers denied Mr. Harrell mental health care and took action that was so contrary to Mr. Harrell's mental and physical well-being, it resulted in Mr. Harrell's death. (Am. Compl. ¶ 171.) This is precisely the protections that should be afforded under both the ADA and the Rehabilitation Act.

Defendants attempt to narrow Plaintiff's allegations, stating that Plaintiff failed to "show that Decedent was denied participation in any program *because* of his disability or that he was treated differently than any other inmate." (Defs' Opp. at 32.) Defendants' attempt to link the brutal physical attack on Mr. Harrell as treatment typical of "any other inmate," ignores important protections of the ADA and Rehabilitation Act. The act of attacking and assaulting Mr. Harrell occurred precisely because of his mental disability. But for Mr. Harrell's delusional behavior on April 21, 2015, Defendants would not have beaten him to death. There was awareness of this fact in that the Defendant corrections officers had been informed of Mr. Harrell's need for mental health treatment. (Am. Compl. ¶¶ 49–50.) Rather than provide Mr. Harrell with needed mental health services, the officers sent out a "Red Dot" alarm, alerting all officers, including officers

"who had previously physically and mentally abused him." (*Id.* ¶¶ 56–57.) Plaintiff has also alleged that such actions "served only to exacerbate whatever mental health crisis [Mr. Harrell] was then experiencing." (*Id.* ¶ 58.) Thus Plaintiff has more than sufficiently pled that DOCCS violated the ADA and the Rehabilitation act in denying him such services, and should be entitled to compensatory damages sufficient to remedy the consequences that resulted from his deprivation.

Here, Plaintiff alleged that the State of New York failed to appropriately designated Mr. Harrell as OMH Level 1 due to his Serious Mental Illness. (Am. Comp. ¶ 176.) The Complaint also alleges a failure of DOCCS in creating a policy that appropriately protected Mr. Harrell after two inmates alerted Defendant Corrections Officers Michels and Mathew that he was in the midst of a mental health crisis. Rather than wait for appropriate treatment, they called a supervisor and other Corrections Officers, including members of the notorious Beat Up Squad, causing Mr. Harrell to panic. (Am. Compl. ¶¶ 56–58.)

Recently, Judge Alison Nathan found that Plaintiff plausibly alleged an ADA/Rehabilitation Act Claim against the City of New York where, with knowledge of an individual's mental health diagnosis of paranoid schizophrenia, rather than calling for a unit which specializes in mental health treatment, the detectives went forward to effectuate an arrest. Plaintiff alleged a violation of the ADA/Rehabilitation Act Claim "on grounds that the City failed to reasonably accommodate Mr. Felix's disability and denied to Mr. Felix the benefits of the City's services, (a) failing to properly train, supervise, and discipline police officers regarding crisis intervention techniques; (b) otherwise providing insufficient resources; and (c) failing to follow established policies and procedures regarding crisis intervention techniques for individuals with mental health disabilities." *Felix v. City of N.Y.*, No. 16-CV-5845 (AJN), 2018 U.S. Dist. LEXIS 169639, at *39–40 (S.D.N.Y. Sep. 30, 2018) The Court held that "[t]he City is obligated to

accommodate individuals with disabilities in the operation of its police department, including delaying, where safety concerns permit, approaching individuals in the middle of mental health crises." *Id.* at *46 (S.D.N.Y. Sep. 30, 2018) (Nathan, J.); *Morales v. City of New York*, No. 13-CV-7667 (RJS), 2016 U.S. Dist. LEXIS 121471, 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016).

The failure to provide adequate resources for the treatment of individuals with mental health emergences, the failure to obtain the necessary mental health treatment on April 21, 2015, the failure to treat Mr. Harrell, and the ultimate beating and murder of Mr. Harrell, all reflect clear violations of the ADA/Rehabilitation Act.

### POINT IX: THE WRONGFUL DEATH CLAIMS MUST SURVIVE

**1. Plaintiff's Wrongful Death Claims Against Nurse Endrizzi, Nurse Laughman, and Nurse Zaprowski Relate Back to the Original Complaint and Are Not Time-Barred.**

Defendants move to dismiss the wrongful death claims against Defendants Endrizzi, Laughman, and Zaprowski. However, these claims relate back to the original complaint. Plaintiff identified these individuals as "OMH Medical Professionals" in the original Complaint, was only able to get the records that provided their names and accounts of what occurred on April 21, 2015 through the limited discovery that recently took place in the case.

"[A]n amended pleading relates back to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable limitations period." *Krupski v. Costa Crociere S. p. A*., 560 U.S. 538, 541 (2010). To relate back under Rule 15(c), the amended claim must arise "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c).

Wrongful death claims are brought pursuant to the Estates Powers & Trusts Law ("EPTL") § 5-4.1(1), which have a two-year statute of limitations. However, pursuant to New York CPLR

39

203, a plaintiff's claims against one defendant may relate back to claims asserted against another if:

> (1) both claims arose out of the same conduct, transaction, or occurrence, (2) the new party is 'united in interest' with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (3) the new party knew or should have known that, but for a[] . . . mistake by plaintiff as to the identity of the proper parties, the action would have been brought against him as well.

*Buran v. Coupal*, 87 N.Y.2d 173 (1995).

Mr. Harrell's death occurred on April 21, 2015. Plaintiff filed her initial Complaint on September 9, 2015 alleging in detail the death of Mr. Harrell and the aftermath. These allegations included the actions of "OMH Medical Professionals whose names" were, at the time, unknown. (Compl., Dkt. No. 1, ¶ 16.) After discovery was exchanged, Plaintiff learned that the OMH Medical Professionals who failed to intervene or provide Mr. Harrell adequate medical care on the day of Mr. Harrell's murder were Defendants Endrizzi, Laughman, and Zaprowski. (Am. Compl. ¶¶ 17, 89.) Plaintiff alleged that, though Mr. Harrell, who was allegedly still alive, was taken to the infirmary, Defendants Endrizzi, Laughman, and Zaprowski were present and knew of Mr. Harrell's presence, but failed to treat him. (Am. Compl. ¶ 89.)

There is no question that the claims against these individuals arose of the same conduct and that, as alleged, these Defendants were united in interest with the previously named Defendants. But for Plaintiff's initial ignorance to their identities, Plaintiff would clearly have included them in the original complaint. *See, e.g.*, *Dacosta v. City of N.Y.*, 296 F. Supp. 3d 569 (E.D.N.Y. 2017) (Weinstein, J.).

## 2. Plaintiff's Wrongful Death Claim Against OMH Commissioner Sullivan Should Survive

Plaintiff has brought state constitutional claims against OMH Commissioner Sullivan in

her individual capacity, not in her official capacity as Defendants have alleged. (Defs' Mot. at 34.) Defendants' argument that she is named simply because "she is the head of [OMH]" ignores the allegations pled in Plaintiff's detailed complaint.

In a wrongful death claim in New York, a Plaintiff must sufficiently allege (1) the death of a human being; (2) negligence of a defendant causing death; (3) survival of distributees suffering pecuniary loss because of the death; and (4) appointment of a personal representative of the decedent. *See Chong v. N.Y. City Tr. Auth.*, 441 N.Y.S.2d 24, 26 (2d Dep't. 1981). Determining the defendant's negligence is often determinative in New York wrongful death suits because "[t]o succeed on a cause of action to recover damages for wrongful death, the decedent's personal representative must establish, *inter alia*, that the defendant's wrongful act, neglect, or default caused the decedent's death." *Eberts v. Makarczuk*, 861 N.Y.S.2d 731, 732 (2d Dep't 2008).

Defendants request dismissal of the wrongful death claim against OMH Commissioner Sullivan because such a claim must be brought in the New York Court of Claims as "the State of New York is the real party in interest." (Defs' Mot. at 34–35.) Defendants misinterpret the law. In fact, in *Morell v. Balasubramanian*, a case cited by the State Defendants, the Court of Appeals held "[w]here, however, the suit against the State agent or officer is in tort for damages arising from the breach of a duty owed individually by such agent or officer directly to the injured party, the State is not the real party in interest—even though it could be held secondarily liable for the tortious acts under respondeat superior." 70 N.Y.2d 297, 303 (1987). The Court reasoned that:

> [T]he Legislature, in adopting the Court of Claims Act, did not intend to abrogate the right of an injured party to sue a State employee for damages. The references in Public Officers Law § 17 (3) (a) to settlements by or judgments against State employees 'in any state or federal court' are a legislative recognition that State employees can be sued in such courts. Indeed, if they could not be, there would be no purpose at all for the indemnification provisions in Public Officers Law § 17 because there would be no court in which State employees could be sued since individuals are not subject to suit in the Court of Claims.

*Id.* By assuming physical custody over inmates, the State takes on a duty of care to ensure their safety to risks of harm that are reasonably foreseeable. *Sanchez v. State of N.Y.*, 99 N.Y.2d 247, 252 (2002).

Here, Plaintiff has alleged that Defendant Commissioner Sullivan "permitted, tolerated, and [was] deliberately indifferent to a pattern of abuse and neglect, and serious physical abuse "specifically targeting mentally ill inmates" of which she had knowledge. (Am. Compl. ¶¶ 122–123.) Thus, Plaintiff has properly pled that Commissioner Sullivan breached "a duty owed individually by such agent or officer directly to the injured party." *Morell*, 70 N.Y.2d at 301. In *Rhynders v. Greene*, the Court found that the Plaintiff could sue a State official in Supreme Court because of a negligently constructed drainage system. The Court reasoned that "the State has assumed liability for defendant's alleged tort" and therefore "the [Court of Claims Act] has not relieved the defendant from his personal responsibility for wrongs committed by him." 255 A.D. 401 (3d Dep't 1938). In Vega v. Fox, the court found that there was a "question of fact" as to whether a supervisor, named in his individual capacity "was or could have been exerting some influence over how [the employees] chose to act in the face of a physical altercation between residents or in the aftermath of that event. 457 F. Supp. 2d 172, 188 (S.D.N.Y. 2006)

Because Commissioner Sullivan had knowledge of the pattern of abuse and neglect in Fishkill's Building 21, the wrongful death claim against her must survive.

### POINT X: STATE CONSTITUTIONAL CLAIMS SHOULD NOT BE DISMISSED[11]

With respect to the State constitutional claims, the State Defendants argue that Plaintiff has

---

[11] It is important to note that, unlike the argument regarding Plaintiff's other state law claims, the State Defendants do not move to dismiss the State Constitutional Claims against the OMH Medical Professionals, as plead in the Complaint. As a result, these claims must survive.

no right of action under the State constitution because she has other actionable tort claims, while at the same time arguing Plaintiff has no actionable tort claims. Defendants cannot have it both ways. Moreover, Plaintiff cannot recover for the deprivation of Mr. Harrell's civil rights under state tort claims, and therefore preventing her from proceeding with his State constitutional claims would be inappropriate. *See Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001) (no private right of action under constitution where deprivation of constitutional right was remedial through other claim).

As this court has held, "the more prudent course at this stage to deny defendants' application to dismiss the State constitutional claims." *Haus v. City of New York*, 2011 U.S. Dist. LEXIS 155735, at *257 (S.D.N.Y. Aug. 31, 2011). In *Brown v. State*, 89 N.Y.2d 172 (1996), relied upon by the court in *Haus*, the Court of Appeals case recognized civil claims under the New York State Constitution, Art. I, §§ 11-12, based on large-scale racially motivated police interrogations. The Court in *Haus* reasoned that dismissal of such claims at the motion to dismiss stage was premature: "[i]f plaintiffs prevail on their parallel federal claims, there will be no occasion to address the issue definitively since the state-law claims will be duplicative and thus not trigger any additional relief. If the plaintiffs fail in their burden of proof on the federal claims, the state-law claims will also presumably fail since they embody comparable legal standards." 011 U.S. Dist. LEXIS 155735, at *257. Thus, the state constitutional claims against OMH Commissioner Sullivan should not be dismissed.

### POINT XI: THE NEGLIGENCE CLAIM WAS PROPERLY PLED

Defendants argue that Plaintiff's claims for negligence relate to a physician-patient relationship that require a claim of medical malpractice rather than negligence. (Defs' Mot. at 35.) However, the very case cited by Defendants belie such an argument. In *Papa v. Brunswick Gen.*

43

*Hosp.*, the Court found that, the "gravamen of the action concerns the alleged failure to exercise ordinary and reasonable care to insure that no unnecessary harm befell the patient" and not "diagnosis, treatment or the failure to follow a physician's instructions." 517 N.Y.S.2d 762, 764 (2d Dep't 1987). As a result, the claim was properly brought as a negligence claim and not a medical malpractice claim. *Id.*; *see also Borrillo v. Beekman Downtown Hosp.*, 146 A.D.2d 734, 735 (2d Dep't 1989) y("The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of the common everyday experience of the trier of facts"). "A hospital in a general sense is always furnishing medical care to patients, but clearly not every act of negligence toward a patient would be medical malpractice." *Sweeney v. Presbyterian/Columbia Presbyterian Medical Center*, 763 F.Supp. 50, 52 (S.D.N.Y. 1991).

Additionally, the Court of Appeals has cautioned against summary dismissal of negligence claims "since often, even if all parties are in agreement as to the underlying facts, the very question of negligence is itself a question for jury determination." *Ugarriza v Schmieder*, 46 N.Y.2d 471, 474 (1993). As a result, these claims must survive.

### POINT XII: PLAINTIFF PROPERLY PLED LIABILITY FOR NEGLIGENT HIRING, TRAINING, AND SUPERVISION

Plaintiff has alleged claims against Defendant OMH Commissioner Sullivan and the Defendant OMH Medical Professionals in their individual capacities. The State Defendants' argue that the OMH Employees were "acting under the scope of their employment," and therefore, the employer was liable based on *respondeat superior* liability.

Under New York law, a claim for negligent hiring, supervision or retention, "in addition to

44

the standard elements of negligence," requires "a plaintiff [to] show: (1) that the tortfeasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and, (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004).

The standard for negligence claims against supervisors differs from the standard for negligence against employees. *Bellere v. Gerics*, 759 N.Y.S.2d 105, 107 (2d Dept. 2003) ("To hold a party liable under theories of negligent hiring, negligent retention, and negligent supervision, a plaintiff must establish that the party knew or should have known of the [employee's] propensity for the conduct which caused the injury."); *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999) ("The liability of a supervisor under Section 1983 is . . . analytically distinct from that of a subordinate who directly caused the unlawful condition or event. . . . Given the lack of *respondeat superior* liability under Section 1983, a supervisor's liability is not for the use of excessive force . . . but for distinct acts or omissions that are a proximate cause of the use of that force.") (citations omitted).

Defendants' assertion that the officers were acting within the scope of their employment is unavailing. In order to dismiss a negligent hiring and retention claim on this basis, Defendants must make an evidentiary showing. *Chavez v. City of New York*, 99 A.D.3d 614, 615 (1st Dep't 2013). Here, they have not made that showing. Plaintiff's claim against Commissioner Sullivan is that she failed to properly train OMH Medical Professionals when she knew "that a pattern of serious physical abuse and neglect" related to inmates with mental health diagnoses prior to and including the time of Mr. Harrell's murder. (Am. Compl. ¶ 122.) This is not merely a *respondeat superior* claim. Thus, this claim must, too, survive.

45

**CONCLUSION**

For the foregoing reasons, and based on the pleadings and papers filed in this action, Defendants' motion should be denied. Should the Court perceive deficiencies with respect to any of her claims, Plaintiff requests the opportunity to amend her Complaint to amplify the allegations. *See Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'") (citation omitted).


Dated: New York, New York
       December 7, 2018

                                        Respectfully submitted,
                                        BELDOCK LEVINE & HOFFMAN LLP

                                        By: _____
                                            Jonathan C. Moore
                                            Luna Droubi
                                            Marc Cannan

                                        *Attorneys for Plaintiff Diane Harrell,
                                        Individually and as Administratrix of the
                                        Estate of Samuel D. Harrell, III*