UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 8/14/19

DIANE HARRELL, Individually and as
Administratrix of the Estate of Samuel D.
Harrell, III, Deceased,

                              Plaintiff,

                    v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS
AND COMMUNITY SUPERVISION
("DOCCS"), et al.,

                              Defendants.

No. 15-CV-7065 (RA)


OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

       Plaintiff Diane Harrell, proceeding individually and as administratrix of the estate of her

late husband Samuel D. Harrell, III ("Harrell"), brings this action for his wrongful death while

incarcerated at Fishkill Correctional Facility. The Defendants consist of various New York State

agencies and their employees (collectively the "State Defendants") and the New York State

Correctional Officers & Benevolent Association, Inc., a union representing correction officers in

New York State, and its agents and employees (collectively the "NYSCOPBA Defendants").

Before the Court is the State Defendants' motion to dismiss the Amended Complaint, pursuant to

Federal Rule of Civil Procedure 12(b)(6), with the exception of the § 1983 claims for excessive

force and deliberate medical indifference, which Defendants have not moved to dismiss.[1] For the

reasons stated below, the motion is granted, and this case will proceed only as to the excessive

force and deliberate medical indifference claims.

---

[1] The NYSCOPBA Defendants filed a separate motion to dismiss, which the Court has granted in a separate opinion.

**BACKGROUND**

The following facts, taken from the Amended Complaint ("AC"), are accepted as true for the purposes of this motion. *See Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009).

## I.     Parties

Plaintiff Diane Harrell is the surviving spouse and administratrix of the estate of Samuel D. Harrell, III, a 30-year old African-American man who resided at Fishkill Correctional Facility ("Fishkill"), a medium security prison located in Beacon, New York, at the time of his death on April 21, 2015.

Defendant New York State Department of Corrections and Community Supervision ("DOCCS") is the department of the State of New York responsible for the confinement and habitation of incarcerated individuals held in correctional facilities throughout the State. At all relevant times, Defendant Anthony J. Annucci was Acting Commissioner of DOCCS, and Defendant Joseph Bellnier was Deputy Commissioner of DOCCS.

Defendant New York State Office of Mental Health ("OMH") is a department of the State of New York responsible for operating and managing psychiatric services across the State. At all relevant times, Defendant Ann Marie Sullivan was Commissioner of OMH, and Defendants Maura Endrizzi, Jason Laufman, and Maria Zaprowski (collectively the "OMH Medical Professionals") were medical and mental health care providers responsible for the medical care of people incarcerated at DOCCS facilities.

At all relevant times, Defendants Frederick Belanger, Shawna Healy, Margaret Berry, Seleste Wallace, Marianne Sarvis, and Shirley Roberts were medical and mental health care

providers responsible for the medical care of people incarcerated at DOCCS facilities (collectively the "DOCCS Medical Professionals").

At all relevant times, Defendant William Connolly was Superintendent of Fishkill, Defendants Lieutenant Alan Washer, Sergeant John U. Carreras, Sergeant Guarino, Sergeant Terry W. Shultis and other unnamed senior officers were high-ranking correction officers at Fishkill (collectively the "Senior Fishkill Officers"), and Defendant Correction Officers Anderson, Beroni, Charpentier, DeFreese, Dickinson, Eull, Harrington, Mathew, Michels, Morel, O'Connor, Rivera, Rolle, Salerno, Sherman, Sorensen, Yager, and John and Jane Doe officers were Fishkill correction officers involved in the incident resulting in Harrell's death (collectively the "Fishkill Officers").

## II.    Events Leading to Harrell's Death

On April 16, 2014, Harrell was sentenced to eight years in prison for criminal sale of a controlled substance in the third degree. On November 19, 2014, Harrell learned that his mother had passed away, and immediately began showing signs of depression. Harrell was transferred to Fishkill on or about January 25, 2015, where he was housed in Building 21, a "mental health unit" of Fishkill. At some time before his death, the OMH Medical Professionals diagnosed Harrell with mood disorder, antisocial personality disorder, and bipolar disorder. Plaintiff alleges that under the care of the OMH and DOCCS Medical Professionals, Harrell took medication to treat his bipolar disorder "for years." AC ¶ 43. Yet Plaintiff also alleges that Defendants did not prescribe Harrell medication—and failed to provide prescribed medicine and treatment—to treat his disorder. *Id.* ¶ 30.[2] Prior to the incident resulting in his death, Harrell had not taken his needed medication.

---

[2] The Court notes that two of the allegations on this issue appear to contradict each other. *Compare* AC ¶ 30 ("[T]he DOCCS and/or OMH Medical Professionals had a policy or practice that resulted in the failure to prescribe Mr.

At Fishkill, Plaintiff alleges, Harrell was subject to repeated physical abuse and punishment without cause by Fishkill Officers. On April 2, 2015, he was placed in solitary confinement based on a purportedly false allegation that he possessed synthetic marijuana. On April 17, 2015, he was released from solitary confinement, and immediately began exhibiting signs of depression and paranoia.

Four days later, on April 21, 2015, Harrell was noticeably upset. Late in the afternoon, he began telling a number of the Fishkill Officers and other inmates that "he was going home that evening." He also told fellow inmates that he was meeting his wife and sister, and that he needed to pack his things. At approximately 8:00 p.m., Harrell began packing his personal belongings into several bags. Two inmates took Harrell to the Correction Officers' desk in Building 21 and told COs Mathew and Michels that Harrell needed immediate medical attention as a result of his delusional thoughts. These officers reported Harrell's condition to Sgt. Guarino, a senior officer, as Harrell sat silently next to the Correction Officers' desk. CO Michels also called OMH Nurse Laufman and informed him that Harrell was exhibiting unusual behavior. Nurse Laufman told CO Michels to bring Harrell to the Regional Medical Unit (RMU) to be seen by the OMH Medical Professionals.

Sgt. Guarino then sent out a "Red Dot" alarm, which alerts all officers to respond to an incident where an inmate is engaging in inappropriate physical resistance to guards. At approximately 8:50 p.m., Harrell was surrounded by several of the Fishkill Officers, including those who purportedly had previously physically and mentally abused him. This response exacerbated Harrell's mental health episode, as he stood up from his chair and began walking

---

Harrell medication[.]"), *with* AC ¶43 ("Under the care of the DOCCS Medical Professionals and/or OMH Medical Professionals, Mr. Harrell had been taking medication to treat his bipolar disorder for years.").

down the hallway. In response, approximately four to six of the Fishkill Officers, including COs Dickinson, Salerno, Michels, and Mathew followed him, with one officer jumping on Harrell's back and tackling him to the ground. The remaining officers then allegedly jumped on top of him as well.

Next, Plaintiff alleges, the officers handcuffed Harrell, and a number of them, including COs Dickinson, Salerno, Michels, Mathew, and Yager, began to kick and punch Harrell on the head and body. Other Fishkill Officers, including COs Anderson, Beroni, Dickinson, Harrington, Mathew, Michels, Morel, O'Connor, Rivera, Salerno, Sherman, Sorensen, Rolle, and Yager, joined in the beating, punching, kicking, stomping, and/or jumping on Harrell's head, neck, arms, back, sides, and/or legs. At one point, CO Dickinson stood on Harrell with one foot on his head and the other on his neck. All of the officers involved in the beating were white, and some were members of the so-called "Beat Up Squad" or "Team Beat Down," terms used by Fishkill inmates to describe an alleged group of all-white correction officers which targets inmates of minority backgrounds. Although Harrell did not resist the officers, unnamed Defendants purportedly screamed "he's resisting arrest" during this encounter. As a result of the beating, Harrell defecated and urinated on himself. The Fishkill Officers allegedly continued to assault him after he became motionless and lost consciousness. During the beating, one or more of the Fishkill Officers are said to have yelled, "You fucking nigger." During the course of the incident, officers purportedly threatened inmates witnessing the beating with words to the effect of: "'Get the fuck back in the dayroom before you're next.'" The Senior Fishkill Officers were present during the encounter and allegedly did not attempt to intervene, nor did any of the correction officers responding to the incident.

As a result of their involvement in the incident, CO Michels had an asthma attack, and CO Harrington claimed he needed medical assistance. The DOCCS Medical Professionals responded and attended to the correction officers' alleged injuries, but not to Harrell, who lay motionless on the ground. After the two correction officers were taken away on stretchers, Sgt. Guarino yelled at Harrell words to the effect of: "You want to put your hands on my staff? Drag this motherfucker to the stairs." A Jane Doe Defendant Officer then obtained bedsheets to cover Harrell's body, and as Harrell was being wrapped in these bedsheets, one John Doe Fishkill Officer said words to the effect of: "I don't think he is going to make it." At that point, Sgt. Guarino allegedly ordered two Fishkill Officers, including CO Eull, to throw Harrell down the stairwell. COs Eull and Dickinson purportedly obligated, dragging Harrell toward the stairwell and throwing him down the steps. According to Plaintiff, unnamed Senior Fishkill Officers witnessed this, but did not intervene. Harrell landed in a distorted position against the ground floor wall of the stairwell. Several of the Fishkill Officers brought a wheelchair and attempted to seat Harrell into it, covering him in bedsheets and strapping his right hand to his left leg and his left hand to his right leg with ripped bedsheets.

The Fishkill Officers brought the wheelchair carrying Harrell toward the building's main walkway where they formed a "human wall," obstructing the view of witnesses as the wheelchair approached a general population area. As the Fishkill Officers pulled the wheelchair through Building 21, Harrell's feet dragged along the ground. The Fishkill Officers, Senior Fishkill Officers, and/or DOCCS Medical Professionals then took Harrell to the RMU. After Harrell was brought into the RMU, he was placed in a corner and ignored for several minutes, in spite of the severity of his injuries. The "Fishkill Medical Professionals" and/or several OMH Medical

Professionals continued to treat the two allegedly injured officers, but still did not treat Harrell.[3] Among other things, DOCCS Medical Professional Sarvis allegedly called an ambulance for the two injured correction officers, but not for Harrell, who remained strapped in the wheelchair.

After Sarvis called the ambulance, the Fishkill Medical Professionals and/or OMH Medical Professionals attempted to resuscitate Harrell. DOCCS Medical Professional Belanger instructed Nurse Berry to call for an ambulance, and together they reported that Harrell had overdosed, when he had not. Twenty minutes after the allegedly injured correction officers had been taken to the hospital, another ambulance arrived. The Fishkill Officers placed Harrell into the ambulance. He was taken to St. Luke's Cornwall Hospital where, at approximately 10:19 p.m., he was pronounced dead. According to the Amended Complaint, an autopsy performed by the Orange County Medical Examiner determined that Harrell's death was a homicide caused by a physical altercation with correction officers. The autopsy further determined that there were no illegal drugs in Harrell's system.

### III.    Events Following Harrell's Death

According to Plaintiff, after the incident, NYSCOPBA spokesman James Miller falsely informed the *Poughkeepsie Journal* that Harrell had assaulted correction officers and that "several officers were needed to restrain Harrell after the assault." The NYSCOPBA Defendants also allegedly distributed a flier related to the murder of Harrell, attached to the Amended Complaint as Plaintiff's Exhibit 1, claiming that Harrell died from an overdose, which was also false. Moreover, NYSCOPBA Defendants conferred with the Fishkill Officers and purportedly received admissions of criminal behavior, but refused to report them.

---

[3] Plaintiff nowhere provides the identities of the "Fishkill Medical Professionals."

Finally, Plaintiff alleges that correction officers physically and verbally threatened inmates who witnessed Harrell's beating. After Harrell was thrown down the stairs, for example, one Fishkill Officer grabbed an inmate witness's neck, pushed him into a corner, and yelled words to the effect of: "You better forget what you saw here if you ever want to make it home alive." Fishkill Officers also punished witnesses who spoke with investigators, including by placing these inmates—some of whom had serious mental illnesses—in solitary confinement, mostly for conduct that did not occur. The Fishkill Officers told witnesses that if they spoke out, the "same thing" that happened to Harrell would happen to them. These officers called witnesses who spoke out about Harrell's death "nigger lovers" and "rats." Days after Harrell's death, an unnamed Fishkill Officer gathered inmates in Building 21 and informed them that treatment there would not change.

## IV.    DOCCS and Fishkill Policies

The Amended Complaint makes various factual allegations about Fishkill's history of violence, neglect, and retaliation, primarily based on two reports issued by the Correctional Association of New York ("CANY"), an independent monitoring group that is authorized by New York law to inspect correctional facilities. [4] *See* N.Y. Correct. Law § 89-e.

In 2005, CANY issued a report about Fishkill, which identified gaps in the provision of mental health services to inmates, fear among inmates that reporting CO misconduct would result in retaliation, and some problems with inmate-officer relations, including a "widespread view that the officers on the 3:00 to 11:00pm shift, who tend to be inexperienced, are prone to abusive behavior and intimidation of inmates." *See* 2005 Prison Monitoring Report: *Fishkill Correctional*

---

[4] Both parties agree that the CANY reports are incorporated by reference into the Amended Complaint. *See* Defs. Memo. at 15 n.8; Pl. Memo. at 7 n.6.

*Facility*, Correctional Ass'n of N.Y. at 1, 3–5 (Feb. 15, 2005). With respect to mental health services, inmates with mental illness were "often treated with psychotropic medication rather than individual or group counseling" and had "insufficient access to mental health professionals," particularly in disciplinary housing. *Id.* at 1, 7. Both inmates and staff reported that there were insufficient mental health staff members at Fishkill. With respect to retaliation, "about half" of the inmates claimed they would not feel safe reporting correction officer misconduct. *Id.* at 5. Finally, with respect to inmate-officer relations, the report noted that while there were "some problems with physical abuse, . . . the majority of abuse is verbal, including racial slurs." *Id.* at 4. The evening shift included younger and more aggressive officers. *Id.*

As relevant here, the report concluded by recommending that Fishkill "increase supervision of staff on the 3:00 to 11:00pm shift and rigorously investigate allegations of abuse"; "remove inmates with major mental disorders from disciplinary housing and place them in residential mental health treatment programs"; and hire more medical staff. *Id.* at 10–12. The report also noted that the authors "met with the Superintendent and his Executive Team" to review their "major impressions." The Superintendent acknowledged that the evening shift was a "tenser environment." *Id.* at 10. The authors also discussed delays in access to medical care and staffing problems, and the need for more mental health services for individuals in disciplinary segregation. *Id.*

In 2012, CANY issued a more detailed report about Fishkill. This time, the report found that "survey respondents rated mental health care relatively highly," with Fishkill ranked as one of the best CANY-visited facilities for mental health care. *See* Prison Monitoring Report: *Fishkill Correctional Facility: 2012*, Correctional Ass'n of N.Y. at 2, 4 (April 2012). This report did indicate that the on-site pharmacy was understaffed, and that 45% of individuals on medication

9

said they experienced occasional problems receiving it. *Id.* at 14. As of July 2012, however, there were no OMH staff vacancies at Fishkill *Id.* at 4. Moreover, while the "high number of people with mental health needs" in Fishkill's SHU "raise[d] serious concerns regarding the devastating impact that isolation can have on people with mental illness," Fishkill's SHU ranked near the top third of CA-visited isolated confinement and SHU units for treatment of individuals with mental illnesses. *Id.* at 32. It also ranked in the top quarter of all units for frequency of check-ups on inmates by mental health staff, and was ranked one of the best SHU facilities for care by clinical providers. *Id.*

By contrast, Fishkill ranked "near the middle or worse half" of all CANY-visited facilities in inmate-staff relations. With respect to sexual abuse, abusive pat frisks, verbal harassment, racial harassment, threats and intimidation, retaliation for complaints, and destruction of property, Fishkill ranked in the bottom 15% among the 35 CANY-visited facilities, according to inmate survey responses. *Id.* at 22. In particular, "both the evening shift (3pm-11pm) and dorms 21 and 21A were repeatedly mentioned in interviews, generally survey comments, and when asked about [] specific locations/times of abuse." *Id.* at 23. Furthermore, over 85% of survey respondents felt that at the time of CANY's visit, the prison administration did "very little" or "nothing at all" in terms of preventing abuse. *Id.* at 24. Retaliation by correction officers did not appear to pose a significant issue. *Id.* at 26.

As relevant here, the report concluded by recommending that Fishkill "explore ways to add additional mental health support for patients currently serving time in the SHU"; "[s]pecifically review staff behavior during the 3:00 p.m. to 11:00 p.m. shifts and those stationed at dorms 21 and 21A, and take appropriate action to address any identified staff abuse"; and "[e]nd the practice of placing . . . people with mental illness in SHU." *Id.* at 57. The report also noted that after providing

a draft of the report to DOCCS and Fishkill officials, CANY had "additional correspondence with Fishkill officials in August 2012 and a conference call on September 30, 2013 with the Superintendent and members of the Executive Team to discuss [] findings and recommendations." *Id.* at 2.

The Amended Complaint separately alleges that, pursuant to a 2007 settlement agreement in *Disability Advocates, Inc. v. New York State Office of Mental Health*, New York State and its agencies agreed to commit to "a heightened level of care for all inmates with serious mental illnesses." The agreement "provides for additional treatment modalities and benefits for persons with mental illness in the State's correctional system." AC ¶ 38. Finally, the Amended Complaint alleges that inmates with serious mental illnesses were required to receive two hours per day of out-of-cell therapeutic programming and mental health treatment five days per week, AC ¶ 40, and that OMH staff were required to make two daily rounds to inmates in solitary confinement at Fishkill. *Id.* ¶ 41.

## V.     Service of Process on Defendants Anderson, Beroni, O'Connor, and Defreese

The Moving Defendants represent that Defendants Anderson, Beroni, O'Connor, and Defreese have not been served with the Summons and Complaint, and that they have not requested representation from the Office of the Attorney General. Defs. Memo. at 2 n.3. Plaintiff does not contest this claim. Indeed, the docket contains no affidavit of service of the Complaint or the Amended Complaint on any of these defendants. As the time limit for service has long expired, and Defendants' memorandum put Plaintiff on notice of her failure to serve, the Court dismisses the action without prejudice as to Defendants Anderson, Beroni, O'Connor, and Defreese. *See* Fed. R. Civ. P. 4(m). Service on all other defendants was proper.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering a motion to dismiss, "the court is to accept as true all facts alleged in the complaint . . . [and] draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

## DISCUSSION

Defendants move to dismiss Plaintiff's Amended Complaint, with the exception of her § 1983 claims for excessive force and deliberate medical indifference against the named Senior Officers (Defendants Washer, Carreras, Guarino, and Shultis), the Fishkill Officers who have been served (CO Dickinson, CO Eull, CO Harrington, CO Mathew, CO Morel, CO Michels, CO Rivera, CO Rolle, CO Salerno, CO Sherman, CO Sorenson, and CO Yager), the DOCCS Medical Professionals (Frederick Belanger, Shawna Healy, Margaret Berry, Seleste Wallace, Marianne Sarvis, and Shirley Roberts), and the OMH Medical Professionals (Maura Endrizzi, Jason Laufman, and Maria Zaprowski). *See* Defs. Memo. at 2 n.4. In short, the Court grants this motion in its entirety, and this case will proceed solely on the excessive force and deliberate medical indifference claims.

I.      **First Cause of Action (Against Annucci, Bellnier, Sullivan, Connolly, DOCCS Medical Professionals, OMH Medical Professionals, the Senior Officers, and the Fishkill Officers)**

Plaintiff's First Cause of Action is brought pursuant to §1983 against all State Defendants, which Defendants have only moved to dismiss as to Annucci, Bellnier, Sullivan, and Connolly (the "Supervisory Defendants"), together with CO Charpentier. Defendants also move to dismiss any claim deriving from Harrell's mental health treatment.

A.      **Claims Against the Supervisory Defendants**

The First Cause of Action contains three types of allegations against the Supervisory Defendants: 1) deliberate indifference toward Fishkill's failure to provide medical care; 2) deliberate indifference toward racially discriminatory treatment at Fishkill; and 3) deliberate indifference toward physical abuse during Fishkill's evening shift in Buildings 21 and 21A.

Deliberate indifference claims under the Eighth Amendment include "both an objective and a subjective prong." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Objectively, the deprivation must be "sufficiently serious," meaning the prison conditions posed "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Subjectively, the prison official must act with a "sufficiently culpable state of mind." *Id.*; *Hathaway*, 99 F.3d at 553. Such culpability exists when an official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 847). A plaintiff "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Id.*

The First Cause of Action is also based, in part, on the Supervisory Defendants' alleged indifference to equal protection violations under the Fourteenth Amendment. "To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). "[A] plaintiff seeking to establish a violation of equal protection by intentional discrimination may proceed in several ways, including by pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) (citation omitted).

Under Section 1983, a plaintiff must also show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 678. When a prison official is sued, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). In *Colon v. Coughlin*, the Second Circuit identified five ways in which a plaintiff may establish a supervisory defendant's "personal involvement" in a constitutional violation:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995). Once a plaintiff properly alleges that a defendant was personally involved in a constitutional deprivation, she "must also establish that the supervisor's actions were

the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). While the Supreme Court's decision in *Iqbal* has raised questions about *Colon*'s viability, the majority of courts in this Circuit have continued to apply the Colon factors absent contrary instructions from the Court of Appeals. *See Booker v. Griffin*, No. 16-CV-0072, 2018 WL 1614346, at *11 (S.D.N.Y. Mar. 31, 2018) (collecting cases); *see also Delee v. Hannigan*, 729 F. App'x 25, 31 (2d Cir. 2018). Indeed, this Court has already expressed its view that Colon remains good law. *See Phillip v. Schriro*, No. 12-CV-8349 (RA), 2014 WL 4184816, at *4 (S.D.N.Y. Aug. 22, 2014).

Plaintiff does not allege direct involvement by any of the Supervisory Defendants in denying Harrell medical care, inflicting physical abuse, or treating him unequally on account of his race. Instead, Plaintiff argues that the Supervisory Defendants should be held liable based on their "acquiescence in," and refusal to remedy, constitutional violations at Fishkill. *See* AC ¶ 122. Both the third and fifth *Colon* categories represent possible bases of liability for these allegations. Under these categories, "allegations as to defendants' knowledge of alleged constitutional violations" are only sufficient if "accompanied by allegations that the defendants had direct responsibility for monitoring the [] violation or that there had been a history of previous episodes putting the defendants on notice of the problem." *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013) (citations omitted). Such "notice" may consist, for example, of an internal report alerting the defendants to the existence of the problem, *see Cash v. County of Erie*, 654 F.3d 324, 327 (2d Cir. 2011), or prior, specific instances of similar unconstitutional violations, *see Doe v. Kaplan*, No. 16-CV-9870, 2018 WL 1449523, at *6 (S.D.N.Y. Mar. 22, 2018). For each of Plaintiff's allegations against the Supervisory Defendants, the Court examines whether she has plausibly alleged that they were on notice of the unconstitutional practice which ultimately led to Harrell's death.

**1.  Deliberate Indifference to Harrell's Medical Needs.**

Plaintiff alleges that the Supervisory Defendants were deliberately indifferent to two of Harrell's medical needs: the mental health care he needed before the assault, and the physical care he needed after the assault occurred. AC ¶ 122; Opp. at 14. Both of these claims are unavailing.

On the issue of mental health care prior to the alleged assault, Plaintiff makes no allegations that he complained of inadequate treatment. Instead, he argues that the reports issued by the Correctional Association of New York put the Supervisory Defendants on notice of "inadequate mental health treatment within Building 21/21A of Fishkill." Opp. at 14. In particular, the 2005 report states that "inmates and staff agree that individuals with mental illness are misunderstood and poorly cared for"; that some correction staff members reported "insufficient mental health staff to assist with mental illness"; and that "there are some concerns that the vast majority of people at Fishkill with mental health needs are in the general population and thus received limited mental health support other than medication." 2005 Report at 1, 3, 5. Plaintiff fails to mention, however, that seven years after the 2005 report, the 2012 report named Fishkill one of the best CANY-visited facilities with respect to the provision of mental health care. 2012 Report at 4. It also ranked Fishkill's SHU—where Harrell was confined shortly before his death—within the top third for mental health care provided to inmates in isolated confinement and SHU units. *Id.* at 32. Finally, it ranked Fishkill in the top quarter of all CANY-visited facilities for frequency of mental health visits to individuals in restricted confinement. *Id.* Thus, the most recent CANY report would not have put a supervisory defendant on notice that provision of mental health care at Fishkill was deficient. If anything, the 2012 report signaled that mental health care provision at Fishkill was relatively positive.

Moreover, the inadequacies in mental health care highlighted in the 2005 and 2012 reports would not have put the Supervisory Defendants on notice of a substantial risk of the type of medical harm that allegedly befell Harrell. The injuries of which Plaintiff complains are narrow: she alleges that the DOCCS and/or the OMH Medical Professionals had a practice that resulted in a failure to prescribe Harrell with medication and a failure to give him the medication he was prescribed. AC ¶ 30. Plaintiff specifically alleges that Harrell had not taken his required medication prior to his death. AC ¶ 44. The CANY reports, by contrast, describe problems with mental health treatment at Fishkill more generally: individuals with mental illness are "misunderstood and poorly cared for" (2005 Report at 1), medical nurses are "insufficiently trained" to care for inmates with mental illnesses (2005 Report at 2), there are not enough mental health personnel (2005 Report at 3), and the facility has not "[e]nsure[d] all people with mental health needs . . . have access to individually tailored programs, treatment, and therapy" (2012 Report at 2).

Where the reports are more specific, they do not support Plaintiff's claims. With respect to delivery of prescribed medication, although 45% of surveyed inmates in 2012 said they experienced problems in getting their medications, this placed Fishkill in the top 40% of this category for all surveyed facilities. 2012 Report at 14. With respect to the failure to prescribe medication, the reports suggest the opposite—that if anything, Fishkill *over*prescribes psychotropic medication for inmates with mental illness. 2005 Report at 1; 2012 Report at 14. There are no findings in the report, by contrast, that would have alerted the Supervisory Defendants that Fishkill staff were failing to prescribe medication for inmates with mental illnesses.

In sum, the shortcomings these reports describe with mental health care provision at Fishkill are either too general to have put the Supervisory Defendants on notice of the issues Harrell faced, or do not support claims regarding Fishkill's failure to deliver Harrell his proper

medication. That the most recent CANY report highlighted the superior quality of mental health care at Fishkill makes even more implausible the theory that the Supervisory Defendants were on notice of constitutional violations and failed to rectify them.

As to the latter claim of deliberate indifference toward Plaintiff's need of medical attention after the assault, there are simply no allegations in the Amended Complaint that the Supervisory Defendants had notice that urgent medical needs were ignored at Fishkill. The Amended Complaint, for example, includes no allegations that, prior to Harrell's death, inmates were denied medical treatment after physical injuries of any kind.

> ### 2.    Deliberate Indifference to a Pattern of Racially Discriminatory Treatment.

Plaintiff's equal protection claim against the Supervisory Defendants, too, fails for lack of personal involvement.[5] The sole allegation Plaintiff makes for this claim against the Supervisory Defendants is that they "have been aware of the existence of the 'Beat Up Squad,' consisting of an all-white group of Fishkill Officers, which operates in a discriminatory manner against incarcerated individuals of minority backgrounds." AC ¶ 124. Neither the Amended Complaint nor the CANY publications, however, provide any allegation of racial discrimination by an all-white group of Fishkill correction officers. The only allegations regarding race, other than during the alleged attack itself, are citations from the CANY reports, which do not mention any instances of racially discriminatory violence. For example, the 2005 report notes that verbal abuse at Fishkill "includ[es] racial slurs," 2005 Report at 4, and the 2012 report mentions the prevalence of racial harassment at Fishkill. 2012 Report at 24, 57. These generalized claims of racial harassment,

---

[5] The Court notes that Plaintiff does not appear to allege an underlying equal protection violation against any of the non-Supervisory Defendants. Cf. Opp. at 19 (discussing "Equal Protection claim against the Supervisory Defendants").

however, do not identify any specific actors or incidents, and fail to plausibly allege that the Supervisory Defendants disregarded a serious risk of substantial physical harm facing Harrell because of his race.

### 3. Deliberate Indifference to Physical Abuse on the Evening Shift at B21 and B21A at Fishkill.

Plaintiff's final allegation against the Supervisory Defendants is that they "failed to protect inmates, including Harrell, from the known and persistent brutality of the Beat Up Squad." Opp. at 15. Plaintiff again argues that the CANY reports put the Supervisory Defendants on notice of constitutional violations, and again, this argument fails. Both the 2005 and the 2012 CANY reports include a number of troubling observations about physical abuse at Fishkill, including specific references to the 3–11 p.m. shift and Building 21 and 21A. The 2005 report focuses on the "widespread view" that "officers on the 3:00 to 11:00pm shift, who tend to be inexperienced, are prone to abusive behavior and intimidation of inmates." 2005 Report at 1; *see also id.* at 10, 11. The 2012 report is more detailed, including an entire section on "Problematic Locations and Shifts." In relevant part, this section reads as follows:

> Questions about particular locations or shifts where abuses occur more frequently garnered a higher response rate than all other open-ended survey questions regarding relations with staff, highlighting the extent of confrontations in these particular areas. Specifically, both the evening shift (3pm-11pm) and dorms 21 and 21A were repeatedly mentioned in interviews, general survey comments, and when asked specifically about specific locations/times of abuse. One respondent referred to the staff during this shift as "team beatdown," another simply "trouble" .... The examples of harassment and provocation of incarcerated persons by the evening staff were similarly echoed when discussing the staff at Buildings 21 and 21A and their yard. . . . Consistent with a significant number of reports of physical abuse facing incarcerated individuals in these areas, one survey respondent noted that staff "puts their hands on you all the time," while another noted that people fear going to the yard because they do not want to "get groped."

2012 Report at 23. The report goes on to recommend that Fishkill "review staff behaviors during the 3:00 p.m. to 11:00 p.m. shifts and those stationed at dorms 21 and 21A, and take appropriate action to address any identified staff abuse." *Id.* at 57.

While these reports indicate the general existence of abusive practices at the same unit and shift where and when Harrell was killed, Plaintiff cannot rely on these two reports alone to plausibly allege that the Supervisory Defendants either had notice of an ongoing constitutional violation which they failed to remedy, or that they allowed a policy under which unconstitutional practices occurred to continue. Another court in this Circuit addressed a similar issue in *Pattiasina v. Sewalt*: whether the superintendent of Elmira Correctional Facility had notice of constitutional violations during the 3–11 p.m. shift at the facility based on the findings of a CANY report. No. 12-CV-6170, 2015 WL 5725139 (W.D.N.Y. Sept. 29, 2015). In *Pattiasina*, the court noted that "[t]he CANY report does not provide specific information regarding the other Defendants in this case, or regarding this incident, or any other basis upon which liability could be imposed on a supervisor. Indeed, the report does not single out any officers, single out a particular location in the prison where multiple attacks previously occurred, or anything along those lines that would provide a specific basis for a supervisory official to respond." *Id.* at 6.

With one exception, this description applies to the CANY reports at issue here. Unlike the report in *Pattiasina*, the 2012 CANY report on Fishkill does identify Buildings 21 and 21A as particularly problematic, but it does not enumerate how frequently or in what manner abuses took place at these locations. Although the 2012 report includes more than just allegations of "abusive-pat frisks," as Defendants claim—the report states that "particularly in the evening shift and in housing areas 21 and 21A," CANY received complaints of "sexual and other abuse," 2012 Report at 2—it does not include any allegations that officers on the evening shift employed excessive uses

of force. Although there is no requirement that a plaintiff allege that a defendant has previously encountered, and has failed to remedy, precisely the same constitutional injury of which the plaintiff complains, evidence from past incidents must provide "notice of the problem." *Parris*, 947 F. Supp. 2d at 364. As another court in this district has explained, even reports that correction officers were "engaging in minor acts of physical abuse such as shoving or pushing inmates" would not put a supervisory official "on notice of a risk of [a correction officer] using excessive force. *Voorhees v. Goord*, No. 05–CV–1407, 2006 WL 1888638, at *5–6 (S.D.N.Y. 2006). The alleged "problem" in this case, as articulated in the Amended Complaint, was a pattern of abuse which included "brutal physical attacks," AC ¶ 121, and "excessive use of violence on inmates." Opp. at 7. Whether or not these allegations are true, there is nothing in the CANY reports which would have alerted the Supervisory Defendants to the risk of such harm befalling Harrell.

## B.    Claim Against CO Charpentier

Defendants single out CO Charpentier as the only correction officer about whom no specific allegations are made in the Amended Complaint with respect to the April 21, 2015 incident. The only specific allegation regarding CO Charpentier is that he was one of a number of officers who "repeatedly punished without cause, beat[], and abused" Harrell "[f]rom the moment Mr. Harrell arrived at Fishkill." AC ¶ 35. No facts are alleged, however, regarding when, where, or how CO Charpentier did this. Plaintiff attempts to supplement the Amended Complaint in her memorandum with additional facts but of a different nature, claiming now that CO Charpentier "placed Mr. Harrell in solitary confinement" and, as discussed below, "was involved in the conspiracy to cover up claims related to Mr. Harrell's murder." Opp. at 20. But neither of these two allegations appears at any point in the Amended Complaint, let alone in the paragraphs Plaintiff cites. *See* AC ¶¶ 36–39; 105–118. This attempt to supplement threadbare allegations

against CO Charpentier is unavailing, as the Court "need not consider facts that could have been pleaded in plaintiff's original complaint." *Butler v. Obama*, 814 F. Supp. 2d 230, 239 (E.D.N.Y. 2011).

Even if these facts had been properly pled in the Amended Complaint, however, they would not amount to a plausible allegation of a § 1983 violation. Without any allegations that CO Charpentier was aware of Harrell's mental health diagnoses or otherwise knew that he was placing Harrell at a substantial risk of serious harm, *see Farmer*, 511 U.S. at 828, Plaintiff fails to explain how CO Charpentier was deliberately indifferent under the Eighth Amendment. Plaintiff's § 1983 claim against CO Charpentier is therefore dismissed.

### C.    Mental Health Claim Against All Defendants

Defendants also move to dismiss Plaintiff's claim that Defendants "failed to diagnose and/or treat Mr. Harrell's Serious Mental Illness."[6] The target of this claim is unclear. On the one hand, it appears directed at only the Supervisory Defendants, as it is placed among other allegations regarding the Supervisory Defendants. AC ¶ 123. On the other hand, it alleges that "these Defendants" "fail[ed] to diagnose and/or treat Mr. Harrell's Illness, and thereafter, brutaliz[ed] him in a way that can only be described as torture." *Id.* These latter allegations appear directed at the non-Supervisory Defendants who were directly involved in Harrell's treatment.

Regardless, Plaintiff makes no individualized allegations about how any of these defendants, Supervisory or otherwise, were involved in Harrell's mental health care. *See* Defs.

---

[6] This claim is distinct from Plaintiff's claim for deliberate medical indifference with respect to the assault, which Defendants have not moved to dismiss and will proceed.

Memo. at 5.[7] Absent any specific allegations regarding Defendants' involvement in the provision of Plaintiff's mental health treatment, Plaintiff's claim on this issue is dismissed.

For the foregoing reasons, Defendants' motion as to the First Cause of Action is granted in its entirety.

## II. Second Cause of Action (Against Connolly, DOCCS Medical Professionals, OMH Medical Defendants, the Senior Officers, the NYSCOPBA Defendants, and the Fishkill Officers)

The Second Cause of Action appears to contain two separate conspiracy claims. The first alleges that the Defendants conspired to deprive Harrell of the right to be free from excessive and unreasonable force and seizure; the right to be free from cruel and unusual punishment; and the right to equal protection of the law. AC ¶¶ 133–134. The second alleges that the Defendants conspired to cover up Harrell's fatal beating. AC ¶¶ 132, 135–136.

In a § 1983 conspiracy claim, the plaintiff must allege "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "While 'conclusory allegations' of a § 1983 conspiracy are insufficient, we have recognized that such 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Id.* at 72 (2d Cir. 1999) (citations omitted). To withstand a motion to dismiss, a plaintiff "must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end" as well as "some details

---

[7] With respect to the DOCCS defendants in particular, the 2012 CANY report itself states that "[a]ll mental health services within the DOCCS system are provided by OMH staff rather than DOCCS staff." *Id.* at 4. In light of this statement, which was included in Plaintiff's own submissions, it is difficult to see how the DOCCS Medical Professionals could be held liable for any of Plaintiff's claims arising from a failure to provide adequate mental health services.

of time and place and the alleged effects of the conspiracy." *Romer v. Morgenthau*, 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000) (internal quotation marks omitted).

As an initial matter, Defendants argue in their reply brief that Plaintiff's conspiracy claims should be dismissed because the Amended Complaint violates Rule 8(a) of the Federal Rules of Civil Procedure by failing to specify which individual defendants engaged in which conduct, thus impermissibly grouping these persons together. "While Rule 8 does not prohibit 'collective allegations' against multiple defendants . . . , it does require that the allegations be sufficient to put each defendant on notice of what they allegedly did or did not do." *Howard v. Mun. Credit Union*, No. 05-CV-7488, 2008 WL 782760, at *12 (S.D.N.Y. Mar. 25, 2008) (alteration and internal quotation marks omitted). Thus, absent sufficient factual allegations elsewhere in the complaint, collective allegations can only "enhance the plausibility of [Plaintiff's] conspiracy claims as to defendants . . . identified in the paragraph at issue." *Dunlop v. City of New York*, No. 06-CV-0433, 2008 WL 1970002, at *7 (S.D.N.Y. May 6, 2008).

The Court concludes that Plaintiff has satisfied Rule 8's requirements. Although several of the allegations in the Amended Complaint are generally linked to "the Fishkill Officers" or "Defendants," *see, e.g.*, AC ¶¶ 114, 136(a)–(f), Defendants have been given fair notice of what "the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001). In several instances, Plaintiff plausibly alleges that *all* of the Defendant Fishkill Officers were involved in the relevant unconstitutional conduct. *See, e.g.* AC ¶ 85 ("The Fishkill Officers brought the wheelchair carrying Mr. Harrell towards the building's main walkway where they created a human wall to obstruct the view of witnesses as the wheelchair approached a general population area."); *see Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 771 (S.D.N.Y. 2018) ("Nothing in Rule 8 prohibits collectively

referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."). In other instances, while Plaintiff does not link allegations to particular individuals within the "Fishkill Officers" group, the allegations are factually specific enough that "the Moving Defendants can readily identify the nature of the case." *Vantone Grp. Ltd. Liability Co. v. Yangpu NGT Indus. Co., Ltd.*, No. 13-CV-7639, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015). For instance, each individual Fishkill correction officer can easily determine whether she or he was one of the "number of Fishkill Officers [who] brought a wheelchair and attempted to seat Mr. Harrell's motionless body into the wheelchair." AC ¶ 81. This method of pleading complies with Rule 8. The claims nonetheless fail.

As to the first conspiracy claim, Plaintiff has not alleged that Defendants entered into an *agreement* to deprive him of his rights, only that all of them participated in and/or were present during the assault. "The mere fact that the officers were all present at the time of the alleged constitutional violations is insufficient to support a conspiracy claim." *Delee v. Hannigan*, 729 F. App'x 25, 32 (2d Cir. 2018) (citing *Warr v. Liberatore*, 270 F. Supp. 3d 637, 650 (W.D.N.Y. 2017)). In addition, the fact that all of the Fishkill Officers allegedly cooperated in the assault does not indicate that there was a "prior agreement" to assault Harrell. *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 389 (S.D.N.Y. 2013). Nor had the officers "entered into an understanding" prior to the assault that, after the inmate was assaulted, they would "cover up the situation," as in *Randle v. Alexander*, 960 F. Supp. 2d 457 (S.D.N.Y. 2013). This incident undisputedly stemmed from Harrell's "mental health episode," AC ¶ 54, which none of the defendants are alleged to have anticipated. *See Ivery v. Baldauf*, 284 F. Supp. 3d 426, 440 (W.D.N.Y. 2018) (finding no agreement for conspiracy purposes, in part because "[t]he underlying incident began suddenly"); *see also Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 508 (S.D.N.Y. 2008) (no allegation of agreement in conspiracy claim). Without any allegation of an

agreement between two or more defendants, the Amended Complaint does not state a claim for conspiracy based on the assault itself.

The second conspiracy claim, regarding the cover-up of Harrell's death, is dismissed as to all Defendants based on the well-established proposition that post-mortem cover-ups are not actionable conspiracies because a deceased person does not have constitutional rights. In *Ford v. Moore*, 237 F. 3d 156 (2d Cir. 2001), the Court of Appeals held that any claim of a decedent against defendant police officers who allegedly conspired to cover-up unconstitutional conduct during an attempt to prevent the decedent from committing suicide "extinguished" upon his death. *Id.* at 165. The Court explained that "the civil rights of a person cannot be violated once that person has died," *Id.* (quoting *Silkwood v. Kerr–McGee Corp.*, 637 F.2d 743, 749 (10th Cir. 1980)), and noted that the plaintiff—the administratrix of the decedent's estate—had not alleged claims in her capacity as administratrix. *Id.*

In this case, the Amended Complaint alleges that Defendants conspired to deprive *Harrell* of his constitutional rights by covering up his death, based on conduct that took place once he had died. Although an alleged conspiracy to violate a decedent's rights beginning prior to the decedent's death may be actionable, *see Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 691 (S.D.N.Y. 2004), the Amended Complaint makes clear that the alleged cover-up began *after* Harrell had died. For example, Plaintiff alleges that a number of Fishkill correction officers attempted to seat Harrell's motionless body into a wheelchair "to make it appear as though Mr. Harrell was still alive," AC ¶¶ 81–82, and thereafter "created a human wall to obstruct the view of witnesses as the wheelchair approached a general population area." *Id.* ¶ 85. All of the remaining allegations regarding Defendants' efforts to "cover-up the cause of Mr. Harrell's death" relate to

actions after Harrell died.[8] There are no plausible allegations in the Amended Complaint that "post-mortem actions are sufficiently linked to pre-death conspiratorial actions." *Morris*, 297 F. Supp. 2d at 691 (quoting *Henderson v. Gomez*, No. C–93–0888, 1993 WL 299363, at *5 (N.D. Cal. July 23, 1993). Moreover, Plaintiff does not make any allegations in the Second Cause of Action based on her capacity as administratrix of decedent's estate. *See Ford*, 237 F.3d at165. Rather, she claims that the conspiracy to cover-up Harrell's death "deprived *Mr. Harrell* of rights, privileges, and immunities secured by the Constitution and laws of the United States." AC ¶ 131 (emphasis added).

Even if Plaintiff had properly alleged that Defendants' conspiracy to cover-up Mr. Harrell's death deprived her of a property right to be "fully compensated through a lawsuit," *Barrett v. United States*, 689 F.2d 324, 332 (2d Cir. 1982), an "access-to-courts" claim of this sort would fail nonetheless. Access-to-court claims exist "to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong[,]" *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002), such as, in this case, the wrongful death of a relative. There are two variants of such claims. In a "forward-looking" access-to-courts claim, a plaintiff alleges that "official action is presently denying an opportunity to litigate." *Id.* at 413. The object of a "forward-looking" claim "is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* In a "backward-looking" claim—the viability of which is uncertain in this Circuit, *see Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012)—a plaintiff looks back "to a time when specific litigation ended poorly, or could not have commenced, or could have

---

[8] The same is not true of the underlying § 1983 claims, which arise from alleged actions against Harrell while he was still alive. "When a party dies before pursuing his cause of action under s 1983, the claim survives for the benefit of his estate if applicable state law creates a right of survival." *Barrett v. United States*, 689 F.2d 324, 331 (2d Cir. 1982). New York law provides that a claim arising from the infringement of a decedent's civil rights survives his death and may be asserted by his personal representative, such as Ms. Harrell in this case. *See* N.Y. E.P.T.L. § 11-3.2(b) (McKinney 1982).

produced a remedy subsequently unobtainable." *Id.* Here, a right-of-access claim of either variant fails. Plaintiff does not seek the removal of a "frustrating condition." *Id.* Nor has Plaintiff alleged that the cover-up conspiracy prevented her from litigating underlying claims against the State Defendants. Indeed, she brings those very claims in this action. *See Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *8 (S.D.N.Y. Jan. 13, 2015). Thus, even assuming the State Defendants conspired to cover up the cause of Harrell's death, the facts alleged do not create a reasonable inference that the cover-up denied Plaintiff access to the courts. As such, this second conspiracy claim fails, and the Second Cause of Action is dismissed in its entirety.

The Court notes, however, that all of the conduct alleged in support of the Second Cause of Action may be relevant to assessing the excessive force and deliberate medical indifference claims, which Defendants have not moved to dismiss.

### III.    Third, Fourth, and Fifth Causes of Action (Against NYSCOPBA, Sgt. Guarino, and the Fishkill Officers)

In the Third, Fourth, and Fifth Causes of Action, Plaintiff alleges that the NYSCOPBA Defendants, Sgt. Guarino, and the Fishkill Officers conspired to impede the due course of justice in violation of the second clause of 42 U.S.C. § 1985(2), conspired to interfere with Harrell's civil rights in violation of 42 U.S.C. § 1985(3), and neglected to prevent interference with Harrell's civil rights in violation of 42 U.S.C. § 1986.

The statutes underlying these three causes of action all require the showing of a conspiracy motivated by discriminatory animus. The second clause of § 1985(2)—the only clause relevant here—provides a cause of action where "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any

State or Territory, with intent to deny to any citizen the equal protection of the laws." 42 U.S.C. § 1985(2). Similarly, § 1985(3) requires a plaintiff to show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (citation omitted). Finally, Section 1986 "provides a cause of action against anyone who having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999) (citation omitted). In other words, "a § 1986 claim must be predicated upon a valid § 1985 claim." *Id.* Thus, "[Sections] 1985 and 1986 require 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

The Court need not assess the viability of Plaintiff's underlying conspiracy claims, as she has not plausibly alleged that Defendants' actions were motivated by "class-based, invidious discriminatory animus." *Id.* at 201–02. Indeed, there are only two plausible allegations in the Amended Complaint related to Defendants' discriminatory animus: during the assault, "one or more of the Fishkill Officers yelled, 'You fucking nigger,'" AC ¶ 68, and in the aftermath of the assault, "Defendant Fishkill Officers have called witnesses who have spoken out about Mr. Harrell's murder 'Nigger lovers.'"[9] AC ¶ 115. While utterly reprehensible, these alleged

---

[9] The conclusory allegation that an all-white gang known as the "Beat Up Squad" targeted minority inmates and was known to the Supervisory Defendants is without support, contrary to Plaintiff's shifting claims. *See* AC ¶ 147 (Defendants have known about Beat Up Squad since 2012); Opp. at 31 (Defendants have known about Beat Up Squad since 2005). As discussed above, the only related reference to such a "squad" is one respondent's reference to

statements, if true, do not alone amount to a violation of § 1985 or §1986. As one court in this district has explained:

> "[O]ne Defendant's use of a racial slur does not plausibly suggest a meeting of the minds in agreement to effect a deprivation of constitutional rights. . . . Reprehensible as it is, a single use of a racial epithet by a single officer does not . . . plausibly indicate that the [] individual Defendant officers (or even a subset of them) entered into any sort of agreement to deprive [the decedent] of constitutionally protected rights, let alone one based on collective racial or personal animus."

*Chamberlain*, 986 F. Supp. 2d at 389. This proposition applies with equal force here, where two racial epithets were allegedly uttered, at different times and by unidentified individuals. *Cf. Sanders v. Long Island Newsday*, No. 09-CV-2393, 2015 WL 5475694, at \*12, 15 (E.D.N.Y. July 14, 2015) (recommending denial of summary judgment as to § 1985(3) claim where multiple named officers undisputedly used racial epithets during interrogation of plaintiff), *report and recommendation adopted sub nom. Sanders v. Garden City Police Dep't*, No. 09-CV-2393, 2015 WL 5518589 (E.D.N.Y. Sept. 16, 2015). Nor is Plaintiff's allegation that "some of" of the Fishkill Officers are members of the all-white "Beat Up Squad," without identifying which officers were in the group, enough to reasonably infer that any specific officer—let alone all of them—acted against Harrell with discriminatory animus. AC ¶ 62. The same applies to Plaintiff's vague allegation that these Defendants "knew" about a racially discriminatory, all-white "Beat Up Squad." AC ¶ 147. As Plaintiff has failed to plausibly allege discriminatory animus as required by § 1985 and §1986, the Court need not address the other elements of these claims. The Third, Fourth, and Fifth Causes of Action are therefore dismissed.

---

"team beatdown" when discussing the evening shift at Fishkill. 2012 Report at 23. No reference is made in either CANY report to racial undertones of such a group.

## IV. Sixth Cause of Action (Against DOCCS)

The Sixth Cause of Action, a Title VI claim against DOCCS, is based on a portion of the conduct alleged in the First Cause of Action, namely, the Supervisory Defendants' deliberate indifference toward the "Beat Up" squad. *See* Opp. at 35; AC ¶¶ 160–64. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "In order to establish a claim based on [Title VI], the plaintiff must show, *inter alia*, that the defendant discriminated against him on the basis of race, that that discrimination was intentional, and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (citations and internal quotation marks omitted).

In this case, Plaintiff does not allege that Defendant DOCCS had an official policy of discrimination, but rather that "the decision makers of DOCCS and OMH" were "deliberately indifferent to the 'strong likelihood' of a violation of individuals' constitutional rights." Opp. at 35. The Supreme Court has held that, for claims not involving an official policy of the defendant, "a damages remedy will not lie . . . unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [defendant's] behalf has actual knowledge of discrimination in the [defendant's] programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Although *Gebser* involved a Title IX claim, the Second Circuit has applied *Gebser*'s "actual knowledge" requirement to Title VI claims. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n.9 (2d Cir. 2012).

31

For the reasons stated in Part I.B, Plaintiff has failed to plausibly allege that any Supervisory Defendant was aware of racially discriminatory treatment at Fishkill, let alone failed to adequately respond to it. The Sixth Cause of Action is therefore dismissed.

## V.    Seventh Cause of Action (Against DOCCS and OMH)

Plaintiff next alleges that Defendants did not accommodate Harrell's disability, both in failing to "designate Mr. Harrell as OMH Level 1 due to his Serious Mental Illness," AC ¶ 176, and in failing to provide emergency mental health care for Harrell after two inmates requested such care for him. AC ¶ 172.

To establish a violation of the ADA or Rehabilitation Act, a plaintiff must prove that "(1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 153 (2d Cir. 2013). Although the Second Circuit has stated that the ADA and the Rehabilitation Act "impose identical requirements," *see Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999), it has also clarified that they require different showings of intentional discrimination to state a claim. *See Garcia v. S.U.N.Y. Health Scis. Ctr. Of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001). In *Garcia*, the Court of Appeals held that a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either "discriminatory animus or ill will due to disability," mirroring Congress's enforcement power under § 5 of the Fourteenth Amendment to proscribe conduct that violates the equal protection guarantees of this Amendment. *Id.* at 108, 115. Only in these limited circumstances would a damages suit comport with Congress's abrogation of state sovereign immunity in the enactment of Title II. *Id.* at 111. While the Supreme

Court's subsequent decision in *Georgia*, led to "continued uncertainty as to the vitality *of Garcia*"
in this Circuit, the Court of Appeals has continued to require "proof of discriminatory animus" for
damages claims under Title II based on an equal protection violation, *Davis v. Shah*, 821 F.3d 231,
260 (2d Cir. 2016), as has this Court. *See Stewart v. City of New York*, No. 15-CV-4335 (RA),
2018 WL 1633819, at *4 (S.D.N.Y. Mar. 31, 2018).

For claims under § 504 of the Rehabilitation Act, by contrast, "deliberate indifference
remains the necessary showing, . . . since the [] Act was enacted pursuant to Congress's Spending
Clause authority and therefore does not require that damage remedies be tailored to be congruent
and proportional to the proscriptions of the Fourteenth Amendment." *Garcia*, 280 F.3d at 115.
Thus, § 504 of the Rehabilitation Act "reach[es] to knowing discrimination in the absence of
animus." *Viera v. City of New York*, No. 15-CV-5430, 2018 WL 4762257, at *14 (S.D.N.Y. Sept.
30, 2018) (quoting *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 347 (11th Cir. 2012)).
Still, "deliberate indifference must be a 'deliberate choice[,] rather than negligence or bureaucratic
inaction.'" *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (citation
omitted). Thus, a plaintiff must show that "a policymaker acted with at least deliberate indifference
to the strong likelihood that a violation of federally protected rights will result from the
implementation of the [challenged] policy . . . [or] custom." *Id.* at 275. In other words, while the
ADA and the Rehabilitation Act "impose identical requirements," the latter demands a lesser
showing of intentional discrimination. *Rodriguez*, 197 F.3d at 618.

Neither of Plaintiff's two allegations state a claim for relief, under either the ADA or
Rehabilitation Act standard for showing intentional discrimination. As to the claim that Defendants
"depriv[ed] and exclude[ed] Mr. Harrell of OMH level one services required by reason of his
disability," AC ¶ 171, no factual allegations are made to support this claim. Moreover, there is no

explanation in the Amended Complaint as to how this "deprivat[ion]" left Harrell "excluded from participation in a public entity's services, programs or activities or [] otherwise discriminated against by a public entity." *Mary Jo C.*, 707 F.3d at 153.

As to the second claim, Plaintiff has failed to plausibly allege that Defendants' failure to accommodate Harrell's need for emergency mental health care was motivated by discriminatory intent. Whether under the discriminatory animus standard under Title II of the ADA or the deliberate indifference standard under § 504 of the Rehabilitation Act, the Court cannot reasonably infer that Defendants failed to respond appropriately to Harrell "by reason of [his] disability." 42 U.S.C. § 12132. Plaintiff argues that this case is similar to *Felix v. City of New York*, 344 F. Supp. 3d 644 (S.D.N.Y. 2018), where Judge Nathan held that the plaintiff had plausibly alleged that the City failed to accommodate the decedent's disability by moving to effectuate his arrest and ultimately shooting him while he experienced a mental health crisis. The Court disagrees. In *Felix*, the plaintiff made factual allegations regarding the City's "fail[ure] to train officers with respect to the treatment of individuals with mental illness." *Id.* at 666. Specifically, the plaintiff there pointed to "training deficiencies of which [the defendants] were aware and which existed with respect to populations police would necessarily encounter as they did their duties." *Id.*

No such allegations have been made here. Harrell "merely asserts that his disability was not adequately treated, not that he was treated inadequately because of his disability." *Varney v. Many*, No. 13-CV-5285, 2015 WL 1730071, at *3 (S.D.N.Y. Apr. 14, 2015). The allegation that Defendants failed to adequately treat Harrell's mental health emergency after two inmates sought help on his behalf does not, in itself, support a reasonable inference that Defendants' failure was "due to [his] disability." *Mary Jo C.*, 707 F.3d at 153. Even under the Rehabilitation Act's more relaxed standard of deliberate indifference, the Amended Complaint includes no plausible

34

allegations that any defendant failed to respond to a "strong likelihood that a violation of federally protected rights w[ould] result from the implementation of [a] challenged policy or custom." *Loeffler*, 582 F.3d at 275 (alterations omitted). Indeed, no such policy or custom is identified in the Amended Complaint. The Court reiterates that it does not address whether the non-Supervisory Defendants were deliberately indifferent to Harrell's medical needs, as Defendants have not moved to dismiss this claim. *See* Defs. Memo. at 38 n.14. On the ADA and Rehabilitation Act claims, however, Defendants' motion to dismiss must be granted.

## VI. Eighth, Tenth, and Eleventh Causes of Action (Against OMH Commissioner Sullivan and the OMH Medical Professionals)

The Eighth, Tenth and Eleventh Causes of Action are a series of state law claims against OMH Commissioner Sullivan and OMH Medical Professionals. Because these claims are brought against the same defendants based on similar conduct, the Court considers them together.

### A. Claims Against the OMH Medical Professionals

Defendants first argue that these claims are time-barred. As to Plaintiff's wrongful death claim against the OMH Medical Professionals, Defendants allege that the statute of limitations for this claim expired on April 21, 2017, and that Plaintiff did not amend her complaint to identify these defendants by name until May 11, 2018.[10] Plaintiff does not dispute that the New York statute governing wrongful death claims has a two-year statute of limitations, *see* EPTL § 5–4.1(l), and that April 21, 2017 was the expiration date for her claim. According to Plaintiff, however, these claims relate back to the original Complaint under Fed. R. Civ. P. 15(c)(1) and N.Y. C.P.L.R. § 203.

---

[10] The original Complaint identified them solely as unnamed "the OMH Medical Professionals." Complaint ¶ 16.

Fed. R. Civ. P. 15(c) governs the relation back of amendments to pleadings. The Rules

Advisory Committee added Rule 15(c)(1)(A) in 1991 to "make . . . clear that [Rule 15] does not

apply to preclude any relation back that may be permitted under the applicable limitations law,"

Fed. R. Civ. P. 15, Advisory Comm. Notes 1991, such as New York's general relation back statute,

N.Y. C.P.L.R. § 203. Rule 15(c)(1)(A) therefore directs the Court to consider both federal and

state law and employ whichever affords a "more forgiving" principle of relation back. *Id.*; *see*

*Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013). As C.P.L.R.§ 203 "closely tracks the federal

relation-back requirement of [Fed. R. Civ. P.] 15(c)(1)(C)," the Court considers them in tandem.

*Vasconcellos v. City of New York*, No. 12-CV-8445, 2014 WL 4961441, at *8 (S.D.N.Y. Oct. 2,

2014). For a claim against a defendant to relate back under Rule 15(c)(1)(C), the following

requirements must be met:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2)
> the party to be brought in must have received such notice that it will not be
> prejudiced in maintaining its defense; (3) that party should have known that, but for
> a mistake of identity, the original action would have been brought against it; and .
> . . [4] the second and third criteria are fulfilled within 120 days of the filing of the
> original complaint, and ... the original complaint [was] filed within the limitations
> period.

*Id.* Similarly, under C.P.L.R. § 203, claims against a new defendant relate back to timely-filed

pleadings when:

> (1) the new claim arose out of the same conduct, transaction or occurrence as the
> original allegations; (2) the new party is united in interest with the original
> defendant, and by reason of that relationship can be charged with such notice of the
> institution of the action that he will not be prejudiced in maintaining his defense on
> the merits; and (3) the new party knew or should have known that, but for a mistake
> as to the identity of the proper parties, the action would have been brought against
> him as well.

*Id.* The third prong of these statutes is the only one relevant here. Although "Rule 15(c) explicitly

allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties

. . . , the failure to identify individual defendants when the plaintiff knows that such defendants

must be named cannot be characterized as a mistake." *Hogan v. Fischer*, 738 F.3d 509, 517–18 (2d Cir. 2013) (quoting *Barrow*, 66 F.3d at 470). Most federal district courts construing the term "mistake" in C.P.L.R. § 203 have held that it means the same thing as in Fed. R. Civ. P. 15(c). *See Briggs v. County of Monroe*, 09–CV–6147W, 2016 WL 1296060, at *10 (W.D.N.Y. Mar. 29, 2016) (citing cases). Thus, failing to identify a defendant when the plaintiff knows the defendant must be named does not constitute a "mistake" under either statute.

Here, Plaintiff acknowledges that she failed to name the OMH Medical Professionals based on "initial ignorance to [their] identities." Opp. at 40. Under the foregoing Second Circuit precedent, this does not constitute a "mistake" for purposes of either federal or state relation-back rules. Thus, Plaintiff's amendment to the Eighth Cause of Action does not relate back to the timely-filed original Complaint.

Nor is the amended wrongful death claim exempt from time-barring under N.Y. C.P.L.R. § 1024, a procedural rule permitting John Doe substitutions *nunc pro tunc* in certain circumstances. Under § 1024:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

*Id.* "To take advantage of § 1024, a party must meet two requirements. First, the party must 'exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name.' Second, the party must describe the John Doe party 'in such form as will fairly apprise the party that [he] is the intended defendant.' *Hogan*, 738 F.3d at 519 (citations omitted).

"Section 1024's 'due diligence' requirement is not forgiving." *Barrett v. City of Newburgh*, 720 F. App'x 29, 33 (2d Cir. 2017). "The onus of identifying an officer defendant's name, or at

least making a good faith effort, lies on the plaintiff." *Id.* The Court's review of the docket for this case reveals no efforts by Plaintiff to identify the OMH Medical Professionals by name prior to April 21, 2017. All the docket indicates is that Plaintiff served initial discovery demands on the State Defendants on July 20, 2017. Dkt. 92 ¶ 14; *see also* Reply Memo. at 16. Indeed, Plaintiff does not argue that she exercised due diligence to identify the OMH Medical Professionals, nor does she mention C.P.L.R. § 1024 at all in her opposition papers. For these reasons, the Court grants Defendants' motion to dismiss the Eighth Cause of Action as to Defendants Endrizzi, Laufman, and Zaprowski.

Defendants' timeliness argument with respect to the amended negligence claim in the Tenth Cause of Action is slightly different. Defendants argue that the amendment naming the OMH Medical Professionals is time-barred because the underlying claim was, "in reality," for medical malpractice, which has a two-and-one-half year statute of limitations, N.Y. C.P.L.R. § 214-a, as opposed to negligence, which has a three-year statute of limitations. N.Y. C.P.L.R. 214; Reply at 20; *see Bleiler v. Bodnar*, 65 N.Y.2d 65, 73, 479 N.E.2d 230, 235 (1985). The amendment naming the OMH Medical Professionals would thus be untimely if construed as a medical malpractice claim, but timely if construed as a negligence claim, as more than two-and-one-half years—but not three years—passed between Harrell's death and the filing of the Amended Complaint.

On this issue, the New York Court of Appeals has distinguished claims of "negligence in furnishing medical treatment to a plaintiff" from those of "failure in fulfilling a different duty." *Id.* at 891. "When the duty owing to the plaintiff by the defendant arises from the physician-patient relationship or is substantially related to medical treatment, the breach thereof gives rise to an

action sounding in medical malpractice as opposed to simple negligence." *Papa v. Brunswick Gen. Hosp.*, 132 A.D.2d 601, 603, 517 N.Y.S.2d 762, 763 (1987).

Here, Plaintiff's negligence claim against the OMH Medical Professionals is "substantially related to medical treatment," and is therefore properly viewed as a medical malpractice claim. *Id.* Both parts of Plaintiff's negligence allegation against the OMH Medical Professionals are, in reality, for medical malpractice. First, Plaintiff alleges that the OMH Medical Professionals "knew of Mr. Harrell's condition and his tendency to exhibit delusional behavior," AC ¶ 29, having diagnosed him with mood disorder, antisocial personality disorder, and bipolar disorder, *id.* ¶ 42, and having overseen his medication needs to treat his bipolar disorder for years. *Id.* ¶ 43. According to Plaintiff, these defendants "had a policy or practice that resulted in the failure to prescribe Mr. Harrell medication, the failure to provide medicine prescribed and the failure to provide the necessary treatment to address his bipolar disorder." AC ¶ 30. Plaintiff also alleges that the OMH Medical Professionals did not ensure that Harrell had taken his required medication prior to the incident. AC ¶ 44.

These are not allegations of simple negligence. Although this Court is mindful of the "analytical difficulty of separating the medical from the nonmedical services furnished by mental health care professionals," *Karasek v. LaJoie*, 92 N.Y.2d 171, 177 (1998), Plaintiff herself has alleged that the OMH Medical Professionals were "medical and mental health care providers, AC ¶ 17, who were responsible for Harrell's medical needs. *Id.* ¶ 43. Moreover, Defendant Laufman is identified as a nurse, *id.* ¶ 54, and the New York Court of Appeals has confirmed that nurses' acts bearing a substantial relationship to the rendition of medical treatment may fall under the heading of medical malpractice, rather than simple negligence. *See Bleiler*, 65 N.Y.2d at 74. Even Plaintiff's allegations that a "policy or practice" led to Harrell's medical problems do not constitute

claims of negligence. AC ¶ 30. It is true that New York courts have treated some cases involving hospital policies or procedures as simple negligence cases, rather than as medical malpractice cases. But the relevant distinction under New York law is between claims involving the "furnishing [of] medical treatment to a patient" and claims involving institutional breaches of a duty "to use due care in selecting and furnishing personnel" or other non-medical duties. *Bleiler*, 65 N.Y.2d at 73. Unlike, for example, the claim that a hospital employs inadequate procedures for blood screening and testing, which "does not implicate questions of medical competence or judgment linked to the treatment of [an individual]," *see Weiner v. Lenox Hill Hosp.*, 88 N.Y.2d 784, 788 (1996), Plaintiff has alleged that these three medical professionals had a practice of failing to abide by their professional duties in delivering Harrell proper care.

Second, Plaintiff alleges that during and after the incident, the OMH Medical Professionals "ignor[ed]" and "failed to treat" Harrell until after the allegedly injured officers were treated. AC ¶¶ 89–91. The "fail[ure] to provide Mr. Harrell with medical attention when it was urgently needed . . . resulted in his death." AC ¶ 189(b), (c). As with the pre-incident allegations, these do not constitute claims of simple negligence. Assessing whether a duty of care was breached in this case would "depend on an analysis of the medical treatment furnished to [Harrell]," bringing this under the umbrella of medical malpractice. *Weiner*, 88 N.Y.2d at 788. Furthermore, the only specific allegation against an OMH Medical Professional by name, *see* AC ¶ 54, indicates that Nurse Laufman properly instructed a correction officer to bring Harrell to the medical unit. This alleged attempt to provide care for Harrell is hardly a plausible allegation of negligence. As the Tenth Cause of Action as to the OMH Medical Professionals is properly construed as an action for medical malpractice, it is barred by the relevant statute of limitations.

**B.     Claims Against Commissioner Sullivan**

As to the claims against Commissioner Sullivan, who was named in the original Complaint, Defendants first argue that the State, and not Sullivan, is the real party in interest. "Generally, actions against State officers acting in their official capacity in the exercise of governmental functions are deemed to be, in essence, claims against the State and, therefore, suable only in the Court of Claims." *Morell v. Balasubramanian*, 70 N.Y.2d 297, 300, 514 N.E.2d 1101 (1987). The New York Court of Appeals in *Morell* provided a host of examples of suits where the State was and was not the real party in interest. Suits against the State as the real party in interest "involve rights asserted . . . solely against the State," such as a claim for damages based on allegedly unconstitutional procedures employed by the State. *Id.* at 301. By contrast, where a tort suit arises from a breached duty owed individually by a State agent, the State is not the real party in interest. *See id.* at 302 (quoting *Rhynders v. Greene*, 255 A.D. 401, 402, 8 N.Y.S.2d 143 (App. Div. 1938)) (damages claim against a public works superintendent for a negligently constructed drainage system).

Plaintiff's state law claims case fit neatly into the latter category. The rights asserted here are based on an alleged breach of duty by a State officer, not on an allegedly unconstitutional State act or procedure, so the State is not the real party in interest. Claims such as these may be brought outside the Court of Claims, including in federal court. *See Morell*, 70 N.Y.2d at 303. The claims nonetheless fail.

Underlying the Eighth, Tenth, and Eleventh Causes of Action is a claim of negligence against Commissioner Sullivan. The wrongful death claim in the Eighth Cause of Action is based on "the wrongful act, neglect or default of the defendant by which the decedent's death was

caused";[11] the Tenth Cause of Action is a negligence claim; and the Eleventh Cause of Action is for negligent hiring, screening, training, supervision, and retention of the OMH Medical Professional Defendants. Under New York law, "[t]o establish a prima facie case of negligence, a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach was a proximate cause of injury to the plaintiff." *Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at *20 (S.D.N.Y. Aug. 25, 2017).

There are simply no allegations in the Amended Complaint specific to Commissioner Sullivan that can support a claim of negligence. Plaintiff has not plausibly alleged that Commissioner Sullivan's neglect toward a "pattern of abuse and neglect . . . specifically targeting mentally ill inmates" caused Harrell's death, Opp. at 42, nor that Sullivan was negligent in any specific way with respect to the operation of mental health care provision at Fishkill. Plaintiff only alleges that Sullivan, who was "responsible for the operation and administration of all OMH facilities within the department," AC ¶ 16, was aware of the contents of the 2005 and 2012 CANY reports, AC ¶ 102, which alerted her to problems with the evening shift in Buildings 21 and 21A, *id.* ¶ 103. As discussed in Parts I.A and I.C, nothing in the CANY reports would have put Sullivan on notice that the provision of medical care at Fishkill put inmates at a serious risk of harm. For a negligence claim, assuming Commissioner Sullivan possessed a duty to Harrell, it was limited "to risks of harm that [we]re reasonably foreseeable." *Sanchez v. State of New York*, 784 N.E.2d 675, 678 (N.Y. 2002). Even assuming Commissioner Sullivan was familiar with the contents of the

---

[11] *See Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622 (KMK), 2018 WL 1626348, at *23 (S.D.N.Y. Mar. 29, 2018) (wrongful death claim based on negligence requires an "actionable negligence claim"). The other elements of a wrongful death claim are the death of a human being, the survival of distributees who suffered pecuniary loss by reason of the death of decedent and, the appointment of a personal representative of the decedent. *Chong v. New York City Transit Auth.*, 83 A.D.2d 546, 547, 441 N.Y.S.2d 24, 25–26 (1981). There is no dispute that Plaintiff has satisfied these elements. Harrell's death is undisputed, as is Plaintiff's appointment as his personal representative, and the Amended Complaint clearly alleges that Plaintiff has suffered pecuniary loss, including lost earnings, by reason of Harrell's death.

2005 and 2012 CANY reports, these reports would not have made a failure to diagnose or treat Harrell's mental illness or a failure to provide him with medical attention on April 21, 2015 "reasonably foreseeable." *Id.*

Furthermore, Plaintiff does not press a respondeat superior theory of liability for Commissioner Sullivan, nor would such a theory be viable where the state law claims against the OMH Medical Professionals have been dismissed. "Inasmuch as the [employees'] liability . . . was effectively extinguished when the Statute of Limitations on plaintiff's cause of action [] expired, . . . any vicarious liability that [Sullivan] might have had in consequence of [her] employees' alleged misconduct must similarly be deemed extinguished." *Karaduman v. Newsday*, Inc., 51 N.Y.2d 531, 546, 416 N.E.2d 557, 564 (1980). Where "the underlying torts . . . have been dismissed," Plaintiff cannot prevail under the doctrine of respondeat superior. *Moorhouse v. Standard, New York*, 124 A.D.3d 1, 11, 997 N.Y.S.2d 127, 135 (2014).

Finally, as claims for negligent hiring, screening, training, supervision, and retention of OMH Medical Professional Defendants require a viable underlying negligence claim, this cause of action fails as well. *See Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). Furthermore, this tort requires the plaintiff to plausibly allege, "in addition to the standard elements of negligence," that "that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Id.* (citations omitted). Plaintiff has failed to allege that Commissioner Sullivan should have been aware of the OMH Medical Professionals' propensity for conduct which caused Harrell injury, let alone that the OMH Medical Professionals engaged in any unconstitutional acts prior to this incident. *See Colon*, 58 F.3d at 873 (dismissing plaintiff's negligent training and supervision claim because it failed to set forth facts indicating that the employer had knowledge of a correction officer's alleged wrongs).

As Plaintiff has failed to plausibly allege that Commissioner Sullivan was negligent, whether under a wrongful death theory, a simple negligence theory, or a hiring, screening, training, supervision, and retention theory, the state law claims against her must be dismissed. For the foregoing reasons, the Eighth, Tenth, and Eleventh Causes of Action are dismissed in their entirety.

### VII. Ninth Cause of Action (Against OMH Commissioner Sullivan and the OMH Medical Professionals)

Finally, Plaintiff brings a claim under Art. I § 2 of the New York State Constitution against Sullivan and the OMH Medical Professionals. "The New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (citing *Brown v. State of New York*, 89 N.Y.2d 172, 192, 652 N.Y.S.2d 223 (1996)). As discussed, Plaintiff has available remedies under § 1983 claims for excessive force and deliberate medical indifference, neither of which Defendants have moved to dismiss. The "narrow remedy" of a private right of action under the New York State Constitution is therefore inapplicable in this case. *Id.* Defendants' motion to dismiss the Eleventh Cause of Action is granted.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted, and this case will proceed only as to the § 1983 claims for excessive force and deliberate medical indifference. The Clerk of Court is respectfully directed to remove Defendants Anderson, Beroni, O'Connor, Defreese, Annucci, Bellnier, Sullivan, Connolly, Charpentier, New York State Department of Corrections and Community Supervision, and New York State Office of Mental Health from the caption of this case. The Clerk of Court is further directed to terminate the motion pending at docket number 198. To the extent Plaintiff's causes of action are not barred by relevant statutes of

limitations, she may file a second amended complaint within thirty days of this Opinion, provided she has a good faith basis for doing so.

SO ORDERED.

Dated:     August 14, 2019
           New York, New York

Ronnie Abrams
United States District Judge